

**RECEIVED**
Jan 4, 2012
JAN 04 2012
01-04-2012
**THOMAS G. BRUTON**
**CLERK, U.S. DISTRICT COURT**

## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

United States of America ex rel.     )
    )
<u>Darrin Wayne Shatner-#B42950</u>     )
(Full name and prison number)     )
(Include name under which convicted)     )
    )
PETITIONER     )
    )
    vs.     )
    )
<u>Mike Atchison, Warden</u>     )
(Warden, Superintendent, or authorized     )
person having custody of petitioner)     )
    )
RESPONDENT, and     )
    )
**(Fill in the following blank only if judgment**     )
**attacked imposes a sentence to commence**     )
**in the future)**     )
    )
ATTORNEY GENERAL OF THE STATE OF     )
    )
<u>    </u>     )
(State where judgment entered)     )

**12 C 0047**
**Judge George M. Marovich**
**Magistrate Judge Jeffrey T. Gilbert**

Case Number of State Court Conviction:

<u>91-CR-2026</u>

### PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

1. Name and location of court where conviction entered: <u>The Circuit Court of Cook</u>
<u>County, Criminal Division</u>

2. Date of judgment of conviction: <u>May 17, 1993</u>

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)
<u>Murder, Armed Robbery, & Arson</u>

4. Sentence(s) imposed: <u>Death</u>

5. What was your plea? (Check one)     (A) Not guilty     ( **X** )
    (B) Guilty     ( )
    (C) Nolo contendere     ( )

If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

<u>    </u>

Revised: 7/20/05

1

**PART I – TRIAL AND DIRECT REVIEW**

1. Kind of trial: (Check one):     Jury ( X )          Judge only (   )

2. Did you testify at trial?     YES ( X )          NO     (   )

3. Did you appeal from the conviction or the sentence imposed?  YES ( x )  NO (   )

    (A) If you appealed, give the

        (1) Name of court: The Supreme Court of Illinois

        (2) Result:     Conviction & Sentence were Affirmed

        (3) Date of ruling: September 19, 1996

        (4) Issues raised: Ineffective Assistance of Counsel, Waiver of rights
        to be sentenced by a jury, Constitutional violations relating to
        evidence entered in error, i.e. gang membership, practicing of
        religion, drug history not being weighed in mitigation, no space

    (B) If you did not appeal, explain briefly why not: for the rest of the issues.


4. Did you appeal, or seek leave to appeal, to the highest state court?  YES ( X ) NO (   )

    (A) If yes, give the

        (1) Result:      Conviction & Sentence Affirmed

        (2) Date of ruling:  September 19, 1996

        (3) Issues raised: Same issues as stated in line A-4, including invalid
        defense, Trial Counsel's ineffectiveness in not putting the State's
        case to a true adversarial test at sentencing, as well as other
        sentencing errors.

    (B) If no, why not:

5. Did you petition the United States Supreme Court for a writ of *certiorari*?  Yes ( X )   No (   )

    If yes, give (A) date of petition: 3-3-1997     (B) date *certiorari* was denied: May ? 1997

2                                                    Revised: 7/20/05

**PART II – COLLATERAL PROCEEDINGS**

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

   YES ( X )  NO ( )

   With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

   A. Name of court:  The Circuit Court of Cook County, Criminal Division

   B. Date of filing:  January 20, 2006

   C. Issues raised:  Ineffective assistance of counsel, Speedy trial violation

   Mitigation for new sentencing

   D. Did you receive an evidentiary hearing on your petition?  YES ( )  NO ( X )

   E. What was the court's ruling?  _____

   F. Date of court's ruling:  _____

   G. Did you appeal from the ruling on your petition?        YES ( X )  NO ( )

   H. (a)    If yes, (1) what was the result?  Dismissal Affirmed

                    (2) date of decision:    December 21, 2010

       (b)    If no, explain briefly why not:  _____

   I. Did you appeal, or seek leave to appeal this decision to the highest state court?

      YES ( X )  NO ( )

      (a)    If yes, (1) what was the result?  Leave to Appeal was Denied

                    (2) date of decision:    September 28, 2011

      (b)    If no, explain briefly why not:  _____

3

Revised: 7/20/05

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?   YES ( )        NO ( X)

    A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

        1.   Nature of proceeding       _____

        2.   Date petition filed        _____

        3.   Ruling on the petition      _____

        4.   Date of ruling           _____

        5.   If you appealed, what was
            the ruling on appeal?       _____

        6.   Date of ruling on appeal    _____

        7.   If there was a further appeal,
            what was the ruling ?      _____

        8.   Date of ruling on appeal    _____

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?
    YES ( )   NO (XX)

    A. If yes, give name of court, case title and case number: _____

_____

    B. Did the court rule on your petition?  If so, state

      (1) Ruling: _____

      (2) Date: _____

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?   YES ( )        NO (XX)

    If yes, explain: _____

_____

_____

_____

_____

_____

_____

Revised:  7/20/05

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A) Ground one:  Mr. Shatner, was denied the right to effective assistance of counsel under the Sixth and Fourteenth Amendments where his trial counsel failed to file a meritorious motion to dismiss all charges based on on the State's failure to bring Mr. Shatner to trial in a timely manner as required by Statute under the Speedy Trial Provisions.

<u>Supporting Facts:</u>

Mr. Shatner, was not tried within 120 days of his arrest Mr. Shatner was arrested out of state and was returned to the state of Illinois.  At this time 725 ILCS 5/103-5 was in full effect and required a trial of a person in custody within 120 days.  The Statute, unlike the current one, did not require the Defendant to expressly demand  trial and instead placed the onus on the court and the state to see to it that the 120 day rule was not violated.  This was the law of the land in Illinois during the time in question of this there is no dispute.

From October 25, 1990 till February 1, 1991 a period of 99 days, Mr. Shatner, was in custody, (the record is clear on this issue) however he was not taken to court, even though at no time did he agree to any type of a continuance.  That delay must be subtracted from the 120 day statutory limit.  So as of February 1, 1991, only 21 days remained on the 120 day Speedy Trial term.  On February 1, 1991, The State conceded it was was not prepared to proceed with Mr. Shatner's bond hearing, at this point the Court suggested a continuance to March 7, 1991 at which point Defense Counsel responded "Thank you".  Defense Counsel did not state this continuance was by agreement, the record dose not indicate it was by agreement and it was not Mr. Shatner's fault that the State was not prepared to proceed. So the case was continued to March 7, 1991, another 35 days. Now with those 35 days added to the already exhausted 99 days that is 134 days Mr. Shatner had been in custody with out being brought to trial.  This well exceeds the 120 day limit set by

Statute, as defined by 725 ILCS 5/103-5. This in its self mandated a dismissal of all charges brought against Mr. Shatner however this was not done, and the constitutional violations continued. On March 7, 1991, the case was again continued without a bond hearing and nothing of substance being discussed. A continuance was granted with no expressed agreement by Defense Counsel or Mr. Shatner himself. the new date was now April 4, 1991, another 25 days. The same holds true for the continuances issued on May 2, 1991, May 20, 1991, and on May 30, 1991, adding yet another 32 days to the unconstitutional delay in bringing Mr. Shatner to trial. The continuances continued all without Defense Counsel or Mr. Shatner expressly agreeing to the continuances that were being set. In total 228 days elapsed delaying Mr. Shatner being brought to trial that can not be attributed to Mr. Shatner. Had Mr. Shatner's Trail Counsel been effective in his duties to Mr. Shatner, he would have filed a Motion to Dismiss all charges against Mr. Shatner, a motion of which the record is exceedingly clear on as a mater of law would have to have been granted and all charges would have to have been dismissed. It is truly unconstitutional and a huge miscarriage of justice to punish Mr. Shatner, for the errors committed by the State and the Court.

The Illinois Appellate Court, in dismissing this claim, made unreasonable findings of fact and unreasonably applied State and Federal law in concluding that Mr. Shatner was not deprived of effective assistance of Trial Counsel. The Illinois Appellate court likewise made unreasonable findings of fact and unreasonably applied clearly established State and Federal law in affirming the dismissal of this claim. A clear violation of Mr. Shatner's Constitutional rights.

(B) Ground two: Mr. Shatner's 14th. Amendment Due Process constitutional rights were violated when the Trial court refused to grant Mr. Shatner relief requested when he a valid constitutional challenge to his sentence. That had all the proper mitigation been presented at sentencing Mr. Shatner would not have received the sentence of DEATH. Or natural life, but years.

6

<u>Supporting Facts:</u>

Mr. Shatner stands convicted of murder where there is
one victim.  The record does not clearly establish that Mr.
Shatner committed this crime but rather was part of the robbery
he had no idea that the victims life was in danger.  Had Mr.
Shatner, been afforded a full and complete sentencing hearing
where all his evidence in Mitigation had been fully presented
and explored, Mr. Shatner believes he would not have been
sentenced to DEATH.  This was his first adult conviction.  He
was a teenager at the time of the offense.  Life or death were
not the only sentences available to the Trial Court and for
said Trial Court to now say that it's hands are tied on the
issue of sentence because of the blanket Executive order commuting
of all DEATH sentences in Illinois.  This is not a question
of the State trying to revoke a Executive order, but rather
Mr. Shatner, requesting review of the fact that his Death
sentence was unconstitutional, furthermore what the Governor
did in no way bar  Mr. Shatner from seeking review of his
constitutional rights having been violated.  Mr. Shatner is
not challenging if the Death Penalty was constitutional at the
time he was sentenced, but rather that his hearing for said
sentence was unconstitutional when his Due Process rights were
violated.

The Illinois Appellate Court, in dismissing this claim,
made unreasonable findings of fact and unreasonably applied
State and federal law in concluding that Mr. Shatner's
constitutional Due Process rights were not violated.  The
Illinois Supreme Court likewise made unreasonable findings of
fact and unreasonably applied clearly established State and
federal law in affirming the dismissal of this claim.  A clear
violation of mr. Shatner's Constitutional rights.

(C)  Ground Three:  That Mr. Shatner received ineffective
assistance of Trial Counsel when Trial Counsel failed to conduct
a meaningful investigation with respect to Mitigation evidence
thus depriving Mr. Shatner of his Sixth and Fourteenth Amendment
rights.

Supporting Facts:

Mr. Shatner's Trial Counsel failed to conduct even the
minimalist of a meaningful investigation into the mitigating
factors that existed.  The following mitigating factors were
were omitted from Mr. Shatner's sentencing hearing and had they
been presented the outcome would have been different in so much
that Mr. Shatner believes that he would not only have been
sentenced to death but he would have received a sentence within
the statutory limit of 20 to 40 years in the Illinois Department
of Corrections.  There was a Social Worker investigation report
prepared for the Circuit Court of Cook County in 1979, which
included relevant mitigating information evidence.  The report
noted that by the age of of twelve, Mr. Shatner, had severe
emotional problems stemming largely from his abusive and
disinterested parents.  He was placed in eleven schools in six
years.  As this report noted, Mr. Shatner's mother often hit
him for no apparent reason and his parents argued constantly.
The author of the report believed Mr. Shatner's sever emotional
problems required treatment but his parents effectively prevented
any such treatment.  The following year in 1980 and second report
was prepared for the Juvenile Court and again the author noted,
" That this young man should be in therapy..."  However Mr.
Shatner's mother did not seem to interested in getting involved
in therapy, and his father flat out did not want to get involved
in therapy at all.  The same report noted that Mrs. Shatner,
frequently slapped Mr. Shatner, who weighed all of 100 pounds
at the time.  Mr. Shatner's father was a drunk, and he lived
in in constant fear of him.  Mr. Shatner never received any
of the parental support that a growing child needs to be able
to develop in to a emotionally stable teenager, and on to adulthood.
Mr. Shatner, felt extremely insecure and inadequate.  It was
"Obvious" to the probation officer that Mr. Shatner had severe
"emotional problems" traceable directly to his home environment.
Even though they were made aware of the problems their son was
having, Mr. Shatner's, parents remained unconcerned and unwilling
and flat out refused to participate in treatment for their son
thereby making everything worse, for Mr. Shatner.

That same year 1980, a school evaluation was prepared
and the report included more mitigation evidence that Trial
Counsel never even attempted to locate and therefore this
evidence was not introduced at Mr. Shatner's sentencing hearing.
Thus depriving Mr. Shatner, of his Due process rights to
effective assistance of counsel.  The aforementioned report
concluded that, "He (Mr. Shatner) needs the structure and
supervision that is not being achieved at home".  The author
of the report believed that Mr. Shatner was "at the age when
a channeling or redirecting of some of his drives can be achieved."
Mr. Shatner's parents, however refused to come to grips with
their son's behavior and instead continued to physically and
psychologically abuse Mr. Shatner.  Another 1980 school report
likewise reported that Mr. Shatner's emotional and school problems
were linked to his parents abusive behavior, their stormy marriage,
and their utter lack of parental support.  When Mr. Shatner
was able to receive such support as one would expect a child
to receive from his parents, he responded well.  This is noted
in an April 6, 1982, report that Trial Counsel failed to present,
the staff where Mr. Shatner, was in school, then thirteen years
old, reported that his "behavior has improved dramatically."
The report also noted that he was "more realistic," "more honest
and sincere," and that his behavior was "mature".  By age
thirteen, Mr. Shatner was so abused physically and emotionally
by his parents that he could not even sleep in his bed.  He
hid under beds of in closets to escape their abuse.  Another
report chronicled Mr. Shatner's problems and how those problems
were traceable directly to his parents and their indifferent,
irresponsible and psychologically abusive and absent behaivor.

Furthermore Mr. Shatner's Trial Counsel was grossly
ineffective in not presenting Mr. Donald Adair, Mr. Shatner's
paternal grandfather, who would have testified that Mr. Shatner,
was constantly abused by both parents.  Mr. Adair, recalled
one incident in particular when Mr. Shatner's mother had gotten
angry with him, for some reason and **TOOK HIS HEAD AND BANGED
IT AGAINST A STREET POLE.**  Trail Counsel further failed to be
effective when he failed to present evidence that Mr. Shatner
was often left unattended with "Uncle Pat" who proceeded to
sexually molest Mr. Shatner.  This conduct continued for years

while Mr. Shatner was very young between three and eight years old. Mr. Shatner's parents were well aware of Uncle Pat's sexual abuse, however they continued to leave Mr. Shatner with him for extended periods of time.

Yet continuing Trial Counsel's utter failure in the sentencing phase is highlighted by his failure to call mitigation witnesses that would have testified to the following. That Mr. Shatner had suffered from chronic, and sever headaches from a very early age. These headaches were so intense that he would sit holding his head crying for hours. Mr. Shatner's early glue sniffing was to relieve the pain of these headaches as well as to escape the physical and psychological abuse that permeated his home. Mr. Shatner, also has a long and well documented history of seizures, high fevers, chronic intense headaches, and head injuries. All of these contributed to his early drug use, to relieve his physical pain yet Mr. Shatner's Trial Counsel failed to provide this evidence during sentencing, although the conduct of Mr. Shatner's was grossly ineffective at his sentencing hearing it was compounded and made all that more tragic because Mr. Shatner, was facing the DEATH PENALTY, a sentence if gotten wrong there is a very real chance that a person could be put to DEATH and not be deserving of such a punishment. In a report authored by Dr. Harvey E. Gunn, Psychologist, concluded that: There is much evidence to suggest that Mr. Shatner, did not have any intent to commit murder when the crime took place. Given his personality if he if he allowed the the lady he was with to initiate him into intravenous drugs, he would not have been aware of what was taking place. Mr. Shatner's description of being dominated by the lady present fits his personality as seen during this examination of Mr. Shatner. He has massive dependency needs and great idenity confusion.... Considering his lifetime of abuse it would have been very easy for a female to have control over him and to direct him into negative behavior.

Mr. Shatner's Trial Counsel further failed him when he failed to interview the following witnesses, Janet Claar, Sam Lawando, and Shirley Faitz. Had the following people been called during the sentencing phase of Mr. Shatner's trial they would

have testified to the following. Janet Claar, would have testified that Mr. Shatner, and a woman named Jean needed a place to stay. Mr. Shatner told Ms. Claar that he was scared and worried about what was going to happen, but was unable to tell her why. Later when she was alone with Jean Rogoz, Jean told her that there was this guy that she despised and that she wanted to take as much of his drugs and property as she could. According to Ms. Claar, Jean Rogoz stated that when she couldn't find any drugs at his place, she hit him over the head with a lamp a couple of times. They tied the guy up and then Mr. Shatner, went to the living room to get the VCR. At that point, Jean Rogoz set the bedroom on fire. Jean admitted to Ms. Claar, that it was she (Jean Rogoz) who talked Mr. Shatner into taking part in the crime, she did this for him to protect her and get the VCR. Mr Shatner and Jean Rogoz, stayed overnight and the following day Ms. Claar's boyfriend Sam drove Jean Rogoz and Mr. Shatner to Jean's brother's residence so she could get some money. Furthermore Ms. Claar would have testified that Mr. Shatner, & Ms. Rogoz, spent a couple of days with her and her then boyfriend Sam Lawando. That at no time was Ms. Rogoz detained against her will, nor did she appear to be in any distress. A full and complete copy of Ms. Claar's Affidavit is included as part of Exhibit #1.

Mr. Lawando could have testified to the following. in part but not verbatim. He would have said that during the time that Mr. Shatner and Ms. Rogoz stayed with him and Ms. Claar, Mr. Shatner & Ms. Rogoz, did not behave aggressively or argue with one another for the three or four days they stayed there, and it was his impression that she was not in any distress or being held against her will. At one point Mr. Lawando drove Mr. Shatner, & Ms. Rogoz to the business of Mr. Shatner's father to get some money. Afterwards Ms. Rogoz, had Mr. Shanter & Mr. Lawando, stay in the car while she went to meet someone. Ms. Rogoz returned a few minutes later. It was the belief of Mr. Lawando that Ms. Rogoz was with Mr. Shatner of her own free will. Mr. Lawando's complete Affidavit is contained in Exhibit #1.

Ms. Shirley Faitz could have testified to the following in part but not verbatim. That on Setember 1, 1986

she moved into a building owned by Mr. Shatner's mother, that
for at least a week after she moved in Mr. Shatner and a young
blong lady (Ms. Rogoz) came to her apartment on several occasions
and appeared to be high. The blond lady appeared to be there
of her own free will and if she wanted to leave she had many
opportunities to do so.  Mr. Shanter & Ms. Rogoz appeared to
be boyfriend and girlfriend, getting along for approximately
two to three weeks after Ms. Faits moved into the apartment.
Ms. Faits' complete Affidavit has been included in Exhibit #1.
All three of the above mentioned people, Ms. Claar, Mr. Lawando,
and Ms. Faitz, were all ready and willing to testify of Mr.
Shatner's behalf but none were contacted by his attorney.  Where
Mr. Shatner's life hung in the balance this level of effort
and representation on the part of Mr. Shatner's Trial Counsel
woefully fell below the standards as defined as effective
representation.  Thus Mr. Shatner was denied protection granted
to him by the U.S. Constitution.

The Illinois Appellate Court in dismissing this claim
made unreasonable findings of fact and unreasonably applied
clearly established Federal Law.  The Illinois Supreme Court
likewise made the same unreasonable findings of fact and
unreasonably applied clearly established federal Law in affirming
the the dismissal of this claim.

(D)   Ground #4  Mr. Shatner, was denied his constitutionally
guaranteed right to effective assistance of Counsel, under the
the Sixth Amendment or the Illinois Constitution, where his
Trial Counsel presented an invalid, inadequate, & irresponsible
defense.  Although, asserting a lack of intent to kill or having
any participation in the murder.  The jury was left with no
choice but to find Mr. Shatner, guilty of Felony Murder.  This
fully negated and rendered his plea of Not Guilty void and
illusory, therefore denying Mr. Shatner, of his right to an
adversarial, fair, trial by jury.

Support Facts:

It is well established that trial strategy is a issue
that will not be view or second guessed by a reviewing court.
However when such a strategy utterly fails to provide any type

12

of a meaningful adversarial process it can not be considered
sound trial strategy. In this case that is just what happen.
Mr. Shatner's Trial Counsel utterly failed him, by putting
forth a defense that guaranteed not only that he would be found
guilty of felony murder but all but guaranteed that he would
be found eligible for the death penalty. The defense theory
of this case as conveyed by Mr. Satner's Trial Counsel in the
opening statement of the trial stated that Mr. Shater did not
come up with the idea to commit robbery, and that Mr. Shatner
had did all he could to stop Ms. Rogoz from beating the victim
with a lamp. At the close of the guilt-innocence phase of the
trial, Mr. Shatner's Trial Counsel argued that Mr. Shatner was
not guilty of the murder, and at most he was guilty of committing
robbery, this simple statement by Trial Counsel sealed the fate
of Mr. Shatner. The jury was duty bound to find Mr. Shatner
guilty of felony murder, because it is well established that
one need not in anyway have to take physical part in the murder
but only be guilty of a underlying felony that meets the standard
in this case that was robbery, and Trial Counsel basically served
Mr. Shatner, up on a silver platter for the jury! Mr. Snatner
was denied his most basic fundamental Untied States Constitutional
protection that being the right to effective counsel that will
put the State's case to a true adversarial test. This did not
happen in this case, although the Counsel seated with Mr. Shatner
was called his Defense Counsel in truth it was like Mr. Shatner,
had a State Attorney seated next to him during trial. Trial
Counsel's actions made Mr. Shatner's claim of innocence null
and void! Even the Trial Court noted during sentencing that
Mr. Shatner's statements convicted him of felony murder. Trial
Counsel's defense strategy that Mr. Shatner, was only guilty
of the robbery was no defense at all but rather acted as seemed
to be acting as a agent for the prosecution. The odds in this
case were so stacked against Mr. Shatner, he most likely would
have fared much better had he just waived his right to a trial
and plead guilty, the outcome could not have been any worse,
considering the actions of Mr. Shatner's Trial Counsel.
The Defense that Mr. Shatner, received was tantamount to no
defense at all. Even when no theory of a defense is available

if the decision to stand trial has been made, Counsel must hold
the Prosecution's case to the heavy burden of proving a defendant
guilty beyond a reasonable doubt. Granted it is established
that since Mr. Shatner is alleging a deprivation of his Sixth
Amendment right to effective assistance of counsel he must
meet the two pronged test as set out in Strickland -v- Washington
(1) showing that Trial Counsel's performance was deficient,
and (2) that he was prejudiced by Trial Counsel's deficiencies.
However in some limited circumstances prejudiced need not be
and will be presumed if counsel completely fails to act as an
advocate by failing to subject the Prosecution's case to a
meaningful adversarial testing. This is such a case where
Mr. Shatner's Trial Counsel to protect his rights or offer a
valid defense. In this case one of two conclusions can be drawn
either Mr. Shatner's, Trial Counsel was incompetent and unskilled
in criminal law enough to know what the definition of felony
murder is or Trial Counsel was working in league with the
prosecution. Mr. Shatner, is unable to give any other type
of explanation to explain the actions of his Trial Counsel.
Furthermore there are a number of cases at both the State and
Federal level that have had raised an issue like the one that
Mr. Shatner, is raising here, and they have found over and over
again that a new trial was warranted. On this ground as well
as all grounds in this Petition Mr. Shatner, prays this Honorable
Court takes into account that he is not a attorney, has limited
schooling and is doing the best he can to following the guidlines
set out to file his Petition.

    The Illinois Supreme Court in dismissing this claim, made
unreasonable findings of fact and unreasonably applied clearly
established State and Federal law.


(E)    Ground #5


    Mr. Shatner, was denied hie right to the effective assistance
of Trial Counsel, under the Sixth Amendment and the Illinois
Constitution. Mr. Shatner's Trial Counsel, failed to subject
the Prosecution's case that was presented to determine if
Mr. Shatner, was in fact eligible for the Death Penalty. Trial
Counsel failed to put this phase of the proceedings to a true

adversarial test. And utterly failed advocate against a finding
of of eligibility for the Death Penalty.  Thereby virtually
conceding to eligibility.  In violation of the right to an
adversarial and fair sentencing hearing under due process and
the Sixth and Eighth Amendments.

<u>Supporting Facts:</u>

During the eligibility phase of the capital sentencing
hearing, Trial Counsel declined to make an opening statement,
Trial Counsel presented no evidence, and made no argument against
a finding of eligibility for the Death Penalty.  The State
similarly declined to make a opening statement.  However did
call one witness to testify as to Mr. Shatner's date of birth,
and introduced his birth certificate and the jury verdicts of
Mr. Shatner's convictions for murder, & armed robbery.  The
State then rested without making an argument.  The Court then
found Mr. Shatner eligible for the Death Penalty.  During the
Mitigation & Aggravation stage of the hearing Trial Counsel
remarked that Mr. Shanter, was eligible for the Death Penalty
because of the felony murder rule.  This was a misstatement
and grave error on the part of Mr. Shatner's Trial Counsel.
To be eligible under section 9-1(b) (6), 720 ILCS 5/9-1 (b) (6)
a defendant must have acted with the intent to kill the murdered
 individual or with knowledge that his acts created a strong
 probability of death or great bodily harm to the murdered
individual... (720 ILCS 5/9-1(b) (6) (b), as the statute makes
clear, the statutory aggravating factor necessary to impose
the Death Penalty, is not proved by a conviction of felony murder
alone.  A culpable mental state must be proven beyond a reasonable
doubt.  This was not done at Mr. Shatner's eligibility hearing.
Therefore Mr. Shatner, was denied his Constitutionally protected
rights.  It has been held that a new Death Penalty hearing was
required when Trial Counsel erroneously believed that a felony
murder conviction alone, without proof of a culpable mental
state, supported capital eligibility.  Mr. Shatner wishes to
remind this Honorable Court of facts previously mentioned in
this Petition, that relate to Mr. Shatner's drug use, and his
family life growing up, as well as his mental state on the day
of the crime in question.  Therefore had Mr. Shatner's Trial

Counsel performed his duties as required and expected of him
not only by the United States Constitution but by the Illinois
Constitution, and the Cannon Rules governing the proper conduct
of attorneys, and put forth the effort required there is a strong
probability that Mr. Shatner, would have been found NOT eligible
for the Death Penalty. Now the State has argued that since
Governor George Ryan has commuted Mr. Shatner's Death sentence
to Life that this issue is now moot. Mr. Shatner, takes issue
with because had Mr. Shatner's trial Counsel provided effective
assistance he stood a high probability of never receiving a
Death sentence. So Mr. Shatner, prays that this Honorable Court
will review this issue as if the actions of Governor Ryan had
not occurred, and review the actions of his Trial Counsel,
in regards to had Mr. Shatner, received effective assistance
would he still have been found eligible for the Death sentence.
Mr. Shatner's trial Counsel did not contest eligibility because
he believed thatMr. Shatner, was automatically eligible for
the Death Penalty solely because of the felony murder conviction.
There can be no other explanation for Trial Counsel's position
because at the guilt/innocence stage, Trial Counsel contended
that Mr. Shatner did not have a culpable mental state as he
never intended to kill the victim and did not commit the murder.
Trial Counsel even invited the jury to hold an inquiry into
the state of mind of Mr. Shatner. Thus it would seem that Trial
Counsel was contesting the existence of a culpable mental state
at the guilt/innocence stage. Furthermore Trial Counsel utterly
failed to act as Mr. Shatner's advocate at the eligibility stage
thus violating Mr. Shatner's rights under the Sixth and
fourteenth Amendments of the United States Constitution and
Article One Section Eight of the Illinois Constitution. The
eligibility stage of a capital sentencing hearing is the
equivalent of a trial. The State is required to prove the
existence of a statutory aggravating factor beyond a reasonable
doubt. When it comes to admitting evidence the rules are the
same as that of a criminal trial. A defendant has the right
to call witnesses, and cross examine the witnesses called by
the prosecution. Trial Counsel must hold the prosecution to
its high burden of proof and perform in an adversarial capacity,

unless Mr. Shatner, had chose to concede his eligibility.  If
Trial Counsel had intended to concede the issue of eligibility
the he was required to make it clear on the record that this
was what Mr. Shatner, had agreed to.  There is no such record
of this occurring.  Mr. Shatner, did not concede to the fact
that he was eligible for teh Death Penalty, in fact to this
very day Mr. Shatner, contends that he was in fact not eligible
to receive the Death Penalty.  Therefore the record is clear
that Mr. Shatner's Trial Counsel acted in a manner that was
not only grossly ineffective but appears on the face of the
record that he was in fact acting as a agent of the State.
There is no question that something went extremely wrong during
this stage of the proceedings, and had as Mr. Shatner, contends
was he provided with effective Trial Counsel, he would not have
been found eligible for the Death Penalty, there by he would
not have been on death row when the Governor took the action
he did thus Mr. Shatner, would not now be serving a natural
life sentence but rather a determinant number of years.  That
is why this issues cries out to be heard, because of the error
that is clear by the record, Mr. Shatner, is entitled to a new
eligibility hearing, because of the failings of his Trial Counsel
and Mr. Shatner, is sure at a full and complete hearing where
he has effective counsel he will NOT BE FOUND ELIGIBLE for the
Death Penalty, and therefore will have to be re-sentenced by
the Trial Court. (when death eligable life is the only other sentence)

     In dismissing this claim the Illinois Supreme Court made
an unreasonable finding of fact and unreasonably applied clearly
established State and Federal law, and the protections guaranteed
to Mr. Shatner, by the United States Constitution and the
Constitution of the State of Illinois.

(F)    Ground #6

     Mr. Shatner, was denied his right to confront and cross
examine the Prosecution's witness over her prior inconsistent
statement.  Thus prejudicing Mr. Shatner, of his Constitutionally
protected right to a fair trial.  The Trial Court erred when
it prevented the complete cross examination of MS. Rogoz, a
clear Due Process violation.

Supporting Facts:

      During cross examination of the State's main witness,
Jean Rogoz, Trail Counsel attempted to refresh her recollection
of a prior statement made to Detective McLaughlin, by showing
her a copy of the Detective's report.  The State objected and
the Court sustained the objection.  This was an error.  It is
not known for sure what the Court was thinking when it sustained
the State's objection.  However what is clear is the intent
of Mr. Shatner's, Trial Counsel, and that was to use the afore
mentioned Detectives report to refresh Ms. Rogoz's memory which
is well within the rules of evidence.  Mr. Shatner would ask
this Honorable Court to allow him to quote the relevant part
from the handbook of Illinois Evidence (6th. Ed. 1994),
Sec. 612.1 Pg. 503:  in where it states: "A witness may refresh
her memory by referring to a document while testifying when
unable to recall relevant facts. (Citation)  The document itself
need not be admissible in evidence; all that is required is
for the witness to state the facts from her own recollection
after inspecting it. (Citation)  The memorandum need not have
been prepared by the witness, or at her direction. (Citation)
The document need not have been made at or near the time of
the event. (Citation)  Thus anything may be used for this
purpose, the only question being whether it genuinely is
calculated to revive the witness's recollection."  That is just
what Mr. Shatner's Trial Counsel was attempting to do when The
Court cut short his cross examination of Ms. Rogoz.  This is
a clear violation of Mr. Shatner's, United States and the State
of Illinois Constitutional rights.  Mr. Shatner, had a
Constitutionally protected right to cross examine Ms. Rogoz
concerning any matter that goes to explain, modify, or discredit
what she testified to on direct examination.  No specific showing
of prejudice is required, because Mr. Shanter has been denied
his Constitutionally protected right to a effective cross
examination, this is a Constitutional error of the first magnitude,
and no amount of snowing of want of prejudice would cure it.

There was prejudice however, not only was Mr. Shatner's Trial
Counsel prevented to cross examine Ms. Rogoz to obtain an
admission, but he was unable to show the jury how her demeanor
would have changed had she been forced to testify truthfully.
Mr. Shatner's Constitutionally protected rights were violated
by the Trial Court because the Trial Court prevented Mr. Shatner's
Trail Counsel from confronting Ms. Rogoz, who's credibility
was crucial, and Trial Counsel's attempt to impeach Ms. Rogoz
was clearly frustrated by the Trial Court.
The Illinois Supreme Court made unreasonable findings of fact
and unreasonably applied clearly established Federal and State
law in concluding that Mr. Shatner was not entitled to relief
on Ground #6

(G)   Ground #7

        Mr. Shatner's waiver of his right to have a jury determine
if he should be sentenced to Death was invalid, Mr. Shatner's
Jury waiver was not knowing and intelligent because the Trial
court failed to properly admonish him to the fact that his life
could be spared by just one Jury member voting to NOT sentence
him to Death.

Supporting Facts:

        Trial Counsel advised the Court that he had informed
Mr. Shatner of his rights to be sentenced by a jury.  The Trial
Court, informed Mr. Shatner, that the State was seeking the
Death Penalty and that he had the right to have a jury determine
if he should be sentenced to Death or not.  This was not a proper
admonishment by the Trial Court where a man's life hung in the
balance.  Illinois law provides that if but one jury member
chooses to not impose Death the Defendant is spared.  Courts
at all levels both Federal and State across the Nation have
continually held that the Sixth Amendment requires that a Jury
waiver be knowing, intelligent, & and voluntary.  This fully
applies to the State of Illinois when it comes to Death Penalty
hearings.  In this case Mr. Shatner's Trial Counsel claims to
have advised that he explained everything to Mr. Shatner
concerning the Jury waiver.  however the Trial Court did not

the little time that would have been needed to properly admonish
Mr. Shatner, but rather relied on his Trial Counsel. Now as
Mr. Shatner, has already pointed out and will point out further
in this Petition that it appears form the record that his Trial
Counsel was attempting to get this all over with as soon as
possible, and it is well established that having to have a Jury
determine Mr. Shatner's fate would have added much more work
for his Trial Counsel, and since Mr. Shatner's, Trial Counsel
took his own life several years ago we will never know. However
it was the Trial Court's responsibility to protect Mr. Shatner's
Constitutionally guaranteed rights and it failed to do so.
Since the Trial Court did not take the time to properly admonish
we will never know what Mr. Shatner knew for certain. Thus
with the record being silent on this issue, Mr. Shatner, prays
that this Honorable Court will now protect his Constitutional
rights and rule the Jury waiver void and order a new sentencing
hearing. Furthermore Mr. Shatner contends that this issue
is not moot as the State may suggest because it must be viewed
in light of what happened at the time, not in light of what
Governor Ryan did as he left office.

The Illinois Supreme Court made unreasonable findings
of fact and unreasonably applied clearly established Federal
and State law and protections guaranteed under the United States
and State of Illinois Constitutions, in ruling that Mr. Shatner
was not entitled to relief sought.


(H)    Ground #8

Mr. Shatner, was denied his right to Due Process to a
fair sentencing hearing as well as his First Amendment right
of free association, by the State's introduction of his alleged
member ship in a gang. Where there was nothing connecting that
alleged membership to the offense in the case at bar, and where
the evidence of alleged gang member ship was extremely prejudicial
to Mr. Shatner.(petitioner maintains that he is not in a gang!)

Supporting Facts:

During the direct examination of Mr. Benjamin Liu at Mr.
Shatner's sentencing hearing the Prosecution elicited testimony
concerning Mr. Shanter's, alleged gang affiliation. This clearly

violated fundamental fairness and due process of law where the probative value of such evidence is greatly outweighed by the prejudice to Mr. Shatner, from its admission. The introduction of prejudicial evidence at a State criminal trial violates the Constitution if it so infused the trail with unfairness as to deny due process of law. This was the case with Mr. Shatner's sentencing hearing. Nothing concerning Mr. Shatner's gang affiliation had anything to with the crime he stands charged with. There fore there was not proative value. This evidence was highly prejudicial considering how street gangs are view by the public as a whole and even more so by the people of Chicago. Our own United States Supreme court has held that a persons right to associate with a gang is Constitutionally protected under the First Amendment right of free association. The U.S. Supreme Court has held that the introduction of evidence of ones gang affiliation when it has no bearing on the crime that one is accused of committing, it violates due process of law. That is just the case where Mr. Shatner, is concerned his alleged gang affiliation has nothing to do with the crime he he was charge with and thus should not have been allowed in as evidence at his sentencing hearing, especially when there was no corroboration what so ever to the claims made by the ex-cell mate of Mr. Shatner. In fact Officer Arocho a Cook County Corrections officer stated that there was nothing about gang activities or affiliation or Disciplinary reports concerning gang activities regarding Mr. Shatner, that he knew of. It is clear on the face of the record that mr. Shatner's Due Process rights were violated concerning this evidence being admitted and the only recourse to correct such a error is that a new sentencing hearing be ordered for Mr. Shatner. This issue as well as all sentencing issues must be viewed as if Governor Ryan had taken no action at all. Because had these errors not occurred there is a high probability that he would not have been sentenced to Death.

    The Illinois Supreme Court made unreasonable findings of fact and unreasonably applied clearly established Federal and State law in concluding that Mr. Shatner was not entitled to relief on Ground #8

(I)    Ground #9

       Mr. Shatner, was denied the free exercise of his religion
when the State introduced hie worship in the Cook County Jail
as aggravating evidence at his Death Penalty hearing.  The State
also erroneously commented on it during closing arguments in
violation of the First Amendment of the United States Constitution
and Article One, Section Three of the Illinois constitution
Furthermore Mr. Shatner, was also denied effective assistance
of trial Counsel where Trial Counsel failed to object to this
evidence being allowed.  This violated Mr. Shatner's Sixth and
Fourteenth Amendment rights under the United States Constitution,
as well as Article One Section Eight of the Illinois Constitution.

Supporting Facts:

       The State portrayed Mr. Shatner, as a man who worshipped
Satan and believed in deadly violence.  This could not be farther
from the truth.  Mr. Shatner's religion was called Wicca, it
is recognized as a religion under the First Amendment  to the
United States Constitution.  For the State to mislead the Court
in such a way as to totally misstate what Mr. Shatner's religion
consists of violated Mr. Shatner's due process rights.  Mr.
Snatner's trial Counsel failed him yet again when he did not
object to this evidence being introduced, even though Mr. Shatner
had told his Trial Counsel that the State's Attorney was wrong
when he stated that Mr. Shatner, worshiped Satan or that his
religion was steeped in violence.  Mr. Shatner's, Trial Counsel
was further ineffective when he did not investigate what deals
or incentives they provided in exchange for the testimony of
Mr. Liu.  When view as a whole this whole phase of the sentencing
hearing violated Mr. Shatner's rights on many levels.  So much
so that the State used his religion against him at sentencing.
which in itself is bad enough, but for the Trial Court to admit
into evidence completely false, misleading, inflammatory, &
inaccurate was a error of such magnitude it cries out to this
Honorable Court to correct this injustice, Mr Shatner, was denied
his Constitutionally protected rights during his sentencing
hearing and now prays that this Honorable Court will now correct
these errors and order a new sentencing hearing.  This issue

is not moot because of the actions taken by Governor Ryan.

The Illinois Supreme Court made unreasonable findings
of fact and unreasonably applied clearly established Federal
and State law in concluding that Mr. Shatner was not entitled
to relief on Ground #9 (Petitioner is now a Rosecrucian, Christian)

(J)    Ground #10

The sentencing court erred reversibly by using Mr. Shatner's
drug abuse history solely as an aggravating factor without any
mitigating dimension or value.  Thereby violating Mr. Shatner's,
Eighth and Fourteenth Amendment rights guaranteed to him under
the United States Constitution.

Supporting Facts:

The sentencing Court stated that Mr. Shatner's, history
of drug abuse was evidence of felony conduct, and constituted
aggravation.  It is clear by the record that the Trial Court
allowed personal feelings about drug use to seep into Mr. Shatner's
sentencing hearing.  Quoting the Trial Court, "today somehow
people are twisting that around to make it some type of mitigation.
Well, the use of drugs in an of itself is a felnoy.  And I can't
see how it would be mitigation."  this statement by the Trial
Court shows his mind was already made up when it came to this
evidence.  Mr. Shatner, did not have a chance at a fair hearing
on this evidence and thus was denied equal protection and due
process.  Drug use is a mitigating factor because it can be
used to explain although not excuse the conduct at issue.  Mr.
Shatner, agrees that drugs are illegal and that has a aggravating
effect to a degree, however that does not negate the possibility
of mitigation either, but the Trial Court made it very clear
by its comments that it was not going to consider mitigation
regarding drug use at all.  Moreover, under the Eighth Amendment's
cruel and unusual punishment clause, the sentencer must consider
the mitigation offered by the capital defendant.  So when the
Trail Court ignored the mitigating value of Mr. Shatner's
Cocaine use and drug abuse history, the Trail Court embarked
down of arbitrariness in sentencing that is forbidden by the
cruel and unusual punishment clause of the Eighth Amendment
of the United State Constitution.

(K)    Ground #11

Mr. Shatner, was denied effective assistance of Trail Counsel, in that his Trial Counsel was addicted to drugs and was said to have been using before, during, & after Mr. Shatner's trail and sentencing.  A clear violation of Mr. Shatner's United States and State of Illinois Constitutional rights.
(ineffective assistence of appellate counsel for failure to raise)

Supporting Facts:

Mr. Shatner, has just recently been made aware of his Trail Counsel's long history of drug abuse.  It was Trial Counsel's Brother-in-law who contacted Mr. Shatner's family with the following information.  Trial Counsel's Brother-in-law, Mr. Thomas F. Sheehan, related the following information to an investigator by the name of Mort Smith, who has secured a Affidavit from Mr. Sheehan, that states the following but not verbatim.  That he had known Michael G, Charonis, Mr. Shatner's Trial Counsel, since 1972 that they were personally close. That is until Mr. Charonis' suicide in 2001.  Mr. Sheehan States that Mr. Charonis, was a very hard working accomplished attorney until he began to use drugs, it was around 1980.  That throughout 80s Mr. Charonis' drug habit & abuse became much worse. Mr. Sheehan, had first hand knowledge of not only this drug use but the effect it was having on Mr. Charonis' law practice this knowledge was learned by way of clients of Mr. Charonis, as well as legal assistants who worked with Mr. Charonis. During the time Mr. Charonis, had received many reprimands from different judges for not being prepared at trial or for seeking excessive amounts of continuances.  Mr. Sheehan, states that more more tan a few clients of Mr. Charonis, had found themselves when Mr. charonis, would withdraw from their case when additional fees he requested over and above what was agreed to were not forth coming, this extra money was needed by Mr. Charonis, to continue supporting his ever growing drug habit.  Mr. Sheehan, states that by the late 1980$^{S}$, Mr. Charonis was using most of his law practices income to support his ever growing drug habit, as well as trips to strip bars and sex clubs, this behavior was witness at times first hand by Mr. Sheehan.  Mr. Sheehan

also witnessed first hand on many occasions Mr. charonis', drug
use both while they were out together and in both their homes
as well.  Mr. Sheehan, states that by the early 1990$^S$,
Mr. Charonis' behavior had become very erratic, and that his
drug use now included the abuse of barbiturates, along with
the use of cocaine, and alcohol.  Mr. Charonis', legal practice
had all but evaporated, Mr. charonis, fell into bankruptcy,
Mr. Charonis, even lost his home and had to move his family
several times from apartment to apartment.  Mr. Sheehan, further
states that Mr. Charonis, was using drugs on a daily basis
throughout 1993, that because of this drug usage he was seriously
impaired due to his drug use.  BY 1995-1996, Mr. Charonis' health
declined and Mr. Charonis had fallen into a deep depression.
Mr. Sheehan stated that Mr. Charonis' drug use continued through-
out this time period.  from 1996 through 2000 Mr. Charonis'
life spun out of control, it became one of inactivity and a
deeper depression continued, in late 2000 Mr. Charonis,
barricaded himself in his home and discharged a firearm, the
Cook County Police Swat team and Oak Park Police had to evacuate
neighbors, and Mr. Charonis was taken into custody.  While charges
were pending concerning the aforementioned incident were pending
Mr. charonis took his own life with a gun shot wound to the head.
With the statement of Mr. Sheehan, along with what the record
shows it is now clear as to why Mr. Shatner, received substandard,
inadequate, negligent, ineffective assistance of Trial Counsel.
As asserted in prior Grounds in this petition Mr. Shatner's
Trial Counsel, failed him at many turns in his proceedings from
the the beginning of trial through conclusion of sentencing,
this new information explains fully the actions of Mr. Shatner's
Trial Counsel and why Mr. Shatner's Constitutionally protected
rights were violated over and over again.


(L)   Ground #12

        Mr. Shatner's Appellate Counsel was Ineffective when the
information provided by Mr. Shatner, to Appellate Counsel was
not used to support his Appeal claims of ineffective assistance
of Trial Counsel.  Mr. Shatner's Constitutional   rights were

violated. as were is Illinois Constitutionally rotected rights
stating that he was to receive effective assistance of counsel.

Supporting Facts:

Mr. Shatner, provided Appellate Counsel with an affidavit
that states the following but not verbatim. That Mr. Shatner's
Trial Counsel did not fully explain the function of a jury for
sentencing, is so much that all it would is for one jury member
to vote no on the issue of sentencing Mr. Shatner, to death
to spare his life. Furthermore Mr. Shatner's, Trial Counsel
rushed Mr. Shatner, to sign the jury waiver by telling him that
he knew the judge for 18 years and that the judge was not going
to sentence him to Death. With the new evidence that has just
came into Mr. Shatner's possession there is now a explaination
as to Trial Counsel's behavior and why he provided ineffective
assistance to Mr. Shatner, and why he seemed to be so interested
in just ending the trial as fast as possible. Mr. Shatner,
Should should not be punished for the misdeeds of his Trial
or appellate Counsel. Mr. Shatner's Due Process Constitutionally
protected rights were violated and he should be granted a new
sentencing hearing at the very least. Furthermore Mr. Shatner,
prays that this Honorable Court will look at this and all his
Grounds without considering what Governor Ryan did by removing
all Illinois Offenders from death row before he left office,
because, had Mr. Shatner's sentencing hearing been
Constitutionally correct Mr. Shatner, would not have been sentenced
to Death.

(M)    Ground #13

Mr. Shatner, has newly discovered evidence of a scientific
nature. Since Mr. Shatner's conviction and Death sentence,
there have been many new advances in the scientific community
that in the interest of justice require Mr. Shatner, to receive
a new sentencing hearing not only regarding, Mr. Shatner's mental
culpability, but his rehabilitative potential as well.

Supporting Facts:

Mr. Shatner, wises to have new scientific evidence
introduced showing that the human brain has now been mapped
in such a way to show that the average human brain does not

fully till 24 or 25 years old.  Mr. Shatner, relies on two
studies that have just recently came into Mr. Shatner's
possession.  The fist being sent on December 2, 2011 from
H. Kent Heller, Attorney at Law, it is a article from the
Dartmouth New dated February 6, 2006.  it states that there
are significant changes in the brains structure well after the
age of 18 (Mr. Shatner, was only 19, at the time of the crime.)
the study touches on the issues that humans now appear to reach
mature adult hood much later that fist thought.  Secondly in
a article from the October 2011 issue  of National Geographic
titled "The New Science of the Teenage Brain."  starting at
page 37 and completing on page 59.  The article highlights how
The brain undergoes a massive reorganization between the 12th.
and 25th year of growth.  This knowledge was obtained by a study
completed by the National Institutes of Health where 100 young
people were studied during the $1990^S$ as they grew up.  what
the study found was with the aid of new imaging tools they were
able to map out parts of the brain like never before, what they
found was amazing.  the brain's axons, the long nerve fibers
that neurons use to send signals to other neurons, become
gradually more insulated with a fatty substance called myelin,
eventually boosting the axon's transmission speed up to a hundred
times.  When this development proceeds normally, we get better
at balancing impulse control, desire, goals, self-interest,
rules, ethics, and even altruism, generating behavior that is
more complex and sometimes at least, more sensible.  But at
times, and especially at first, the brain does this work clumsily
it is hard to get all those new cogs to mesh.  In essence there
is much we are learning about how a brain grows and matures,
and are still learning.  In Mr. Shatner's case there is ample
evidence that shows there were some very serious mental issues
going on with him throughout his whole life and even more so
as a teenager.  In light of this new evidence on how the brain
continues to grow and mature well past the teenage years and
given Mr. Shatner's health issues both physical and mental,
a full and complete hear is required where evidence can be
presented to support this claim.  Mr. Shatner, is at a huge
disadvantage at this point because he is not a attorney,

nor can he afford ● hire one. He has no way of ●nvestigating this claim any further, nor does he know how to petition to have the medical scans done on his own brain to show what damage if any is there. It is Mr. Shatner's, belief that damage does exist, not only now but with the new imaging tools He believes that the damage will be able to be traced back to before the date of the crime. Which would greatly provide more evidence to show a new sentencing hearing is warranted in the interest of justice, because overwhelming evidence will then exist in mitigation and cry out for a new sentence other than Death or Natural Life. Since this New evidence did not exist when Governor ryan choose to commute all Death Sentences in Illinois to Natural Life, this is not moot issue because no one can say what Governor Ryan's decisions would have been had he been in control of such mitigating evidence. Therefore Mr. Shatner prays that this Honorable Court advances this petition for further proceedings.

(N)   Ground #14

    Mr. Shatner, was denied his Due Process Right to a fair trial.

Supporting Facts:

    Mr. Shatner was denied his Constitutionally protected Due Process rights to a fair and impartial Trial of Fact. The Trial Judge had a clear cut bias against drug users as made evident by his comments about drug use. In Mr. Shatner's, case he stated he did not believe he was high or the amount of drug use on the day of his arrest where Mr. Shatner, made a statement. Yet spoke at Mr. Shatner's, sentencing hearing about how Mr. Shatner, was using drugs and was high the day he was arrested which was a felony. Now the Trial Judge can not have it both ways. Mr. Shatner's Trial Counsel was ineffective for allowing this clear cut bias error to go unchallenged, his Appeallate Counsel was ineffective for not raising this issue on direct as was his Post Conviction Counsel and Post Conviction Appeallate Counsel. For petitioner to be sentenced to death or life based on such a condrediction by the trial court is a miscarriage of justice and must be addressed, either petitioner was hige on drugs the day of his arrest and the statement should of been dismissed,or he was not on drugs & not be sentenced to death!

2.    Have all grounds raised in this petition been presented
to the highest court having jurisdiction?

    Yes ( )    No (XX)

3.    If you answered "NO" to question (2), state briefly what
ground were not so presented and why not:

    Ground #11, was not presented because Mr. Shatner, has
just recently come into newly discovered evidence to support
this Ground.

    Ground #12, was not presented because Mr. Shatner, was
denied effective assistance of appellate counsel.

    Ground #13, was not presented because Mr. Shatner, has
just recently discovered this new evidence to support this ground

    Ground #14, was not presented because Mr. Shatner, was
denied effective assistance of appellate counsel, post conviction
counsel, & appellate post conviction counsel.

## PART IV – REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing ___N/A___

(B) At arraignment and plea ___Danniel Mangeameli___

(C) At trial ___Michael G. Charonis___

(D) At sentencing ___Michael G. Charonis___

(E) On appeal ___Kim Fawcett___

(F) In any post-conviction proceeding ___William Barnet, John Greenlees, Marshal Hartman___

(G) Other (state): ___Thomas Peters, Amended Post Conviction, And Appeal of Post Conviction Petition___

## PART V – FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )   NO (**XX**)

Name and location of the court which imposed the sentence: _____

Date and length of sentence to be served in the future _____

   WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: ___12-14-2011___
                (Date)

_____
Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

___Darrin Strotner___
(Signature of petitioner)

___B-42950___
(I.D. Number)

___Box 1000 Menard, IL 62259___
(Address)

Revised: 7/20/05

30

## AFFIDAVIT OF THOMAS F. SHEEHAN

I, Thomas F. Sheehan, first being duly sworn, state the following under oath and the penalty of perjury:

1.  My name is Thomas F. Sheehan and I am 66 years old.
2.  I live at 1100 N. Linden, Oak Park, IL 60302.
3.  I am the brother-in-law of Attorney Michael G. Cheronis.
4.  I had known Michael since 1972 and had been close with him on a personal basis until his suicide death in 2001.
5.  Michael was an accomplished, hard working attorney until he began to experiment with hard drugs in 1980. Throughout the 80's it became obviously worse as the years went on.
6.  I personally knew many of Michael's former clients as well as his legal assistant in his office and learned firsthand how the drug usage was affecting his practice.
7.  Many of the judges he appeared before reprimanded him for excessive requests for continuances or for not being prepared at trial time.
8.  More than a few of Michael's clients found themselves without representation when Michael would withdraw from the case when additional fees he requested were not forthcoming.
9.  By the late 1980's Michael was spending the money he received on drugs and in strip bars and sex clubs in the suburban area. In some cases I saw this behavior firsthand.
10.  I also witnessed Michael using drugs on many occasions while we were out together, or in his home or in my home.
11.  By the early 1990's his behavior had become very erratic, and the drug usage now included barbiturate abuse in addition to the cocaine and alcohol.
12.  His legal practice had all but evaporated. He fell into bankruptcy and lost his home and had to move his family into a series of rental apartments.
13.  Although I do not personally know Darrin Shattner, I can absolutely attest to the fact that during the period of time Michael represented Mr. Shattner, Michael was seriously impaired due to his drug usage on a constant basis. By 1995/1996, Michael's health declined and Michael fell into serious depression. Unfortunately, his drug and alcohol use continued.
14.  From 1996-2000, Michaels life became one of inactivity and further depression. In late 2000 he barricaded himself in his home and discharged firearms. The Cook County Swat Team and the Oak Park Police had to evacuate neighbors and take Michael into custody.
15.  While this case was pending, Michael shot himself in the head on January 2, 2001.

16. I am providing this affidavit freely and voluntarily.  No one has given me and reward for this affidavit. No one has forced me to provide this affidavit.  I do not know any of the particulars of Mr. Shatters' case and have no opinion as to his guilt or innocence.

17. I do know, however, that during the time Michael represent him, Mr. Shattner received inadequate representation because of Michael's condition and behavior.

The contents of this affidavit are true and accurate to the best of my knowledge and recollection.  If called upon to testify, I could do so competently.  Further affiant sayeth not.

Signed_____

Subscribed and sworn to before me this ___7___ day of _____, 2011

Notary Public_____

OFFICIAL SEAL
MORTIMER SMITH
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:06/23/15

Newsome, Karen

Newsome, Helen

In the Circuit Court of Cook County

PEOPLE OF THE STATE OF ILLINOIS,  )
                                   )
-vs-                                )
                                   )
DARRIN SHATNER,             )
                                 )
      Petitioner.           )

## AFFIDAVIT OF KAREN NEWSOME

I, Karen Newsome, being duly sworn state the following under oath:

1.  Darrin Shatner is my maternal cousin. Darrin's mother, Dorothy Newsome, and my father, Daniel Newsome are biological siblings.

2.  I currently live in Algonquin, but will be moving to California in the near future.

3.  Darrin's lawyer, Michael Cheronis, didn't ask me to testify on Darrin's behalf until the day of his sentencing hearing. We (Darrin's family) didn't know what we were supposed to do. I attended Darrin's trial every day and his lawyer had several opportunities to meet with me to discuss my testimony. Unfortunately, his lawyer waited until the day of Darrin's sentencing hearing and I wasn't prepared and would have liked to have said a lot more on my cousin's behalf.

4.  Darrin is like a brother to me, he and I have always been really close. I love all of Darrin's qualities. He is a very caring and loving person.

5.  Darrin was an only child and was picked on by everyone in the family and I didn't like the way he was treated. I've heard stories from other family member about how Darrin used to be slapped down by his parents for doing the normal things children do.

6.  Darrin's mother was always busy and didn't make time for Darrin. I believe she was too young and wasn't cut out to be a mother.



OFFICIAL SEAL
**DANA PITTS**
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 8-14-2005

7. Darrin's father was too busy trying to make money and never seemed to care about his son. His father was always promising things to Darrin but wouldn't follow through on his promises.

8. Darrin and I lived with our grandmother, Agnes Bently, in Kentucky for one summer when we were teenagers. Our cousin's Basil and Can also lived there for part of the summer. I was having difficulties with my parents and Darrin was having problems with his.

9. When we were living in Kentucky I can vividly recall how no one called Darrin on his sixteenth birthday. Neither of his parents called him, nor did our grandmother acknowledge Darrin's birthday. I felt very sorry for him. It was sad that his parents didn't care enough to call and wish their son a happy sixteenth birthday.

10. I knew Darrin was sniffing glue when he was younger. I never directly saw Darrin do it but I'd see him with the rag (used for sniffing) and could tell by his behavior that he was on something. Darrin would act "out of it" and I could smell the glue and/or paint on him.

11. I lived with Darrin's mother, Dorothy and her husband, Mark, when I was about nineteen years old. Darrin was living at one of his father's buildings. Darrin didn't get along with his stepfather. I think Darrin was jealous of him because he wanted his mother's attention. Darrin eventually moved back in with his mother and stepfather and I moved out because Mark didn't want us both there.

12. I recall one time there was some money taken from our grandmother and she blamed Darrin. Everyone else knew it was out cousin, Can, because he stole everything, but as usual, Darrin was blamed for everything.

13. I have remained in contact with Darrin since his incarceration and visit him when I can.

14. In my opinion, Darrin's attorney didn't do anything. The prosecution portrayed Darrin as a monster and his attorney failed to do anything to show this wasn't the case. I have never known Darrin to pick a fight. He was always a gentle giant, really positive and very charming.



OFFICIAL SEAL
**DANA PITTS**
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 8-14-2005

15. I was in the room when Darrin's son, Dustin, was born. He was born March 31, 1991. Darrin's mother and I use to take Dustin and my son to visit Darrin when he was at Pontiac. During these visits, I observed Darrin to be a very attentive and caring father. Darrin use to let Dustin sit on his lap while he was playing chess and card games with my son. Darrin is really good around children and has always been very loving towards Dustin and my son. Darrin has expressed to me that he wants the best for Dustin and want him to make the right choices and do well in his life. Darrin loves and adores Dustin and Dustin loves his father very much.

16. I have never believed Darrin was solely responsible for this crime and feel that his attorney, and the State, failed Darrin by refusing to investigate this case in it's entirety.


FURTHER AFFIANT SAYETH NOT

_Karen Newsome_
Karen Newsome

SWORN to and SUBSCRIBED in my presence
This _____ day of _____ 2003.


OFFICIAL SEAL
**DANA PITTS**
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 8-14-2005

## HARRY E. GUNN, Ph.D.
### PSYCHOLOGIST

**20860 CORINTH RD. OLYMPIA FIELDS, ILLINOIS**          **PHONE (708)748-5889**

### PSYCHOLOGICAL REPORT

**NAME:** Mr. Darrin Shatner          **Date: 4/9/98**
**Birthdate:** 7/12/67
**Age:** 30
**Tests:** WAIS-R, Bender-Gestalt Test, KFD, Rorschach, TAT

**Observations:** Mr. Shatner was a tall, husky, neatly dressed, good looking man who was immediately friendly and cooperative. He stated that he felt very good being out of his cell and having a challenging set of tasks. He denied depression but he laughed too much in order to hide his depression. He later admitted to that fact. He did relate exceptionally well to the test materials.

Mr. Shatner always related well to this examiner and is able to show warmth. He gave background information readily. He stated that he still longed for a close relationship with his mother. He described her as "warm one day, cold and angry the next". He added that he had felt worthless when his mother had thrown him out because of a boy friend. He spoke about his running away a lot because he felt his parents did not care about him. He said his mother often hit him hard but "dad was the real abusive one". Mr. Shatner mentioned having gone to many different schools, and said he had an embarrassing learning disorder mainly with spelling.

Mr. Shatner did speak about the killing that led to his incarceration. He claimed that he had never used coke IV and was not prepared for the reaction. He said that a girl that he just met and liked talked him into it. It was her idea to rob the person that was later killed. Mr. Shatner said he was so high on drugs he hardly "had any judgement left but I was not the one who killed that guy."

**Test Results:** Mr. Shatner was given the Wechsler Adult Intelligence Scale - Revised, and he warned a Verbal IQ of 96, a Performance IQ of 108, and a Full Scale IQ of 100. The latter indicates average ability.

The scaled scores are as follows:

| VERBAL TESTS | | PERFORMANCE TESTS | |
|---|---|---|---|
| Information | - 9 | Picture Completion | - 12 |
| Digit Span | - 9 | Picture Arrangement | - 11 |
| Vocabulary | - 12 | Block Design | - 15 |
| Arithmetic | - 6 | Object Assembly   not given | |
| Comprehension | - 13 | Digit Symbol | - 7 |
| Similarities | - 10 | | |

**Mr. Darrin Shatner**                    **2**

The major weakness is in the use of symbols, i.e. arithmetic and Digit Symbol. There were also indications of weak abstract thinking and problems with many of the angles on diamond figures. All told there are soft signs of neurological impairment. Considering the severe substance abuse and head injuries, plus signs from testing, a neuropsychological examination is recommended.

With the family drawing there were indications of a great need for a relationship with much dependency. However, in general, family members are too afraid to be close to allow it to happen. They are literally stuck in mud and can not get away or get closer to one another.

Mr. Shatner did an extremely good job relating to the Rorschach Test. He shows an abundant fantasy life and an ability to be cooperative. He does present indication of some distortion of external reality but not to the point of psychosis. There is great evidence of severe depression but he covers this up with bravado.

Mr. Shatner has a great deal of conflict regarding his self concept and his pattern for relating to others. Above all he has extremely strong dependency needs and in particular he wants to be controlled by a female. After all these years he is still seeking a mother. He associates mother's acceptance with being hurt and he is prepared to harm himself if that will bring support from a woman. Clearly Mr. Shatner has always been easily controlled by women. He knows his dependency and resultant helplessness and is also prone to take flight at times. He can relate with rather intense warmth but his suspiciousness can also disrupt his relationships.

Mr. Shatner's conscious controls are a fair strength but his unconscious controls are weak. He periodically suffers strong depressive mood and then feels a push to act out. He has used drugs because with consciousness dimmed he can feel a little less empty. He can be self destructive but hostile acts towards others are unlikely unless under drug influence or directed by a significant woman.

The diagnostic pattern then is one of Major Depression with slight psychotic features, 296.34. (Axis 1). The Axis 11 is Dependant Personality, 301.6. There are also features of the Borderline Personality, 301.83. The latter include the constant feeling of abandonment, impulsiveness, transient stress-related paranoid ideation, idealization of certain others, and in particular - identity disturbance.

Rorschach responses plus the TAT stories indicate a constantly changing relationship with his mother. She ran from warm to cold to very angry but she gave enough warmth at times for her son to find breaking away difficult. There are also suggestions that he may have experienced homosexual abuse. He shows suicidal ideation, he feels incomplete without a woman in his life, he can be easily dominated by a woman and he seems to have abuse but not support from his father.

Summary: A neuropsychological exam is recommended as there are soft neurological indicators which would potentially indicate brain injury. Therefore, it is imperative to

**Mr. Darrin Shatner**                    3

rule out neuropsychological damage.    I recommend an evaluation by a
neuropsychologist. There is much evidence to suggest that Mr. Shatner did not have
any intent to commit murder when the crime took place. Given his personality if he
allowed the lady he was with to initiate him into IV drugs he would not have been
aware of what was taking place. His description of being dominated by the lady
presents fits his personality as seen during this examination.    He has massive
dependency needs and great identity confusion.    He would be easily by a female.
Considering his lifetime of abuse it would have been very easy for a female to have
control over him and to direct him into negative behavior.

*Harry E. Gunn Ph.D.*

**Harry E. Gunn, Ph.D.**

In the Circuit Court of Cook County

PEOPLE OF THE STATE OF ILLINOIS,    )
                                    )
-vs-                                )
                                    )
DARRIN SHATNER,                     )
                                    )
            Petitioner.             )

## AFFIDAVIT OF HELEN NEWSOME

I, Helen Newsome, being duly sworn state the following under oath:

1. I am Darrin Shatner's aunt by marriage. I married Darrin's maternal uncle, Daniel Newsome. We have been married for 37 years and have three children; Karen Newsome, Danny Newsome, and Christy Newsome.

2. For the past twenty-five years I have resided at 6 N. 061 Keeney Road in Roselle, Illinois.

3. I was willing and able to testify on Darrin's behalf at his trial and sentencing hearing. I attended both and was easily accessible to his lawyer. However, Darrin's lawyer, Michael Cheronis, never asked me to speak on Darrin's behalf. I would have been able to provide insight into Darrin's childhood and upbringing.

4. Darrin's mother, Dorothy Newsome, and his father, Donald Shatner, were extremely young when they had Darrin. Neither Dorothy nor Donald wanted a child at that time.

5. Darrin was a problematic baby from day one. His mother had a very difficult delivery and Darrin was a sick baby. Darrin was colicky and constantly cried. Dorothy took him to several doctors but nothing seemed to help. Darrin's father was arrested shortly after Darrin's birth and was incarcerated for approximately a year and a half. Dorothy was left to raise Darrin on her own during this time.

6. Dorothy was a young mother who didn't know how to raise a child. Darrin was sick a lot and this was very hard on his mother.

7. Pat Ryan, a family friend, was the main person who took care of Darrin. Darrin's parents were always too busy to take care of

Darrin themselves.  Darrin was always at the bottom of his parent's priority list.

8.  Darrin had a sad childhood.  One time I witnessed him being slapped down at the table just for pulling up a chair. *Darrin was a baby, Probably less than one year old, He was trying to walk at the time* HN

9.  Darrin's parents went on vacation all the time and they never brought Darrin with them.  One year it was especially sad because they went to Disneyland and left Darrin at home.  This would have been a perfect vacation for a child; unfortunately Darrin was not allowed to go. *Don & Dorothy were having problems but Dorothy thought they were going to work it when he sold the home.* HN

10.    Darrin's parents provided him with material things.  However, that was all he got.  Darrin never got love or attention.

11.    I have heard stories of Darrin being locked in the closet by his father.

12.    Darrin was moved around a lot during his childhood.  He went from one place to another and was always being shuffled around.  One time his mom put him in military school.

13.    Darrin and my daughter, Karen Newsome, spent time living together at their grandmother's house in Kentucky.

14.    I tried to spoil Darrin when I saw him because I felt so bad for him.

15.    We all wish someone would have stepped in and helped Darrin.  Instead, no one did anything.  It was the time, no one said anything, and you didn't want to get into anyone's business. I have asked my self several times why I didn't say anything.  I was young myself and didn't know much more than Dorothy did.

16.    When Darrin was in his teens he took his fathers car and accidentally smashed it up.  He was taken to a hospital in Winnetka.  Darrin didn't call his parents because he was afraid of what they would do so he called me instead.  By the time I could get to the hospital Darrin his parents had already picked him up. I heard that Darrin's father beat him with his fists and locked him in the closet.

17.    Darrin was shuffled around a lot.  He didn't get love from any one.  The only attention Darrin got was negative attention.

Sometimes negative attention is better than no attention at all. Unfortunately Darrin learned that the only way to get attention from his parents was to get into trouble.

18.     On the surface, Darrin's parent's marriage seemed o.k. After they were separated I started to hear all kinds of stories. For instance, on time Darrin's father sent Darrin's mother on vacation and when she got back he had sold the house and all of the furniture.

19.     One time Darrin's dad hid in the trunk of Darrin's mom's car. He ended up locking himself in and had to pound on the trunk so she would let him out. She was driving and had to pull over and let him out.

20.     When Darrin was a teenager he had his own apartment. His parents gave him an apartment in the apartment complex they owned because neither parent wanted Darrin to live with them.

21.     I have heard rumors that Darrin sniffed glue, but I never saw him actually doing it.

22.     I witnessed Darrin crawling up to the coffee table and being smacked down and called a little bastard for no reason. Although Darrin was physically abused, I believe he was verbally abused even worse.

23.     Darrin's parents were too much into themselves and how much money they could make.

24.     I don't know how Darrin's mom would handle having her only child executed. It would devastate her.

**FURTHER AFFIANT SAYETH NOT**

*Helen Newsome*
Helen Newsome

SWORN to and SUBSCRIBED in my presence
This 4th day of Apnl 2002.



OFFICIAL SEAL
**DANA PITTS**
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 8-14-2005

Newsome, Dorothy

In the Circuit Court of Cook County

PEOPLE OF THE STATE OF ILLINOIS,)

                                        )

-vs-                                  )

                                          )

DARRIN SHATNER,             )

                                          )

       Petitioner.                   )

### AFFIDAVIT OF DOROTHY (NEWSOME) (CRUMB) (SHATNER) DUMKE

I, Dorothy (Newsome) (Crumb) (Shatner) Dumke, being duly sworn state the following under oath:

1. Darrin Shatner is my biological son and my only child.

2. I currently reside in Wauconda, Illinois with my husband, Mark Dumke.

3. I was born in Seco, Kentucky on March 2, 1949. My biological parents are Owne Newsome and Agnes (Smallwood) (Newsome) Bentley. My mother and father had seven children together: Daniel Newsome, Christine Newsome, Phyllis Newsome, Carl Newsome, Monroe Newsome, Josie Newsome and myself.

4. My father was a coalminer and died from black lung disease when I was around two years old. My sister, Phyllis Newsome, died from diphtheria around the age of five.

5. Following my father's death, my mother became extremely ill with rheumatic fever and was bedridden for approximately nine months. As a result, my siblings and I were placed in an orphanage and remained there for over one year.

6. My mother (Agnes Bentley) had five more children with her second husband, Earl Bentley: Earl Bentley Jr., James Bentley, Virgie Bentley, Can Bentley, and Basiel Bentley.

7. My mother was educated to the third grade and spent the majority of her life barefoot and pregnant. She had twelve children and three miscarriages. My mother attended Darrin's sentencing hearing. She wasn't asked to testify.

8. My oldest brother, Daniel Newsome, recently retired and moved to Georgia with his wife Helen Newsome. Daniel and Helen have three children: Karen, Christy and Danny. Darrin spent a lot of time with these family members during his upbringing and was extremely close with his cousin, Karen Newsome. Helen and Karen both attended Darrin's sentencing hearing. Karen testified but Darrin's lawyer didn't prepare her for her testimony.

9. My oldest sister, Christine (Newsome) (Kiser) Pena, lives in Maple Park, Illinois. Her first husband, Jerry Kiser, was extremely abusive and would beat her so badly that she

1

ended up in the emergency room. Jerry Kiser is a recovering alcoholic who has been in and out of jail over the past 30 years. Christine and Jerry had three children: Daniel, Michael and Jerrie Lynn. Daniel Kiser is currently incarcerated in LaGrange, Kentucky. Jerrie Lynn is incarcerated in Union Grove, Wisconsin. Daniel Kiser has also spent time in jail and is currently living in Kentucky. Christine divorced Jerry Kiser and is currently married to John Pena. Christine and John have two children: Matthew and Shawn. Christine, Jerrie Lynn, Mathew and Shawn all attended Darrin's sentencing. None were asked to testify on his behalf.

10. My sister, Phyllis Newsome, died when she was five years old from diphtheria.

11. My brother, Carl Newsome, was in a serious motorcycle accident several years ago that put him in a coma for approximately 30 days. Carl suffered severe brain damage. He currently lives in Indiana and is an alcoholic. Carl is married to Lucille and they have one child together, Carl Newsome Jr.

12. My brother, Monroe Newsome, lives and works at Sunset Ridge in Illinois. Monroe was married to Mary and had two children: Lilly and Sandy. Monroe divorced Mary and married a woman named Ester and they have one son, Pat Newsome.

13. My sister, Josie (Newsome) (Madison) Thornhill, married Barney Madison when she was fifteen years old, and had two children, Buck Jr. and Junior. Barney Madison was an alcoholic and died from cirrhosis of the liver. Josie later married Buck Thornhill. Josie knew Darrin well and witnessed a lot of the abuse he endured.

14. My half brother, Earl Bentley Jr., lives in Kentucky. Earl is an alcoholic. Earl was married to Diane and had two children, Kenneth and Anthony.

15. My half brother, James Bentley, lives in Florida. James knew Darrin well; Darrin lived with him in Florida. James was married to Carol and they had three children together: Dorothy, Kim and Misty. James and Carol are divorced.

16. My half brother, Basiel Bentley, lives in Kentucky. Basiel is an alcoholic and abuses cocaine. Basiel has never been married but has a daughter named Anna. Basiel attended Darrin's sentencing but wasn't asked to testify on Darrin's behalf. Darrin spent a lot of time with Basiel while he was growing up and could have informed the judge about Darrin's upbringing.

17. My half brother, Can Bentley, lives in Kentucky. Can was married to Mary and they have a son named Mark. Can and Mary were divorced. Can is currently married to a woman named Martha and they adopted one child, Shanda. Shanda was my foster child for almost one year.

18. My half sister, Virgie (Bentley) (Moore) Voss lives in McHenry, Illinois. Virgie married Eddie Moore but they divorced. Virgie later married Rick Voss and had three children: Travis, Savanna and Kaylee. Virgie and Rick attended Darrin's sentencing hearing but were not asked to testify.

19. Growing up, my mother wasn't a very loving woman. She was very strict and didn't allow us to go anywhere or do anything. She was meticulous with her house, she even pressed and ironed the bed sheets.

20. My stepfather, Earl Bentley, sexually molested my sisters, Christine and Josie and myself while we were growing up. Earl used to peep on use, show us his penis and come to our bed at night and sexually fondle us. If our mother saw him in our room he would tell her he was covering us up with blankets. My sisters and I have talked about this sexual abuse. Josie told me that Earl used to show her his penis and peep on her when she was bathing. He also used to follow her to the outhouse and would put his penis through one of the holes in the wall while she was using the bathroom. He didn't bother me as much as he did Josie, she was bigger busted and he mainly went after her.

21. My mother and stepfather treated the Newsome children poorly in comparison to the Bentley children. The Newsome children were expected to miss school in order to take care of the Bentley children and would spend our days changing diapers, bringing in coal, cooking and cleaning for them. In addition, my mother and stepfather used to take the Bentley children on vacation and leave Newsome children home alone for days on end. I remember one occasion, when I was around five or six, being home alone with no food and having to go to the store and get food on credit. We were beaten later when our parents found out about it

22. Earl Bentley was physically abusive towards us. On one occasion, I was sitting on the front porch playing with my "Etch-a-sketch" and my mom came home with the groceries. Earl walked up to me and took the game away and hit me over the head with it, causing it to shatter into several pieces. He then yelled at me to help my mother with the groceries.

23. Earl and my mother used to whip us with belts and switches. Earl was the one who did the majority of the abuse. Earl once hit Daniel in the face with his fist and knocked his tooth out. We were abused with switches. I have a scar on my leg where I was hit with a thorny switch where the thorns went into my leg when I was a young girl. Back in those days in our "hick" town, no one cared that we were being abused and missing school. No one wanted to get involved.

24. I had a very difficult life growing up. My family was extremely poor. We ate beans and potatoes almost every day and rarely had meat. Earl didn't work and my mother stayed at home to take care of the kids. Earl was a thief. He used to go out at night and steal copper wire and then burn the rubber off and then sell it. For the most part, Earl and my mom lived off the social security check the Newsome children received each month because of the death of our father. They were living off our father's social security check and that bothers me to this day. We were the ones who had to go outside, get the wood and build the fires while everyone else stayed warm. We also were the ones who had to miss school to cook, clean and wash their clothes.

25. I remember standing in a line for low-income families to get peanut butter, cheese and bags of flower. There weren't any holiday meals and we didn't celebrate Christmas because we couldn't afford the food or the toys. The Bentley kids did get something

3

because they were the babies. Growing up, our ice cream was snow; we'd eat the snow and pretend it was ice cream. Our cousin owned a secondhand store and occasionally allowed my family to come down and pick out some clothing. All of the boys slept in one room and all of the girls slept in another room. Christine, Josie and I shared a bed and I slept in the middle. We used an outhouse and brought in buckets of water to fill up a tub for baths.

26. My older sister, Christine, moved to Chicago when she was a teenager. My older brothers, Daniel, Monroe and Carl also moved to Chicago at a later time. My sister, Josie and I were the last two Newsome children at home and our parents wanted us to leave so we moved to Chicago and lived with our siblings. I was fifteen and Josie was thirteen. I worked and took prep classes for my GED. I made $57.00 a week and sent $30.00 of that back to my parents because I felt bad for them and wanted to help them out. Despite what they did to us, we still loved them.

27. I felt cheated out of life. I didn't know any better until I got out of there and saw how normal people live. We were robbed of a normal life and education.

28. I attended school up to the 8th Grade and received my GED when I was around 18 or 19. I later put myself through beauty school and now work out of my house as a licensed beautician.

29. I met Darrin's father, Donald Shatner, in Chicago in 1965 and we were married in October of 1966. I was seventeen and Don was eighteen. I wasn't old enough to get married and required my mother's signature so we drove to Seco, Kentucky, got her signature, and then went to Clintwood, Virginia and were married at the local courthouse.

30. I got pregnant with Darrin shortly after we were married. He was not a planned or wanted pregnancy. His father and I wanted to work and get ahead in life before we had any children. We both came from extreme poverty. I didn't know anything about birth control. No one was allowed to talk about sex in our house, and back then the schools didn't teach you about that kind of stuff.

31. Darrin's delivery was extremely difficult. I was in labor for over thirty hours and required heavy sedation. The doctors used forceps to deliver Darrin and the forceps left scars on his face. These scars are evident in his childhood pictures.

32. Darrin's father was arrested for armed robbery and spent nearly a year in jail when Darrin was just an infant.

33. Darrin was a very sick baby. He was always crying and wasn't easily consoled. Darrin was later an extremely hyper toddler and child.

34. When Darrin was a toddler, he ran a fever of about 105. I couldn't get him to the doctor so I called the pharmacist and he sent over some medication for him.

35. I punished Darrin by slapping him in the face, hitting him with a broom, and hitting him on the head with my hairbrushes. I was physically abusive towards my son. I was

abused as a little girl, and was being abused by my husband, so I guess I just started to abuse Darrin.

36. I called Darrin a "little bastard", a "son-of-a-bitch", and would tell him he was just like his father.

37. Darrin's father called Darrin a "son-of-a-bitch" and told him he was lazy and would never amount to nothing.

38. Darrin wasn't wanted; he was in our way. Darrin's godfather, Pat Ryan, took care of Darrin more then we did.

39. I didn't visit Darrin as much as I should have while he was in his placements. I was working, going to school and my life was crazy at that time. I guess I didn't make time for my son.

40. Mark and I got together around 1982 and were married in 1989. Mark was somewhat jealous of Darrin and Darrin was jealous of Mark. Mark didn't have a great deal respect for Darrin because he was getting into trouble.

41. Don was an evil man and physically abused Darrin and I. Don was also very verbally abusive and extremely jealous. He wanted to lock me up in the house and beat me when I didn't listen to him. I think Don was more obsessed with me than he was in love with me.

42. I was a little like my mother, let the man handle everything. Don beat Darrin and I let him.

43. Don was a jealous man and I was untrue to him. After Darrin was born, Don went to jail and I took job as a waitress and started to secretly date a man I meet at the restaurant. Don attempted to put an explosive device in this man's car and it accidentally went off, seriously injuring Don's hand and significantly damaging the car. A few weeks later, this man's car 'blew up' when he was driving. Fortunately he wasn't seriously hurt. No charges were ever pressed.

44. During one of our fights, Don choked me to the point that I passed out. Don took me to the emergency room and he told me to tell the doctor I fell down the stairs. I was afraid to tell the truth because Don was outside my room. The doctor looked at the x-ray and saw the bruising on my neck and asked me who choked me but I continued to stick to my story.

45. During another fight, Don shot a shotgun over my bed to scare me and left a hole in the headboard above my head. My mom saw the bed with the hole in it. The man was crazy.

46. Once Don beat Darrin badly in the face, and on the head, because Darrin took one of his cars and got in an accident. Darrin was only twelve or thirteen years old. Don had Darrin in our other car and the three of us were driving home and Don took his fist and repeatedly beat Darrin in the face and on the head. I attempted to stop him and he hit

5

me. It turned out that the car Darrin took had Don's dynamite in the trunk. Don was really upset because he would have gotten into big trouble if the police found it. I think Don kept dynamite as a kind of controlling device. He was a very evil and sadistic man. I left Don for good shortly after this incident.

47. Don and I separated in 1980 and divorced in 1982. The divorce was very messy. We stopped living together after Don sold our house and all of the furniture while I was away. Don had all of this planned. He bought me a ticket to go see my family and while I was gone he finalized the sale. Before I got home, I called to check in and the new owners answered the phone and said they had just bought the house and Don had given them our phone number. When I returned, I discovered that my house, and all of my belonging were gone. Don didn't care that he left Darrin and me on the street. Don had moved in with his girlfriend.

48. After our divorce, Don spent time in the federal prison downtown Chicago for embezzlement.

49. Darrin and his cousin, Jerrie Lynn used to sniff glue together. Jerrie Lynn's mother used to catch them sniffing glue and would tell me. Darrin was around eight or nine when this started.

50. Mark and I caught Darrin sniffing glue when he was living with us. We used to find socks and plastic bags with the glue that Darrin used to get high. I called the McHenry County Police and they came out to the house. They put in him the car and talked with him but didn't do anything else. They told me to call a hotline. We called but nothing happened. If you didn't have money or insurance, you couldn't get any help back then

51. Darrin used to sit in the truck by himself for hours in the driveway. The truck wasn't running and we'd worry he'd freeze to death out there. He must have been sniffing glue because he wouldn't come in the house.

52. Darrin and Jerrie Lynn stole their uncle's car. Darrin was around ten and Jerrie Lynn was around twelve. I remember calling the police and being scared because they were both so young.

53. Darrin and Jerrie Lynn ran away together on several occasions.

54. My stepfather, Earl Bentley, died on August 19, 2001 from cancer.

55. My mother had a stroke on September 29, 2001. The stroke resulted in frontal brain damage. Her left side is paralyzed and she lacks reasoning ability. She's like a child and doesn't really understand what is going on around her. I am her legal guardian and have been taking care of her.

56. Throughout Darrin's trial and sentencing, there were a lot of money issues with Darrin's lawyer. I sent him money every month. He would take my last twenty dollars. I once gave him a check for five hundred dollars and a bar in Oak Park called because they found it on their floor, he must have dropped it there. Darrin's lawyer called me