CASE NO. ___12cv 47___

ATTACHMENT NO. ___2___

EXHIBIT _____

TAB (DESCRIPTION) _____

## E. ADULTHOOD

Darrin was released from the Kentucky Treatment center on his eighteenth birthday. He stayed with his cousin's wife, Kathy Newsome, for a little while and then moved to Florida and stayed with his uncle, James Bentley.

Darrin never married but was in a long-term relationship with Cinda McDonnell. Darrin and Cinda have a son, Dustin Shatner. Dustin was born on March 31, 1991 at Good Shepard Hospital in Barrington, Illinois. Dustin is currently 12 years old and lives out of state with his mother. Dustin was born after Darrin's incarceration and has only seen his father behind bars. When Dustin was an infant and a young child, his mother brought him to see Darrin on a regular basis. Dustin continues to visit his father, during which time they play card games and chess and talk about what's going in Dustin's life. Darrin subscribes to a comic strip that he reads each month and then sends to Dustin. Darrin feels this is one way he can share something and bond with his son. Darrin has also discussed maintaining a journal that he can pass on to his Dustin when he's older that will help him understand and know more about his father.

## F. EXPERT EVALUATIONS

Expert evaluations were completed in an effort to gain insight and understanding into the psychological and physiological effects of early abuse and neglect, attention deficit disorder, learning disabilities, multiple placements, early drug use, head trauma and several other circumstances that impacted Darrin's social, emotional and cognitive development.

- DR. JAMES O'DONNELL

Dr. James O'Donnell conducted an in-depth interview with Darrin regarding his prior drug use, the effects experienced, his drugs of choice, amounts consumed, adverse effects on social relationships and the effects this had on Darrin's physical health. Darrin described abusing glue and Toluene (Toly) beginning in his early teens and continuing use for several years. He described acute toxicity as the "echo zone", wherein he experienced auditory hallucinations, distorted and confused thought and extreme disorientation.

Darrin started abusing marijuana and hashish at age thirteen and reported that he smoked marijuana every day, as much as he could get his hands on, and explained that this drug made him feel "mellow," "giggly," and he generally felt good.

During Darrin's adolescence, his abuse of alcohol occurred primarily on the weekends, becoming intoxicated almost weekly. Darrin explained that he liked the high he got from alcohol and it made him feel braver in social situations. Darrin reported experiencing occasional blackouts. Darrin also experimented with LSD.

Darrin used cocaine for the first time sometime around his eighteenth birthday. Darrin experienced the high as a "pick- up" and felt "pumped-up" when he was high which resulted in him craving more and more cocaine. Darrin explained that his life revolved

around cocaine. In Dr. O'Donnell's opinion, Darrin was psychologically addicted to cocaine. (Appendix C, pg. 129-135).

- DR. GUNN

Dr. Harry E. Gunn, a licensed psychologist, completed a psychological evaluation on April 4, 1998. Darrin reported that he still longed for a close relationship with his mother and described her as being warm one day and then cold and angry the next. Darrin explained that he felt worthless when she threw him out because of her boyfriend. His mother often hit him hard but Darrin feels that his father was the more abusive of the two. Darrin frequently ran away because he felt his parents didn't care about him.

According to Dr. Gunn, Darrin has a great deal of conflict regarding his self-concept and his pattern for relating to others. Above all he has extremely strong dependency needs and in particular he wants to be controlled by a female and after all these years he is still seeking a mother. He associates his mother's acceptance with being hurt and he is prepared to harm himself if that will bring support from a woman. Dr. Gunn wrote, "Clearly, women have always easily controlled Darrin. He knows his dependency and resultant helplessness and is also prone to take flight at times. He can relate with rather intense warmth but his suspiciousness can also disrupt his relationships."

According to Dr. Gunn, Darrin did an extremely good job relating to the Rorschach Test and showed an abundant fantasy life and an ability to be cooperative. There were indications of some distortion of external reality but not to the point of psychosis. There was also great evidence of severe depression but Darrin covers this up with bravado.

Conscious controls are a fair strength but his unconscious controls are weak. He periodically suffers strong depressive mood and then feels a push to act out. He has used drugs because with consciousness dimmed he can feel a little less empty. He can be self-destructive but hostile acts towards others are unlikely unless under drug influence or directed by a significant woman.

Rorschach responses plus the TAT stories indicate a constantly changing relationship with his mother. She ran from warm to cold to very angry but she gave enough warmth at times for her son to find breaking away difficult. He shows suicidal ideation, feels incomplete without a woman in his life, and can be easily dominated by a woman.

Dr. Gunn administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R) and according to test results, Darrin's Verbal IQ is 96, his Performance IQ is 108 and his Full Scale IQ is 100. Darrin's major weakness was in the use of symbols, i.e. arithmetic and digit symbol. There were indications of weak abstract thinking and problems with many of the angles on diamond figures, which are soft signs of neurological impairment. Due to Darrin's history of severe substance abuse and head injuries, plus the signs from testing, Dr. Gunn recommended a neuropsychological examination because there are soft neurological indicators, which would potentially indicate brain injury. Therefore, it is imperative to rule out neuropsychological damage.

According to Dr. Gunn, the diagnostic pattern is one of Major Depression with slight psychotic features accompanied with a diagnosis of Dependent Personality Disorder

and features of Borderline Personality Disorder. The latter includes the constant feeling of abandonment, impulsiveness, transient stress-related paranoid ideation, idealization of certain others, and in particular---identity disturbance. (Appendix C, pg. 126-129).

- JONATHAN L. HESS, PH.D.

Dr. Jonathan Hess completed a Neuropsychological Report on March 19, 1999. During the interview, Darrin reported that the first time he was arrested was when he was nine. He asked for a glass of water from a restaurant and they refused to give him one. He responded by kicking a window as he left and a substantial window shattered. He was taken to the authorities having been guilty of vandalism.

According to Dr. Hess, Darrin has some very strong beliefs, including but not limited to the system of astrology in understanding the human personality. Dr. Hess commented that he had read Dr. Gunn's personality assessment that indicated the possibility of psychotic tendencies but doesn't think Darrin has the risk of psychosis at his age, but added that Darrin is not well grounded in reality in a number of his orientations. He described Darrin as somewhat of a delusional person, saying that he gets communications from the spirits occasionally but again added that this is not uncommon among persons who report faith in some spiritual (supreme or otherwise) being.

Darrin reported that he has seizures about once every two months resulting in loss of consciousness and the soiling of his clothes. He also states that he suffers from headaches and lists the classic migraine symptoms.

Results from the California Verbal Learning Test indicate mild anterograde amnesia. Darrin's first free recall trial is in the 2nd percentile as is his last trial in the series. Additionally, his memory is characterized as having memory retrieval problems. He has both incomplete memory retrieval, as evidenced by these low percentile scores, as well as aberrant retrieval. 98% of persons of his sex and age group would have fewer false positives.

Results from the Benton Visual Retention Test place Darrin in the mildly impaired range. His error score is borderline, but both errors are symptomatic preservations, symptomatic for frontal lobe/subcortical circuit problems. The results from the Rey Osterrieth Complex Figure Test are also consistent with a mild deficit in executive skills. Darrin showed some difficulty in the repetition of complex sentences and exhibited word-finding difficulties (anomia) at a number of points in the assessment.

Dr. Hess summarized that, "Whether from traumatic brain injury, toxicity, or inheritance, Mr. Shatner definitely shows symptoms of aberrant brain function. These symptoms include sustained attention problems involving overt perseveration. He also has difficulty in executive skills."

Dr. Hess feels that Darrin's particular chronic form of substance abuse is very unusual, involving glue, paint, hydrocarbon fumes, etc. It appears as though he sought out this sniffing experience virtually every time he had the opportunity.

Dr. Hess commented, though Darrin has sustained attention problems, his conceptual flexibility is beyond what one would estimate from both his limited education and his

average IQ. It is a shame that he never had the ability to cooperate with formal education to channel his intellectual skills. It is also his style to manipulate ideas irrespective of considerations of evidence to confirm or disconfirm those ideas.

Dr. Hess concluded, that as a professional psychologist who has done assessment with problem children, he believed that Darrin is a consequence of a failed educational and health care system. "Of course, he is accountable for any crimes he committed as an adult. How accountable was he when he started grade school? Effective assessments and interventions at that time may well have prevented the tragic events that subsequently unfolded." (Appendix C, pg. 141-143).

- JOHN GORDON MELTON

Dr. John Gordon Melton, Director of the Institute for the Study of American Religion (ISAR), interviewed Darrin in regards to his chosen religion. Darrin describes himself as a hermeticist and astrologer. According to Dr. Melton, while astrology appears as a means of fortune telling in popular culture, for someone who takes the practice seriously, it is a key means of self-understanding and a tool for spiritual growth.

Darrin appears to have been drawn into the esoteric world from his childhood with visions and other paranormal (psychic) experiences that date as early as his twelfth year. Esotericism is commonly based around the individuals search for the spiritual enlightenment and mastery of one's life. According to Dr. Melton, Darrin's exploration of esotericism is quite understandable with his teenage family life that provided little in the way of any family-based or community-centered religious experiences. Dr. Melton added that, "Esotericism commonly serves its practitioners with assists in stabilizing one's internal self-image over against a constantly changing environment, such as the one in which Mr. Shatner existed in during his teenage years.

Esoteric religions place an emphasis upon the inner exploration of spiritual space (what an outsider might call the subconscious or unconscious, which is equated with God's spiritual realm). Darrin's primary religion prior to the incident for which he is currently incarcerated was the Sabean Religious Order, a Neo-Pagan group that functioned for many years on Chicago's Southside. Darrin also studied the Wicca religion and the Kabbalah.

Within the larger world of esotericsism, Darrin is basically a Wiccan (as a Christian might be seen as basically Methodist or Baptist). This faith includes the performance of some basic Wiccan rituals, the practice of Astrology, and the study of esoteric thought.

Dr. Melton explained that it has been quite common since the sixteenth century for those most influenced by Christianity and Christian culture to equate esotericism with Satanism. However, with a few minor exceptions, members of the esoteric community (in particular the groups Darrin has associated with) do not believe in Satan and certainly would not be participating in activities invoking Satan or acknowledging his power. Dr. Melton explained that an uninformed observer, growing up in a Christian environment, might, upon seeing esoteric ritual activity or behavior, label it "Satanist." This is his understanding of what happened in Darrin's case (Appendix C, pg 149).

Dr. Melton reviewed Benjamin Lui's testimony describing a ritual he allegedly witnessed that included the use of candle and chants and described Darrin as trying to invoke the "Angle Lucifer." Darrin vehemently denies Benjamin Lui's allegation that he tried to invoke the "Angle Lucifer" and Dr. Melton concluded that because of Mr. Lui's ignorance, Darrin was incorrectly labeled a Satanist. He is not; he is an esotericist and Wiccan (Appendix C).

Dr. Melton also commented on the prosecutions closing arguments that described Darrin's religion as violent. In fact, Wicca proclaims an ethic of harmlessness, summarized in the dictim.

Dr. Melton concluded that Darrin is a longtime practitioner of Western Esotericism. The labeling of Mr. Shatner's religion as Satanism at his trial was at best an honest mistake by someone who did not know what he or she was talking about. The arguing that his religion was violent was, at best, simply an error of the first order that stands in need of correction (Appendix C, pg. 144-151).

## III. DEVELOPMENTAL FINDINGS

### A. INADEQUATE PARENTING

Dorothy and Don both had difficult childhoods. Dorothy was emotionally and physically neglected, lost her father at a young age, grew up in extreme poverty, endured physical, sexual and emotional abuse, and forced to leave home at a young age. Don also came from poverty and was abandoned by his mother and forced to care for his brothers at an early age.

Dorothy was extremely young and wasn't ready, didn't know how to, and didn't want to be a parent. She lacked positive experiences to draw upon and wanted to focus on her goals and her needs because no one else ever had. Don also wanted to focus on his own need and wasn't ready and didn't want a child. Dorothy experienced a difficult delivery and struggled on her own following Don's incarceration. Dorothy admits she didn't want Darrin and felt burdened by the demands of a needy child.

Dorothy and Don's inadequate parenting skills and disinterest in Darrin are well documented in childhood records. One worker wrote, "Darrin is an only child who lives with his natural parents who are both very work oriented. This need for financial success has at times interfered with their association or contact with Darrin." (Appendix C, pg. 52). Another reported, "He (Darrin) seems to be a child who was seemingly deprived of the normal growing up and childhood stimulation because of the parent's involvement in their financial goals and achievement." (Appendix C, pg. 45).

During a childhood intake interview, Dorothy explained, "Darrin idealizes his father and wants to do what he does." (Appendix C, pg. 45). She was "aware that her husband is not a family man and his thoughts and energies are directed to work-work-work." (Appendix C, pg. 43). Darrin's father was seldom at home because he worked two jobs and records also indicated that Darrin's father had a drinking problem and that this problem caused the divorce. (Appendix B, pg. 85-267).

A school psychologist wrote, "Darrin's feelings of love for his father are strong despite his expressed awareness that in the past his father had no strong feelings for him and reportedly was the parent who sent him to military school, to various residential schools, or to stay with relatives when both parents vacationed or traveled, thereby excluding him from family interactions." (Appendix C, pg. 123).

Dorothy told one worker that Darrin liked attention, "wants all of it." She described Darrin as not being able to take teasing or joking and felt that "everybody is against him." Darrin was impulsive, talked loud and out of turn. This worker commented that Darrin's personality was like one of an older boy and felt that may be related to his having had adults around him mainly (Appendix C, pg. 45).

Neither Dorothy nor Don took an interest in Darrin's education and failed to show up for parent conferences regarding his individualized education plan (IEP). On October 23, 1979, Corinne Warsawsky, Director of Education at Arden Shores, wrote a letter reporting that Darrin's parents once again failed their son when they neglected to show up for a scheduled conference (Appendix C, pg. 60). The school called a parent conference on December 18, 1979 because they wanted to discuss Darrin's acting out behavior both in and outside of school. The school was concerned about Darrin's ability to get guns and shoot them off. The same school called another conference on February 6, 1980. According to the report, "This conference was called to discuss Darrin's unprovoked acting out which is reflective of problems in the home." The school was concerned that Darrin might hurt himself or someone else (Appendix C, pg. 63).

On February 27, 1980, Darrin was evaluated by Dr. Karnicki who wrote, "He (Darrin) is depressed and discouraged about his parents and operates (toward himself) partly out of morbid parental introject. His grandiose, exhibitionistic self is archaic: i.e., it is confined to his juvenile, delinquent acting-out. He has not learned to be grandiose and exhibitionistic in more matured and productive ways. It may well be that his parents cannot appropriately respond to him as "special" to them when he is intelligent, effective, creative and charming. They may see him on those occasions as threatening to their own (respective) narcissistic equilibriums." He went on to say that "I may be scheduled to interview Darrin's parents to try and find some leverage (psychological) into their pathology." (Appendix C, pg. 119).

According to another worker, "The parents impress as being rather narcissistic and as having some difficulties in being able to admire the growth and development of their child without being threatened by it" and went on to say "One receives the impression that they have some insight into Darrin's problems and needs, but have a great deal of difficulty meeting these needs without feeling cheated in their attempt to meet their own needs." (Appendix B, pg. 12).

Darrin's juvenile probation officer suspected his parents were well intentioned but really didn't know how to deal with Darrin. They were very young and were not quite sure where to turn for help. (Appendix C, pg. 73). Another worker observed, "Mr. and Mrs. Shatner are very bright people but do not seem to know how to parent. Mrs. Shatner

29

openly stated that her husband should not be tied down to a child, and that he has a great deal of difficulty in dealing with this." (Appendix C, pg. 90).

Neither parent was a constant in Darrin's life. Both came and went as it suited them and each disappeared for varying lengths of time. Dorothy used to leave the family for weeks at a time and Don disappeared for several months at a time.

One worker wrote, "At present, Darrin would like to live with dad, although his reasoning is more of a 'no' vote for mom, than a 'yes' for dad. He feels that the only reason his mom wants him is for child support. The prospect of a prison term, if the latter is ever found, does seem to phase his planning. In the absence of any word from his father, Darrin has felt compelled to track him down. He will, no doubt, use the phone at home over Christmas to do some research." (Appendix B, pg. 55).

According to staff, "At this point, Darrin's treatment team feels that it is premature to make any recommendations or judgments regarding the fitness of any one of Darrin's parents. At the time of this writing, Darrin's mother was allowing Darrin to chose who he wanted to live with, her or his father. "Her message is clear but could change with the wind. Staff remembers last January when she didn't want to 'see his face' and then in March she was back with her own Appalachian version of 'Amazing Grace', suddenly all was forgiven." (Appendix A, pg. 188). Darrin's father had recently reemerged and was living with his girlfriend and her two young children. "His residence remains undisclosed since Mr. Shatner is still party to numerous legal suits. Like his ex-wife, Mr. Shatner made some commitments to Darrin (more calls, working out an on-grounds visit, perhaps eventually living with him), but has failed to follow through. Darrin attempted to contact his father through his grandmother in mid March, but there have been no calls from his dad to date." (Appendix A, pg. 178).

One worker wrote, "Mr. Shatner re-appeared after five months of silence. " "Mr. Shatner, like his ex-wife, seems to appear out of nowhere." "We were all taken aback by the very emotional, tearful embrace he gave Darrin, hugging and holding him tightly. It was clear that Darrin didn't know what to make of this situation." "Mr. Shatner prefers that his whereabouts and phone number be kept confidential. He still has some outstanding financial matters to deal with as well as some legal problems. "Darrin's birthday is just a few weeks away, and Mr. Shatner has promised to be in touch between now and then. He has promised Darrin a bike. Darrin is certain his dad will deliver. He has told Darrin that as soon as he gets his finances straightened out, he plans to take Dottie (Dorothy) to court for custody, and then partition DCFS to release Darrin to his care." "Predictably, Darrin has thrown all his eggs into Dad's basket. He is even contemplating attending the Jehovah Witness 'Kingdom Hall' as reportedly his father has some interest and has studied in this sect. (Appendix A, pg. 187).

A school psychologist wrote, "Although desirous of independence, Darrin also projects a need for close family ties and togetherness. It would appear that he experienced strong feelings of rejection in his early years within the family structure. It would also seem that in the past he did not receive much recognition for his accomplishments. When asked what his family would do if he did something well, he responded that 'it doesn't matter to anyone else, just to me….so I keep it to myself.'" (Appendix C, pg. 123)

30

Dorothy and Don admit they failed as parents and neglected to give Darrin the love and attention he wanted and so desperately needed. They were self-absorbed individuals who chose to focus more on work, and their ability to make money, and as a result, neglected their son. As Darrin got older, and his needs grew stronger, so did his parent's resentment towards him.

## IMPLICATIONS FOR COPING AND FUNCTIONING

Sadly, Darrin was deprived of a nurturing and caring upbringing, never had the opportunity to appropriately bond with either parent and lacked positive role models throughout his development. All children have basic needs and require certain things from those around them in order to feel that the world of people is a positive place and that they themselves have value. They require certain experiences in infancy that will enable them to feel confident enough to explore, to develop healthy peer relations, and to rebound from adversity.

A child requires a positive and responsive relationship with their primary caretaker. The child is helpless and totally dependent on others to care for him. The first task is to bond with the primary caretaker in order for their basic needs to be met. Through this bonding process, the child learns how to trust. If a child does not master these tasks he is more likely to present as clinging, be impulse-ridden, fear groups, have a short attention span, have temper tantrums, and become easily over stimulated. A responsive mother provides a secure base. The infant needs to know that his primary caregiver is steady, dependable, and will be there for him. Fortified with the knowledge of his mother's availability, the child is able to go forth and explore the world. Lacking it, he is insecure, and his exploratory behavior is stunted (Karen, 1990). Children require constant care and support from their primary caregivers. These caregivers must be prepared and able to respond to their child's need for love and stimulation. The child's foundation of how they will eventually perceive themselves and their world is built upon this relationship (Kaplan & Sadock, 1998).

A secure attachment between mother and child in infancy affects a person's ability to form healthy relationships in later life. Attachment can be defined as the emotional tone between children and their caregivers and is evidenced by an infant's seeking and clinging to the care giving person. According to John Bowlby, attachment occurs when there is a warm, intimate and continuous relationship with the mother in which both find satisfaction and enjoyment. Attachment gives the infant feelings of security. A child who isn't provided with a secure attachment takes the opposite track. He becomes angry and distant, even though he remains no less attached. His pleas for attention have been painfully rejected, and reaching out seems impossible. The child seems to say, "Who needs you—I can do it on my own!" Often in conjunction with this attitude, grandiose ideas about the self develop, "I am great, I don't need anybody". Bowlby believes that avoidant attachment lies at the heart of narcissistic personality traits, one of the predominant psychiatric concerns of our time (Kaplan & Sadock, 1998).

In addition, a child relies on his parents to provide support, set reasonable boundaries, be consistent and teach the difference between right and wrong. Parents are expected to model appropriate decision and choice making, moral systems and boundaries. If

there is no consistent set of standards for the child, the child is not able to learn a consistent set of morals.

Darrin's parents clearly had several of their own unresolved childhood issues that impaired their ability to properly care for Darrin. Neither was ever able to place Darrin first and as a result, Darrin didn't receive the love and attention he needed and never received the treatment and support he required to address his emotional disturbance.

## B. EMOTIONAL & PHSYICAL ABUSE

Darrin endured substantial emotional and physical abuse throughout his development. Dorothy admits she neglected and physically abused him and explained that she was self absorbed and basically ignored Darrin during his formative years (Affidavit of Dorothy Newsome).

Darrin's grandfather reported that Darrin was constantly abused by both of his parents. He recalled an incident that occurred when he was at the mall with Dorothy and Darrin. Dorothy was angry with Darrin so she took his head and slammed it against the streetlight pole. Mr. Crumb reported that he kept Darrin with him as much as possible to keep his mother from beating him (Affidavit of Donald Crumb).

Darrin reported that his mother used to beat him with a broomstick and whatever else was at her disposal. According to Dorothy, Don used to hit Darrin with his fists and would beat him on the head and face to the point that Darrin would be bleeding. Dorothy explained that Darrin's father once beat him in the head until he was nearly unconscious and blood was gushing from his nose and mouth (Affidavit of Dorothy Newsome).

One childhood record reported, "Darrin is very fearful of his father, and the probation officer suspects that this is because he is physically afraid of his father "(Appendix C, pg. 81). Another record indicates, "The father stated that the minor was physically abused by the mother" (Appendix A, pg. 98). Darrin also had a lot of conflict with his stepfather. According to records, Darrin reported that Mark didn't like him and hit him when he was drunk for playing the car radio too loud (Appendix A, pg. 188)

In addition to the physical abuse, Darrin was also subjected to emotional and verbal abuse. He received abuse from both mom and dad, either cursing at him or telling him how bad he was. Dorothy's nickname for Darrin was "little bastard" and his father called him a "dumb son-of-a-bitch."

## IMPLICATIONS FOR COPING AND FUNCTIONING

According to the article, Child Abuse-The Hidden Bruises (1992), children who have been abused may display a poor self-image, inability to trust or love others, aggressive and disruptive behavior, anger and rage, school problems or failure, feelings of sadness or other symptoms of depression, and drug and alcohol abuse. Often the severe emotional damage does not surface until adolescence or later. Some adults, who were abused as children often have trouble establishing intimate personal relationships, are at higher risk for anxiety, depression and substance abuse. Early identification and treatment is important to minimize the long-term consequences of abuse. Even though

Darrin reported the abuse, and several workers suspected and commented on this, Darrin remained in his parents care for several years and never received proper treatment for this.

Children who witness and experience violence in their homes often learn to normalize this violence. Children who are physically abused by their parents often suffer serious long-term effects. They experience a confusing combination of intense fear and intense love for the abusive parent. The self-esteem of such children is often low. Abused children are likely to feel isolated, unworthy and may avoid close peer relationships so as to avoid detection of abuse.

## C. EMOTIONAL & PHYSICAL ABANDONMENT

In addition to enduring both verbal and physical abuse, Darrin was forced to deal with being emotionally and physically abandoned by his parents. Both Dorothy and Don came from extreme poverty and wanted to make money while they were young and Darrin was an obstacle to that goal. As a result, they ignored Darrin and frequently sent him to stay with friends and family member. These stays varied in length but always resulted in Darrin being returned home only to be sent away again at a later time. Darrin's grandfather, Donald Crumb, explained that if Darrin wasn't with him, he was with his godfather, Pat Ryan, or his grandmother, Agnes Bentley, in Kentucky. Darrin also spent time with various aunts and uncles, cousins and friends.

In addition, Darrin wasn't allowed to join his parents on vacation and told he couldn't go with them because he was too mean and that no one wanted to be bothered by him.

Dorothy and Don's involvement in Darrin's live continued to diminish once Darrin was placed in the care of DCFS facilities. Both Dorothy and Don began disappearing for varying amounts of time. Darrin's father, in particular, disappeared for months at a time and Darrin would worry because he had no idea where he was or how he was doing. Dorothy did the same, but for shorter periods of time. Darrin was a scared little boy placed in unfamiliar settings, full of complete strangers who expected him to act like everything was fine. He felt unwanted and unimportant and feared that his parents would forget about him altogether.

Despite the fact that these facilities arranged set visitation schedules for Darrin's parents to visit, they rarely took the time to visit Darrin. In addition, several of these facilities attempted to involve Dorothy and Don in some form of family therapy but neither would take the time to commit to helping their son and made up excuses about why they couldn't attend therapy sessions. According to staff, Darrin would watch as the other children received visits from their family members.

## IMPLICATIONS FOR COPING/FUNCTIONING

Darrin's parents made little effort to make Darrin feel as though he was an important part of a family. The clear message was 'we don't want you' and 'you don't belong.' They failed to emotionally invest in Darrin and made him feel worthless. Darrin lived in fear that his mother, father, or both, would eventually disappear. Living this way made it difficult for him to trust in others and created an enormous amount of anxiety.

## D. DOMETIC VIOLENCE, PARENTS RELATIONSHIP & DIVORCE

Dorothy and Don were married on October 1, 1966 and lived together as husband and wife until on or about October 1980, at which time they stopped living together because of irreconcilable difference. Their divorce was finalized on February 26, 1982. Dorothy received sole custody of Darrin and Don was allowed visitation. (Appendix C, pg. 118).

Prior to the divorce, family relationships in the home were complicated and difficult, primarily due to the constant fighting that occurred between Dorothy and Don. Neither parent appeared to be overly concerned about Darrin and seemed to place their own needs before their sons. Darrin advised his probation officer that his parents fought all the time and that his father hits his mother. (Appendix C, pg. 73) According to a social history, Darrin's home situation was very confusing. Don was a jealous man and Dorothy was unfaithful and this unfortunate combination led to frequent violent episodes in the home.

Darrin's probation officer wrote, "Their marriage is so shaky and their relationship so strained, that quite often Darrin gets stuck in the middle whether he wants to or not." She suspected that although Darrin's parents stated they would like to present a united front, they proved to be very inconsistent. "Their relationship is poor and quite often, Mrs. Shatner is gone for a week or two weeks at a time. Mr. Shatner has a drinking problem and really does not give any positive support of caring and attention to his son." (Appendix C, pg. 81). She also felt that Darrin's parents definitely needed to learn to be much more positive and more supportive of their son. "However, they have several marital problems of their own, and that quite often, they leave Darrin as the bouncing ball in the middle." She suspected that Darrin was a tool used between the parents. Also, Darrin was an only child and all of the pressure was on him. (Appendix C, pg. 70-95)

Dorothy explained that the marriage was one of constant verbal and physical abuse and Don stated that the marriage was one of constant infidelity on Dorothy's part. As a result of the above combination, the marriage ended after twelve years and Darrin was placed in the middle of their bitter divorce.

According to one report, Dorothy was "having a very difficult time in her divorce and felt that her ex-husband was definitely taking monetary advantage of her and is fearful that he is angry enough to do harm to her." (Appendix C). According to the Judgment of Dissolution of Marriage, "That the Petitioner (Dorothy) has established by competent material and relevant proof that the Respondent, DONALD GENE SHATNER, was guilty of extreme and repeated mental cruelty towards the Petitioner as alleged and charged in her Petition for Dissolution of Marriage without cause or provocation on the part of the Petitioner" and "Husband acknowledges that without consent, signature or approval of wife, he sold the marital premises..." (Appendix C, pg.110)

## IMPLICATIONS FOR COPING/FUNCTIONING

Darrin not only witnessed the turbulent relationship between his parents, he was often placed in the middle and forced to choose sides. Witnessing this violence

and hearing the verbal abuse was very difficult for Darrin and negatively impacted his development.

For obvious reasons, children see divorce as something very traumatic. They are often concerned with their own security and will question: What if they both leave me? What is it that I did wrong? Did I cause the divorce? Now what's going to happen to me? Children react in different ways with the onset of divorce. Some will be extremely sad and show signs of depression and even sleeplessness. Anxiety levels peak as they feel they are going to be abandoned or rejected by one or even both parents. Some divorce situations may make the child feel lonely. This may be due to a long absence of one of the parents (Hughes).

No matter what the situation, the child will be affected in some way by a divorce. Some children may become psychologically scarred from the experience, and still other children may not be affected emotionally at all (Hughes). Much depends on how well the parents are able to handle the situation and Dorothy and Don failed miserably by involving Darrin in their arguments, placing him in the middle, and forcing him to chose sides.

Darrin was devastated by his parent's breakup but lacked the ability to express his feelings and like many children in similar situations, he began to act out in order to obtain the attention he so desperately needed. Unfortunately Darrin's cries for help went unheard and his acting out behaviors continued to escalate. Due to his parent's inability, and/or unwillingness to help their child, Darrin was placed in the custody of the Department of Children and Family Services. Once Darrin was in the system, he was moved from one placement to another. Darrin never stayed anywhere long enough to develop meaningful relationships and this left him with little or no sense of trust or belonging.

**E.  MEDICAL (Infancy/Migraines/Seizures/Head Trauma)**

As an infant, Darrin suffered from several medical conditions and continued to experience medical issues and complications throughout his development. In infancy, Darrin was brought to several doctors and emergency rooms and was diagnosed with colic, gastroenteritis and anemia. In childhood, Darrin began experiencing migraine headaches, had numerous head traumas and suffered from a seizure disorder.

Darrin began experiencing chronic headaches when he was just a toddler. He'd cry uncontrollably until he'd eventually cry himself to sleep. His mother gave him aspirin but it didn't seem to help. At age eight, he was evaluated for his severe headaches and was prescribed Dilantin (Affidavit of Dorothy Newsome). According to childhood records, "Darrin's major physical complaint remains headaches in the temporal area. Darrin's headaches appear to be severe enough for Darrin to grab his head and roll on the floor in apparent pain." Darrin was prescribed Bellengal Space Tablets for migraine headaches." (Appendix A, pg. 185).

Darrin presents with a long history of injuries that began with his falling out of trees when he was approximately five or six years old. It seemed that every couple of days Darrin was injuring himself in some form or fashion. At age nine, Darrin fell out of a tree while visiting his grandmother and was knocked unconscious for several minutes but didn't receive medical treatment for this injury (Affidavit of Agnes Bently). At age ten, Darrin was hit by a car and received injuries to his head. In addition, Darrin's father hit him in the head with a marble ashtray and once hit him in the face and broke his nose. Darrin was also hit in the head with a wine bottle and was once hit in the head with a baseball bat and knocked unconscious for twenty minutes.

Darrin also presents with a seizure disorder that dates back to his early childhood and continues in the present. He reports that during the onset of the seizure, he has "visions" and hallucinates. As a child, Darrin was placed on Phenobarbital for his seizures and was recently (1-5-04) placed on Klonapin, an anti-seizure mediation.

## IMPLICATIONS FOR COPING/FUNCTIONING

Dorothy had a difficult time with Darrin because he was a sick child and required a lot of attention. According to research, a colicky infant isn't easily consoled and cries excessively, which often varies with good and bad days. It is a condition that varies in its severity, with some babies settling on being held while others are inconsolable. Colic is a painful condition that usually peeks at around six weeks and stops around three months of age, although it can persist for up to five months. It includes a variety of symptoms ranging from pulling up legs, clenching fists, tensing of abdomen, bloating, cramps, passing flatus, frequent loose bowel actions and crying (The Colicky Baby). According to Dorothy, Darrin had a severe case and suffered from all of the symptoms of colic.

Darrin suffered from gastroenteritis, which is an acute infectious syndrome of the stomach lining and intestines. Symptoms include diarrhea, vomiting, and abdominal cramps. Severity varies from transient diarrhea to life-threatening dehydration (The Britannica Concise).

Darrin also suffered from anemia, a condition in which there is an abnormally low amount of normal red blood cells in the body. The red blood cells are the oxygen carrying cells, so when there are low numbers of them, the body has to work harder as a whole to get enough oxygen with the limited number of red blood cells it has (Anemia in Infants: What Causes it?).

In addition, Darrin developed a seizure disorder. According to research, a convulsion disorder can occur at any stage of life but most frequently begins in childhood. The specific causes of epilepsy are not clearly known. It is believed that people become seizure-prone when a particular area of the brain becomes electrically unstable. This condition may result from an underlying lesion caused by scar tissue from a head injury, a tumor, or an interruption in blood supply to the brain. A wide variety of psychological, physical, and sensory factors are thought to trigger seizures in susceptible persons—for example, fatigue, excitement, anger or surprise (Heward, 1996).

A combination of the above medical conditions increased Dorothy's resentment towards Darrin and caused her to pull farther away from him. Darrin's seizure disorder and migraine headaches continue to bother him to date.

## F. ATTENTION DEFICIT DISORDER/ LEARNING DISORDER

Darrin was described as a hyperactive child, showed evidence of a learning disability and was diagnosed with an attention deficit disorder at an early age. Despite early detection, the school system failed to properly address and/or program for Darrin's disabilities. As a result, Darrin acted out in the classroom, stood out among his peers, was shuffled from school to school, and ultimately fell way behind his peers in the academic arena. Darrin's background included several factors (home situation, verbal and physical abuse, multiple school placements, along with several living situations) that served as obstacles for him getting the services he needed.

## IMPLICATION FOR COPING/FUNCTIONING

In his evaluation of Darrin, Dr. Jonathan Hess noted the existence of a learning disorder and attention deficit disorder that is directly related to his finding of sustained attention problems (Appendix C, pg. 141). According to the Diagnostic and Statistical Manual of Mental Disorders Fourth Edition Text Revision (DSM-IV-TR), "The essential feature of Attention-Deficit/Hyperactivity Disorder is a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequently displayed and more severe than is typically observed in individuals at a comparable level of development." (American Psychiatric Association, 2000).

A study of the relationship between learning disabilities and delinquency found that learning disabilities might be linked to certain underdeveloped personality skills, such as general impulsiveness and poor judgment. A deficiency in these skills may lead to increased susceptibility to delinquent behavior through unwise social choices (Walkie & Spreen 1993).

Darrin struggled to succeed in school and to fit in with his peers but wasn't able to due to his attention deficit disorder. Although aware of the problem, the school system and his parents failed to address and properly treat this disorder. As a result, Darrin was set up for failure at each school he was placed at and stood out among his peers, which in turn made if difficult for him to form meaningful peer relationships.

## G. RUNNING AWAY

Darrin's juvenile probation officer, Karen Brucks, reported that Darrin was a "runner". Mrs. Brucks explained that in her experience, if a child continues to run away from home, there is usually something wrong at home. She had a gut feeling that something wasn't right with Darrin's family but explained that she had little leverage to do much on cases like Darrin's because she couldn't force his parents to go to counseling and/or to spend more time with their son. "There weren't any consequences for them if they failed to follow through on my recommendations. I remember I felt bad for Darrin." (Affidavit of Karen Brucks).

## IMPLICATIONS FOR COPING/FUNCTIONING

According to the Family Help Tree, disruptive family conditions may be the principle reason that young people leave home. It is critical that the number of youth who run away not be viewed entirely as an indicator of problem behavior, but also as evidence of society's inability to develop adequate supports for youth and families troubled with difficulties, alcohol or drug abuse, incest, and violence (FamilyHelp Tree.Com).

Many in the field say kids always run for a reason. "Something has gone wrong." Kids are unlikely to leave a good home, unless they have some sort of emotional or psychological issues that preclude them from being attached to that family. Running away is viewed as a "cry for help" and a signal of unaddressed problems at home (Slavin 2001).

Darrin attempted to escape his circumstances by running away. He couldn't handle his home situation, couldn't take the abuse and didn't want to witness the domestic violence any more. Darrin needed help but unfortunately, his cries for help were ignored and never addressed. His family, DCFS and the school system all failed to address this issue and look for the cause of this behavior. The symptom was well noted but never addressed.

## H. SUBSTANCE ABUSE

Darrin began using inhalants at a very young age and continued this self-destructive behavior for several years. Eventually, the inhalants led to experimentation with, and use of, alcohol, marijuana, LSD and cocaine. By the time Darrin reached the age of ten he was heavily into sniffing glue and paint. By the time he reached fifteen he was still using inhalants, smoking marijuana, drinking alcohol and began to use LSD. Darrin started using cocaine when he was a young adult.

Darrin's inhalant abuse is well documented in childhood records. According to Darrin, he began sniffing glue when he was approximately eight years old. Darrin's mother reports that she first caught him sniffing glue when he was around eight and recalls that he had a bad reaction to the glue because he was throwing himself back and forth against the wall.

According to an IEP staff conference note, "Mother reports suspicion of heavy glue sniffing" (Appendix C, Pg. 53). An intake record from Sunny Ridge Treatment Center reads, "The problems which Darrin himself says he has are: cursing, misleading, stealing and drugs (Appendix B, pg. 12). According to an intake record from Locust Jr. High School, "Darrin has been repeatedly into heavy glue sniffing which he must learn to control." (Appendix C, pg. 52). Lastly, Darrin was referred to the Juvenile Court on a Delinquent Petition No. 79-10361 alleging theft of glue.

According to a needs assessment form from the Kentucky Treatment Center, Darrin began sniffing paint and glue at age nine. Darrin continued to use inhalants and one worker wrote, he "puts himself in dangerous situations, especially related to getting high (paint, glue, alcohol) and not being in control." (Appendix B, pg. 140).

In an interview with Dr. James O'Donnell, Darrin described abusing glue, toluene, and a substance like toluene (TOLY), which is unlike glue. He described acute toxicity as the 'echo zone', wherein he experienced auditory hallucinations, distorted and confused thought, and extreme disorientation (Appendix C, pg. 129-135),

Dr. Mash reported that Darrin is typical of an inhalant abuser being, "from disproportionately troubled and fragmented families. Mr. Shatner meets the generic pattern for inhalant abuse/dependence." Dr. Mash explained that Darrin's pattern of abuse completely fits the epidemiological profile of an inhalant abuser (Appendix C, pg. 136-140).

Darrin started abusing marijuana and hashish at the age of thirteen, and described this as his drug of choice during his teenaged years, smoking as much as he could get his hands on everyday. Darrin explained the marijuana made him mellow, "giggly", laid back, and he generally felt good. (Appendix C, pg. 129-135),

Darrin's abuse of alcohol occurred primarily on the weekends during his adolescence and resulted in him becoming intoxicated almost weekly. Darrin liked the high from alcohol and liked how it made him feel braver. He responded, or rather, hyper-responded, to any social interaction and found himself frequently in flight while intoxicated from alcohol. He occasionally experienced blackouts.

Darrin began using cocaine around his 18th birthday and his method of consumption was nasal insufflation (snorting) and later occasional smoking. He described a frequent and consuming use of cocaine beginning at age eighteen and continuing to escalate up to the day of the instance offense. Darrin met Jean Rogoz on the day of the offense and she injected him intravenously with cocaine. This was the first time Darrin had used cocaine intravenously. According to Darrin, he used approximately ten injections throughout that evening.

Darrin was aware that his life with out of control with cocaine and informed Dr. O'Donnell the he sought treatment at a residential drug treatment in August of 1986 but was refused treatment due to financial constraints.

## IMPLICATIONS FOR COPING AND FUNCTIONING

According to research, sniffing volatile solvents, which includes most inhalants, can cause severe damage to the brain and nervous system. The National Institute on Drug Abuse has shown that initial use of inhalants often starts early and young people are likely to abuse inhalants, in part because inhalants are readily available and inexpensive (Sharp, Beauvais & Spence 1992). According to the National Institute on Drug Abuse, research suggests that chronic or long-term inhalant abusers are among the most difficult to treat and may experience multiple psychological and social problems.

Dr. Deborah Mash reported that the essential feature of inhalant abuse is the presence of clinically significant maladaptive behavioral or psychological changes. She explained that Inhalants are known to cause both central and peripheral nervous system damage, which may be permanent. Such damage can lead to impaired perception, reasoning and memory, as well as defective muscular coordination and eventually dementia. She

summarized by stating, "I am certain that he (Darrin Shatner) had inhalant related brain damage." (Appendix C, pg. 134-140). Dr. Deborah Mash concluded that during Darrin's active use period, he would have met the DSM-IV diagnostic criteria for inhalant dependence. She explained that the essential feature of substance dependence is a cluster of cognitive, behavioral, and physiological symptoms indicating that the individual continues use of an inhalant, despite significant substance-related problems. (Appendix C, pg. 138). Dr. Mash stated, "It is unfortunate that an early social intervention (rehabilitation) of Mr. Shatner as a child inhalant abuser did not occur." (Appendix C. pg. 137).

Dr. James O'Donnell explained that any cocaine use has a high potential for dependency and overdose since the period of euphoria is quickly followed by a powerful dysphonic mood swing that leads to further drug use. As compulsive drug use continues, interest diminishes in social contact, family friends, food, sexual activity and other activities. Depending on the dose, chronicity, personality, genetic predisposition, and expectation, cocaine produces a continuum of psychiatric syndromes ranging from euphoria and dysphoria to a schizopreniform psychosis similar to amphetamine-induced psychosis. While under the influence of cocaine, distorted thought processes can result in impaired judgment and attention deficits and increase the chance of accidental trauma. Acute overdose or habitual use leads to profound mood changes characterized by paranoid thinking, agitation, irritability, restlessness, and impulsivity. Dr. O'Donnell concluded that in Darrin's case, this increase in impulsivity was exacerbated by a frontal lobe brain injury symptom of impulsivity that was identified by Dr. Jonathan Hess. (Appendix C, pg. 129-135).

According to experts, LSD causes a feeling of depersonalization and loss of body image. Pseudo-hallucinations are common. One sensation merges into another, and one sense into another, so that the individual may report being able to taste color or touch sound. Time stands still; also past, present, and future frequently become mixed up. Intense mood changes are also experienced under the influence of LSD.

The National Institute of Drug Abuse-funded research has led to the important conclusion that drug abuse is a disease of the brain. According to Brookhaven National Laboratory in New York, drug dependence has a clear biological basis. Addiction is a disorder of the brain, no different from other forms of mental illness (Nash 1997).

## I.  FAILURE OF THE SCHOOL SYSTEM

Darrin was an active child in his first years of school, but didn't exhibit any significant problems until the first grade when he began biting and arguing with other students. From the second grade on, Darrin experienced frequent moves and multiple school placements because the school system failed to properly identify and program for his special needs.

Although Darrin began having difficulties in the first grade, he wasn't diagnosed as a hyperactive child until the fourth grade. Darrin's probation officer reported, "This would give an explanation for his short attention span, his inability to get along with kids, the setting up of teachers, and this has all led to complicated problems such as being behind in reading and poor negative self-image and not wanting to read and therefore

creating more problems in the classroom." (Appendix C, pg. 75). Despite detecting the disorder, Darrin didn't receive appropriate services until the end of the fifth grade.

Various schools couldn't deal with Darrin's problems so his parent's sent him to a military boarding school for the fourth grade. His parents felt that this was hard on Darrin so they let him come home and put him back in the public schools. Darrin's behavior continued to deteriorate and at the end of the fifth grade the school sent him to Swift Elementary School where he was in an ERA class. Shortly thereafter, Darrin's family moved to Glenview and enrolled him at Locust Jr. High School but because of his extremely poor school record, the school did not want to take Darrin and he was transferred to Howard Jr. High. Due to extensive problems at Howard Jr. High, he was placed in Rosenthal School for a summer session at Arden Shore (Appendix C, pg. 75).

According to an intake summary dated July 17, 1980 "It would seem apparent that Darrin is a child in the need of the services of a special class to upgrade his academic skill, to give him emotional support and to help him with his behavior (Appendix C, pg. 11)." Intake records from Locust Jr. High School noted, "From the description of his checkered school background he sounds like a child who needs the service of a special class to help him upgrade his academic skills and also to give him emotional support and protection. He is a youngster who has had many years of failure and seemingly not serviced appropriately but merely maintained." (Appendix C, pg. 45).

Dr. Jonathan Hess wrote, "As a professional psychologist who has done assessment with problem children, Mr. Shatner is a consequence of a failed educational and health care system. Of course, he is accountable for any crimes he committed as an adult. How accountable was he when he started grade school? Effective assessments and interventions at that time may well have prevented the tragic events that subsequently unfolded (Appendix C, pg. 141-143).

Darrin received educational services at the following places:
- Blue Bird Nursery School
- Bell Kindergarten
- St. Gregory Elementary
- Pierce Elementary
- St. Gregory Elementary
- Midwest Military School
- Hugen Elementary School
- Neon Fleming Elementary School
- Swift Elementary School
- Locust Jr. High School
- Howard Jr. High School
- Arden Shore Day Program
- Sunny Ridge Treatment Center
- Arden Shore Home for Boys
- Juvenile Detention Center
- Elk Grove Jr. High School
- Shelter Inc.

- Covenant Children's Home
- Juvenile Detention Center
- Princeton High School
- California Juvenile Detention Center
- Kentucky Treatment Center

## IMPLICATIONS FOR COPING/FUNCTIONING

According to research, one of the strongest predictors of any child growing up to be a well-functioning adult is academic achievement (Rutter & Quinton, 1984). The Illinois school system failed to properly diagnosis and program for Darrin's special needs and as a result, subjected him to multiple moves and frequent disruptions in his educational career.

Without intervention, proper diagnosis or appropriate planning Darrin was constantly set up for failure. It was difficult for Darrin to go to school each day. He didn't understand the subjects, couldn't do the work, couldn't sit still, and the other children made fun of him. Each school came with a new set of failures as Darrin struggled to do the work and struggled to fit in and deal with the peer rejection that came with each new move. Darrin's school experiences contributed to his low self-esteem and poor self-image.

## J. FAILURE OF DCFS/ MULITPLE MOVES & MULITPLE PLACEMENTS

Darrin's developmental years were punctuated with frequent, and oftentimes disruptive, moves. Darrin was shuffled between family members, friends and once DCFS obtained custody, was moved from one placement to the next due to inadequate case management and inappropriate placements. Darrin never had one place to call home.

Darrin's parents admit they didn't have time for Darrin and pawned him off on whoever would take him. From infancy on, Darrin was left with his godfather, family, and family friends. Throughout his upbringing, Darrin spent significant time in Kentucky, California, Maryland, Florida and Illinois with grandparents, aunts, uncles and cousins.

In addition to several unsuccessful family placements, Darrin also endured the consequences of inadequate case management and inappropriate placements at the hands of DCFS. As a result, Darrin was either rejected by the placement or ran away from the placement. Almost every time Darrin ran away, he ran home to one of his parents, who rejected him and forced him to return. Darrin ran away from Sunny Ridge Treatment Center, The Shelter Inc., Arden Shore Home for Boys, The New Life House and Covenant Children's Home.

The following is a list of some of the places Darrin lived
- Parent's house
- Agnes Bentley's home in Kentucky on several occasions
- Donald Crumb's home Maryland on a few occasions
- Pat Ryan's home off and on for several years.
- Military Boarding School
- Juvenile Detention
- Parent's house

- Sunny Ridge Treatment Center (6-17-80 to 7-29-80)
- Arden Shore Home for Boys (7-29-80 to1-30-81)
- Juvenile Detention (1-30-81 to 2-28-81)
- Mother's house (2-28-81 to 8-5-81)
- Shelter Inc. (8-5-81 to 8-23-81)
- Juvenile Detention (8-27-81 to 10-6-81).
- Covenant Children's Home (10-6-81 to 7-25-82)
- The Salvation Army New Life House (7-25-82 to 7-26-82)
- Father's House
- Uncle Monroe's house in California
- Circus in California
- Uncle Monroe's house in California
- Circus in California
- California Juvenile Detention Center (3-13-83 to 4-20-83)
- Godfather's house
- Mother's house
- Agnes Bentley's house in Kentucky
- Daniel Kiser's house
- California
- California Juvenile Detention Center
- Daniel Kiser's house in Kentucky
- Mother's house
- Father's house
- Godfather's house
- Cousin, Daniel Kiser's house
- Kentucky Treatment Center
- Kathy Newsome in Kentucky
- James Bentley's home in Florida
- Earl Bentley's home in Kentucky
- Father's house
- Donald Crumb's house in West Virginia.
- John Crumb
- Own apartment in his mother's building

One worker commented, "It is obvious to this worker that Darrin Shatner has lived many places in his life. It is doubtful if he ever had a place called home. This living situation has indeed caused many of his problems in juvenile services throughout this country." (Appendix B, pg. 85-267).

## IMPLICATIONS FOR COPING/FUNCTIONING

By the time Darrin reached eighteen he had moved over forty times. He never belonged anywhere and never had one place he could call home. The perpetual rejection that he experienced caused him to feel unwanted and unloved and left him with little sense of trust or faith in others.

## K. EMOTIONAL ABUSE BY ARDEN SHORE HOME FOR BOYS

Darrin was removed from his parent's care and placed at Arden Shore Home for Boys
because he needed a therapeutic setting that could help him address his emotional
problems. According to childhood records, Darrin's parents were criticized for their
inability to recognize and praise Darrin for his positive behaviors. Sadly, the staff at
Arden Shore viewed and treated Darrin as a "bad" kid, rather than an abused and
neglected child, with severe emotional disturbances, who came from a devastating
family situation.

In a progress letter written September 20, 1980, Darrin's team leader reports, "When he
is held accountable on this, he will throw a temper tantrum just like a five year old.
Does Darrin want to be a baby the rest of his life? Darrin can act like an idiot in front of
the whole group, but says he can't talk to the whole group. Who does Darrin think he is
fooling? (Appendix B, pg. 18)." He went on to write, "He (Darrin) will try to get back at
group members by bringing up confidential stuff just like a five year old will tell mama
what his sister did. The group wants Darrin to grow up because there won't be people
to take care of him the rest of his life (Appendix B, pg. 19)." Based on his family
history, Darrin was aware that no one would be there to take care of him the rest of his
life and perhaps he acted like a "baby" and "an idiot" because he was an emotionally
disturbed child who lacked the skills to express himself appropriately.

A progress letter, written October 30, 1980 reads, "It's true that Darrin is using some of
the help because he didn't show as many silly problems this month, but why show any
unnecessary problems?" In addition, "He (Darrin) doesn't want to realize that he will
need to quit fantasizing about the way things should be and needs to start dealing with
the way they really are. Life is not a fairytale where magically everyone lives happily
ever after." (Appendix B, pg. 20). Life isn't a fairytale where everyone lives happily ever
after, but a twelve year old boy should have at least one caring parent, be living at
home, free from emotional and physical abuse, free from drug additions, free from a
severe emotional disturbance, etc. Fantasizing about the way things should have been
was Darrin's attempt to cope with his unfortunate situation because dealing with reality
was just too painful. In addition, his "silly problems" were symptoms of his emotional
disturbance and it is also quite possible that these "silly problems" were Darrin's attempt
to communicate his feelings because he lacked the verbal ability to do so.

Another progress letter, dated January 2, 1981 reported, "As Darrin's group leader I see
him as a young man who still will allow his feelings to tear him down. Instead of being
man enough to talk about them, Darrin chooses to act like a five-year-old before he
decides to maturely deal with his problems." The reporter goes on to ask, "Why doesn't
Darrin have the confidence to talk about his feelings before he needs to look like a
fool?" "Darrin sees himself needing to play games to let his group know he feels bad.
Does Darrin have a mouth? Can he talk about his feelings before he finds it necessary
to act like a baby? Why doesn't Darrin believe in himself? (Appendix B, pg. 28). In
reality, Darrin wasn't "man enough" to communicate his feelings because he was only a
twelve-year-old boy. Perhaps he lacked the confidence to talk about his feelings
because he was an abused, neglected, emotionally disturbed child being ridiculed by
the staff that was employed to help him. It is also quite possible that Darrin acted like a
five-year old child because he was functioning at the five-year old level and needed

support and guidance in order to successfully move forward in his development. Lastly, he probably didn't believe in himself because no one else did and it probably wasn't helpful to be called a "five-year old," told he wasn't "man enough" and that he looks like "a fool" and "acts like a baby."

**IMPLICATIONS FOR COPING/FUNCTIONING**
Darrin was an emotionally disturbed child who was in need of a therapeutic setting that could help him address some of his issues. Instead, Darrin's team leader treated Darrin like a "bad kid" who had 100% control over his actions and reactions to those around him. Darrin was an emotionally traumatized child, abandoned by his family, addicted to drugs, without a home, and suffering from attention deficit disorder. Being called an "idiot," "baby," and a "fool" didn't help bolster his self-esteem and being told to "act like a man" is not a very therapeutic approach.

## L. POSITIVE PEER CULTURE
The majority of residential centers where Darrin stayed utilized a Positive Peer Culture (PPC) treatment modality. The PPC model believes that peer influence is the most powerful, motivating force behind the choices and actions of many adolescents.
The PPC model utilizes the individual's peers to restrain them when they were acting out. Darrin disliked this approach and felt it didn't work. In fact, he felt the PPC model subjected him to additional abuse from his peers. Darrin explained that when he was restrained the other boys took cheap shots at him, punching and kicking him during the restraint. Darrin also got hurt when he assisted in restraining others. For example, an incident report dated 11/29/80 indicates Darrin was bitten in the arm while containing an acting out group member and on another occasion, a peer bit Darrin on the foot when the group was containing him. (Appendix A, pg. 232-233).

**IMPLICATIONS FOR COPING/FUNCTIONING**
Darrin explained that it was a bad idea to put a bunch of troubled kids in a setting that allowed and encouraged them to tell each other what to do. According to psychologist Bob Thorud, you get kids with all kinds of problems, who don't necessarily know how to deal with their own problems and aggression; much less others. Groups are often dominated by aggressive teenagers and sometimes, an irritated teenager persuades his buddies to gang up on another teen and begin a take down (Graham, 2002).

Illinois is one of several states that have allowed the use of peer takedowns. Advocates say the so-called peer confinement helps teenagers learn how to help each other, but critics say the practice gives dangerous and often violent youths too much power. Recently, the tide appears to be turning away from these takedowns, explaining that seriously disturbed youths often have difficulty exercising self-control and handling aggression, making them ill-suited for this kind of group discipline. In Illinois, the Department of Children and Family Services has proposed a rule that would end peer restraints in the few facility that still uses the PPC model within four years. The General Assembly is considering the proposal. "We really feel this is an adult's responsibility, not a child's, and that it's especially inappropriate for a child to lay hands on another child who has been a victim of abuse or neglect," said Tom Finnegan, DCFS chief of staff for operations. (Graham, 2002).

It was well documented that Darrin had difficulties relating to his peers and was often viewed as an outcast. Darrin explained that he hated the PPC model and begged his caseworker not to place him in this type of setting. Despite his pleas, Darrin continued to be placed in these facilities, continued to fail, and continued to run away.

## M. MENTAL HEALTH (DIAGNOSIS)

It is obvious from childhood records that Darrin began suffering from an emotional disturbance at young age and that this emotional disturbance continued to progress throughout his development. One worker wrote, "It is difficult to state exactly what level this young man's emotional health is. He obviously has some severe emotional problems at this time. He has very poor judgment, little impulse control, and definitely is in need of intense therapy and limits placed on his behavior. This could possibly be complicated by the fact that his parents do not know how to deal with him." (Appendix C, pg. 74).

Another worker wrote, "It is obvious that he has emotional problems. He has been diagnosed as hyperactive through school testing. Darrin does have some emotional problems at this time. He has very poor judgment, little impulse control and is in definite need of intense therapy. He also needs structure and limits placed upon his behavior. His parents have not been able to provide any kind of consistent parenting and quite often give him double messages." (Appendix A, pg. 49.)

By the time Darrin was eleven years old he was telling his mother he wished he were dead and used to tell his cousin, Jerrie Lynn, that he wanted to kill himself.

"His self-esteem is still closely tied to the feedback he gets from his parents. Since they seem very caught up in taking care of their own needs first, Darrin is set-up for a fall every time he looks for praise from them. Unless some dramatic changes occur within the system, Darrin will always come out on the short end. We have seen evidence that Darrin has the potential for positive psychological growth when his sights are not blunted by family expectations. " "He is still very vulnerable to the manipulations from other peers and adults—'easily led'—and needs further life experiences under keen, supportive supervision to broaden and deepen his responses." (Appendix A, pg. 189).

Staff at Covenant Children's Home wrote, "His (Darrin's) mood swings are still 'rollercoaster-ish', (Appendix A, pg. 189), "he no longer exhibits paranoia. He doesn't sleep in his closet or between the bed and wall now." (Appendix A, pg. 175)

According to records from Los Angeles, "It is apparent that the minor is emotionally troubled, self-destructive and in need of psychological counseling, guidance and supervision." (Appendix A, pg. 102).

Darrin never received the therapeutic services he required, despite the fact that therapy and other related services were recommended by several mental health experts. Darrin's probation officer wrote, she "realizes that Darrin does need more intensive therapy. However, there are several stumbling blocks here. Number one, Arden Shore does not like to involve anyone else in their treatment program. Number two, Mrs. Shatner does not seem too interested in getting involved in therapy and the probation

officer strongly suspects that Mr. Shatner would not want to be involved in therapy at all." (Appendix C, pg. 87).

Darrin's probation officer felt "that this young man has numerous emotional problems, and the Arden Shore School could not possibly be meeting all of them." "This young man should be in therapy but does not know if Arden Shore School Program, which is totally a peer pressure program, will allow him to receive outside therapy and remain in this program." (Appendix C, pg. 87).

In recent evaluations, Dr. Gunn diagnosed Darrin with an Axis I diagnosis of Major Depression with slight psychotic features and with an Axis II diagnosis of Dependent Personality Disorder. Dr. Gunn explained that Dependent Personality Disorder is characterized with constant feelings of abandonment, impulsiveness, transient stress-related paranoid ideation, idealization of certain others, and in particular-identity disturbance. Dr. Gunn explained that Darrin has a great deal of conflict regarding his self-concept and his pattern for relating to others. Above all, he has extremely strong dependency needs and in particular, he wants to be controlled by a female. After all these years, he is still seeking a mother. He associates his mother's acceptance with being hurt and he is prepared to harm himself if that will bring support from a woman (Appendix C, pg. 126-129).

According to Dr. Gunn, Darrin's conscious controls are of fair strength, but his unconscious controls are weak. He periodically suffers strong depressive moods and then feels a push to act out. Darrin has used drugs because with consciousness dimmed, he can fell a little less empty. He can be self-destructive, but hostilities towards others are unlikely, unless under drug influence or directed by a significant woman (Appendix C, pg. 126-129).


**IMPLICATIONS FOR COPING AND FUNCTIONING**
Darrin was diagnosed as an emotionally disturbed child who suffered with attention deficit disorder. He came from an extremely dysfunctional family who failed to provide any type of structure or security for their son. Later in life, Darrin was diagnosed with Dependent Personality Disorder

According to Dr. Gunn, Dependent Personality Disorder is characterized with constant feelings of abandonment, impulsiveness, transient stress-related paranoid ideation, idealization of certain others, and in particular-identity disturbance.

Symptoms, which in the adult indicate depression, are not necessarily found in children with depressive reaction. Thus, symptoms which in the adult are usually considered diagnostic for depression; such as suicidal attempts or suicide, do not necessarily point toward the same diagnosis in children, but may be impulsive acts, indicating acute anger or rebellion, rather than chronic depression ["Masked Depression in Children and Adolescents, Kurt Glaser, M.D.].

In older children, behavioral problems and delinquent behavior, such as tempter tantrums, disobedience, truancy, running away from home, may indicate depressive feelings but may not be recognized as such.

Dr. Karnicki wrote, "We need to find some way to engage the parents to change in order to 'salvage' Darrin." (Appendix C. pg. 119).

## N. TRUAMATIC BRAIN INJURY
In addition to the deficits associated with a learning disability and attention deficit disorder, Darrin shows evidence of a mild brain dysfunction. Several factors in Darrin's background, including numerous head traumas, seizure disorder, extreme childhood temperatures and years of repeated inhalant abuse may have led to the development of this traumatic brain injury.

When Darrin was thirteen years old, he informed an examiner that "he never wants to become involved with hard drugs again and is quite concerned that his previous use of drugs affected his brain and deteriorated his memory." (Appendix C, pg. 123). Unfortunately, Darrin did continue to use drugs and his concerns became reality.

Following a thorough examination, Dr. Jonathan Hess diagnosed Darrin with traumatic brain injury and reported, "Whether from traumatic brain Injury, toxicity, or inheritance, Mr. Shatner definitely shows symptoms of aberrant brain function. These symptoms include sustained attention problems involving overt perseveration. He also has difficulties in executive skills." (Appendix C, pg. 141-143).

In Dr. Mash's expert opinion, Darrin "suffers from a diminished cognitive capacity due to long-term inhalant abuse/dependence." Dr. Mash reported that, "Chronic inhalant abuse is known to affect higher brain reasoning centers. These higher brain cerebral cortical areas carry out the executive functions of the brain, which include a person's ability to accurately judge situational outcomes and to execute moral self-control." (Appendix C, pg. 140).

## IMPLICATIONS FOR COPING/FUNCTIONING
Dr. Hess concluded that Darrin has cognitive damage including pathological impulsivity that can be conceptualized as a failure to regulate, monitor, or control behavior and emotional expression. Because of an inability to exercise normal controls, behavior becomes disruptive and may consist of either excesses or deficits (Appendix C, pg. 141-143).

The effects of impulsivity in neurobehavioral disorders may be seen across areas of functioning that include cognition, behavior, and emotional expression. The impact on cognition leads to a change in functioning that may be characterized by a failure to consider, review, or appreciate the nature of one's actions. Poor judgment is common, as are limited insights, diminished self-monitoring capability, and lack of concern about the impact of one's actions on others (Holmes, Johnson & Roedel, 1993).

Everyone who knew Darrin described him as impulsive, juvenile, angry, depressed, etc. Disorders of impulse control are frequently associated with adult psychiatric diagnoses,

as well as disorders with a typical onset in childhood (e.g., attention deficit disorders). Behavior and personality changes are also commonly found in adult neurological diseases. In fact, an inability to restrain one's impulses, and control behavior, is often the initial symptom or primary compliant noted by concerned family members or by neurologists when examining a patient for frontal lobe brain injury [See Neuropsychological by Dr. Hess].

In addition to the damage caused by excessive abuse of inhalants, the development of Darrin's brain was negatively impacted by several other factors, most importantly, early and prolonged exposure to stressful situations. According to experts, the brain is very complex and is acutely vulnerable to trauma. While experience may alter the behavior of an adult, it literally provides the organizing framework for the brain of a child (Dr. Bruce Perry, Baylor College of Medicine). If the brain's organization reflects its experience, and the experience of the traumatized child is fear and stress, then the neurochemical responses to fear and stress become the most powerful architects of the brain and it's functioning.

High cortisol levels during the vulnerable years of zero to three, increase activity in the brain structure involved in vigilance and arousal. As a result, regions of the brain that were activated by the original trauma are immediately reactivated whenever the child dreams of, thinks about, or is reminded of the trauma. According to Bruce Perry, the slightest stress, the most inchoate fear, unleashes a new surge of stress hormones. This in return causes hyperactivity, anxiety and impulsive behavior. Trauma also scrambles neurotransmitter signals. Since neurotransmitters play key roles in telling growing neurons where to go and what to connect to, children exposed to chronic and unpredictable stress will suffer deficits in their ability to learn. Some percentage of capacity is permanently lost (Perry, 1997). Darrin's early and prolonged exposure to early abuse and domestic violence created a stressful environment that negatively impacted his brain development and may have contributed to his developing an attention deficit disorder and poor impulse control.

## O. RELIGION
Like many adolescents, Darrin was curious about the supernatural and the occult. Darrin explained that one of the counselors at Covenant Children's home encouraged Darrin to go the library and research the topic after which he and Darrin would discuss what Darrin had learned. Darrin eventually became involved with astrology and the Wicca religion. These religions are primarily based on nature and the stars.

## IMPLICATIONS FOR COPING/FUNCTIONING
Darrin's religion was misunderstood throughout Darrin's trial and sentencing where Darrin was portrayed as a devil worshipper. Darrin's religion is peaceful and he does not worship the devil. Darrin utilizes his religion for guidance and uses it to help him through the difficult times in his life.

## P. GOOD PERSON
As a young boy, Darrin liked all sports, football, basketball and he especially enjoyed skate boarding. He was an excellent swimmer, good at making things and really liked

art at school (Appendix C, Pg. 45). As a child, he indicated a possible interest in being a policeman, electrician, or mechanic who works with diesel car engines.

Staff at Children's Covenant Home described Darrin as "genuinely thrilled when significant adults at Covenant praise him and shows hurt if he is not measuring up to a level of behavior which he has shown to hold previously." "Darrin wants to please me and his child care workers and usually takes pride when he does. He will even brag about it." (Appendix A, pg. 189).

As a child Darrin was a caring and likeable person, despite the problems he had. According to childhood records, Darrin showed a very mature attitude when helping the handicapped people at Grove School and the Waukegan Developmental Center (Appendix B, pg. 21). When asked about this experience, Darrin explained he liked to help the kids and in a way understood how they felt because they couldn't live with their families either.

Several people commented on Darrin's helpfulness to others and described him as having a good heart. Dorothy describes Darrin as a loving son and a spiritual individual and enjoys the letters and paintings he sends her on a regular basis.

As an adult, Darrin turned to his religion, the religion of the stars, to help him work through and heal from the turmoil of his childhood experiences. Darrin's religion emphasizes astrology and teaches mental and spiritual alchemy. Darrin explains that he enjoys astrology because it helps him understand his problems, as well as others, and helps him find solutions for these problems. Darrin has grown and matured through his religion and utilizes his beliefs and practices to understand how his childhood experiences impacted the choices he made throughout his life and uses this understanding for continued maturity and spiritual growth.

## Q. SON
Darrin has a young son named Dustin Shatner who he expresses great interest in, and demonstrates great love and concern for. Darrin recognized that although his influence in his son's life is limited by external constraints, he maintains as much contact with him as possible. Darrin hopes to provide Dustin with the encouragement and guidance that he never received from his father.

## T. INCIDENT
Darrin met Jean Rogoz on the night of Danny Schneider's murder. Darrin and Jean had stopped by a common friend's house and both were using cocaine. Darrin was snorting the drug and Jean was injecting the cocaine into her arm and introduced Darrin to this form of drug use. She injected Darrin with his first IV drug use. Darrin explained that this high was much more intense than the typical high he experienced. It was during this high when Jean Rogoz came up with the idea to rob Danny Schneider. Darrin was attracted to Jean and wanted to spend more time with her so he agreed to accompany her to Danny's house. Darrin admits he agreed to rob Danny but maintains that Jean was the individual responsible for Danny's death.

A number of factors should be taken into consideration when assessing Darrin's level of involvement with this crime. According to Dr. Gunn, "There is much evidence to suggest that Mr. Shatner did not have any intent to commit murder when the crime took place. Given his personality if he allowed the lady he was with to initiate him into IV drug he would not have been aware of what was taking place. His description of being dominated by the lady present fits his personality as seen during this examination. He has massive dependency needs and great identify confusion. He would be easily led by a female. Considering his lifetime of abuse it would have been very easy for a female to have control over him and to direct him into negative behavior." (Appendix C, pg. 128).

According to Dr. O'Donnell, "At the time of the murder/arson, Mr. Shatner was intoxicated by cocaine, which impairs the ability of the brain to think clearly, causes other impairments in ability to function, and alters behavior and increases risk taking. In my opinion, with a reasonable degree of pharmacological certainty, the defendant Darrin Shatner, was intoxicated with cocaine." (Appendix C, pg. 133).

Dr. Mash concluded, "It is my expert opinion that Mr. Shatner suffers from a diminished cognitive capacity due to long-term inhalant abuse/dependence. Mr. Shatner was markedly intoxicated by cocaine (and coca ethylene and alcohol) at the time of the incident. He was severely impaired in his capacity to reason due to his combined cocaine and alcohol intoxication overlaid on his reduced mental capacity that resulted from his inhalant abuse. Chronic inhalant abuse is known to affect higher brain reasoning centers. These higher brain cerebral cortical areas carry out the executive functions of the brain, which includes a person's ability to accurately judge situational outcomes and to execute moral self-control. Based on these facts and findings, my expert opinion is that Mr. Shatner did not have the criminal intent to engage in the homicidal acts that led to the death of the victim." (Appendix C, pg. 140).

## III. SUMMARY OF FINDINGS

Darrin's family history reflects generational patterns of substance abuse, mental illness, neglect, physical abuse and abandonment. Childhood records paint a picture of a sad little boy who was provided very little opportunity to succeed in life. From the onset of his birth, to his present incarceration, Darrin has lived a life of abuse, desertion, desperation and isolation.

Darrin is a young man whose developmental years were marked by parental neglect and abandonment, physical and emotional abuse, domestic violence, substance abuse, inadequate education and multiple residential placements due to improper case management by the Illinois Department of Children and Family Services. He lacked a positive role model and struggled to develop stable friendships and relationships. Darrin also endured several medical issues, accidents and head injuries and struggled with an attention deficit disorder and a learning disability.

Darrin lacked the normative experiences that one would hope and expect a child would experience. He wasn't provided with a supportive and healthy environment in which to thrive and lacked a nurturing caregiver who could respond to him in an appropriate

manner. Darrin's parents were emotionally and physically inaccessible, disappeared for varying amounts of time, and frequently forced Darrin to stay with whoever would take him. Darrin never had a place to call home and lived over forty places by the time he was eighteen.

Darrin's parents lacked the necessary skills and involvement to recognize and address the terrible struggle in which their son was tangled. They were either incapable or unwilling to provide for Darrin's well being, therefore, depriving him of the love and support he needed. Both parents consistently exhibited poor judgment in the decisions they made that impacted Darrin's life. They were encouraged on numerous occasions to become more interested in Darrin's life, but continued to place their own needs before Darrin's.

A combination of Darrin's unique experiences led to the development of a severe emotional disturbance, the beginning symptoms of which are well documented in childhood records. Despite all of Darrin's cries for help, several red flags, and numerous recommendations by school personnel, the courts and various mental health professionals, Darrin never received the treatment and/or care he so desperately needed. In addition to several extraordinary external factors, Darrin overall development was negatively impacted by the presence of an attention deficit disorder and traumatic brain injury. Darrin attempted to self medicate, lacked impulse control, shows evidence of a cognitive delay, and was easily led by others. These factors must be taken into account when reviewing the choices Darrin made the night Danny Schneider's murderer.

During incarceration, Darrin has matured and gained insight into his behavior. He has demonstrated characteristics that reflect his love for his family and friends, especially his son, and has begun to express himself through his art. The purpose of this report is neither to excuse nor justify any offense that Darrin may have committed, but rather to assist the reader in understanding how Darrin's life experiences influenced and limited the choices he made. As difficult as it may be to understand the actions and choices Darrin made, we must remember that these actions were a natural extension of his life experiences.

Several family members and friends reported that they were willing and able to testify on Darrin's behalf at the time of sentencing but were never asked by his attorney. All were easily located, several even attended Darrin's trial and sentencing, and all would have testified about Darrin's childhood and the abuse he endured. In addition, childhood records were easily obtained and contained pertinent information that should have been revealed at Darrin's initial trial and sentencing hearing.

The aforementioned factors are important mitigating circumstances that were not brought to the attention of the court at the time of Darrin's original trial and were not introduced at his original sentencing hearing. These factors must be considered because they provide critical insight into Darrin Shatner's overall development and explain how his developmental background contributed to his frame of mind and the choices he made at the time of the incident.

IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) ) ) | NO. 91-CR-2026 |
| v. | ) ) | |
| Darrin Shatner | ) | |

## AFFIDAVIT OF ALICE WASHINGTON

I, Alice Washington, being duly sworn, do hereby state the following under oath:

1. That I am currently employed as a Forensic Social Worker by the Capital Litigation Division of the State Appellate Defender's Office at 600 W. Jackson Blvd., in Chicago, Illinois.

2. That my duties consist of investigating, compiling, and analyzing potentially mitigating evidence for capital defendants.

3. That I obtained my Bachelors' Degree in Science at DePaul University, my Masters Degree at Chicago State University and a certificate as a Paralegal, at Roosevelt University.

4. That I have completed training at the Cook County Public Defender's Office at 2650 S. California Ave. in Chicago, Illinois.

5. That I have performed professional services as a mitigation specialist since 1993.

6. That I have worked as a sentencing specialist on both non-capital as well as capital cases since 1993.

7. That I have tesified in court at sentencing hearings.

8. That the role of the sentencing specialist is to assist the defense team by conducting a thorough investigation of the defendant's biopsychosocial developmental history. Such an investigation necessitates:

      a. that the sentencing specialist obtain and review all records related to the client, including but not limited to medical records, school records, social service agency records, employment records, military records, prison records; and

      b. that the sentencing specialist conduct interviews with family members and other individuals close to the client to corroborate information obtained from the client and the

aforementioned records. Persons who should be interviewed include, but are not limited to: parents, siblings, spouses or significant others; children, extended family members such as grandparents, aunts and uncles, cousins, childhood and adult friends, godparents, neighbors, professional contacts, such as school personnel, social service personnel, psychological experts who have previously tested or assessed the client; jail and correctional personnel; and

        c. that the sentencing specialist make appropriate referrals for expert evaluations, when indicated, based on factors identified in the client's life from the above sources.

8. This report is based on currently accepted psychiatric, psychological and sociological theory and standards of practice within the field of clinical social work, outlines the developmental life experiences of the defendant. The facts contained herein were described by the defendant and his family members. Facts were also gathered by documented records and interviews of significant others who have known the defendant throughout his lifetime.

9. The purpose of this report is:

        1) to determine if there is evidence that the defendant suffered any forms of abuse, neglect, deprivation, loss, trauma, and /or stress, and to what degree;

        2) to determine to what extent the defendant's social and emotional development as a child and as an adult was affected by such experiences;

        3) to put into perspective these details of the defendant's life, not in an effort to dispel guilt or deprecate the serious nature of the crime, but rather to understand the offense within the larger context of his life experiences.

10. That based on my social experience as a mitigation specialist and on the results of my social history investigation of Mr. Darrin Shatner, I conclude that the facts contained within the following report include material and significant findings in support of mitigation.

FURTHER AFFIANT SAYETH NOT.

                 Alice Washington/Forensic Social Worker

SWORN to and SUBSCRIBED in my presence this 6 day of May , 1998.

Notary Public

OFFICIAL SEAL
Pamela J. Bremer
Notary Public, State of Illinois
My Commission Expires 12/12/98

## I. INTRODUCTION

This report, based on currently accepted psychosocial theory and standards of practice within the field of clinical social work, briefly outlines the life experiences of the defendant, Darrin Shatner. The facts herein were described by the defendant and his family, as well as documented records.

## II. SOURCES OF INFORMATION

The following relatives were interviewed regarding their knowledge of Mr. Shatner and his life:

Darrin Shatner
Defendant

Dorothy Shatner
Defendant's Mother

Donald Shatner
Defendant's Father

Agnes Bently
Defendant's Maternal Grandmother

Donald Adair
Defendant's Paternal Grandfather

Helen Newsome
Defendant's Aunt

Cinda McConnell
Defendant's Fiancee

The following records and documents were reviewed:

--Court transcripts from Darrin Shatner's original sentencing
  hearing
--Department of Children and Family Services Records
--Records from Arden Shore Home for Boys
--Department of Corrections Records
--Records from Covenant Childrens Home and Family Services
--Records from Sunny Ridge Family Center
--Juvenile records
--Toxicologist report from Dr. O'Donnell
--Psychological report from Dr. Gunn

## MITIGATION REPORT

### INTRODUCTION

This mitigation report contains evidence of both physical and mental abuse at the hands of Darrin Shatner's parents. It demonstrates the inadequacies in his upbringing including: an inappropriate role model (his father had spent time in prison), domestic violence, adultery, neglect, emotional and physical abuse. Darrin may also have been a victim of major neurological injuries and deficits, including suspected seizure disorder (for which he was medicated) from frequent violent head injuries due to abuse and accidents. Furthermore, there are reports by competent forensic experts that at the time of the offense, Darrin Shatner suffered from extreme emotional disturbance and a diminished capacity which would have impaired his ability to control his behavior.

This mitigation report will document evidence of the numerous illnesses and injuries that Shatner was subjected to. It delineates the psychological issues that Shatner had to deal with, and how he was subsequently led into a life of drugs and alcohol in order to cope with problems that he was too young to understand.

This report is based upon the information that was made available to Capital Litigation Division to date. There are many records that have yet to be received which will enable defense counsel to tender a more complete report.

1

This report has been prepared to assist the Court in rendering an informed decision with respect to Mr. Shatner's sentence. The report below will chronologically explain the various environmental factors which has brought Darrin Shatner before the court today.

## DEVELOPMENTAL CHRONOLOGY

### INTERGENERATIONAL FAMILY HISTORY

In order to fully understand Darrin Shatner and his development, it is important to first understand the generational patterns into which he was born. Darrin has a pervasive history of child abuse, neglect, abandonment, as well as maltreatment, coupled with substance abuse and domestic violence. The prevalence of substance use and violence and/or abuse within the history of Darrin Shatner's extended family, were the groundwork for Darrin's developmental experiences.

### PARENTAL HISTORY

Both of Darrin's parents were teens at the time of his conception. His mother, Dorothy Shatner was only 18 years old and his father, Donald Shatner was only a year older, 19. Although they were married at the time, neither was ready for a child. Dorothy Shatner was born on March 2, 1949. She recalls how she had suffered as a young child in an overcrowded house with 11 other siblings. "One of my sisters died when she was 5 years old from diphtheria. My biological father died when I was 1 year old from black lung.

2

After my father's death, we were placed in an orphan home because my mother had gotten very ill. She had rheumatic fever. We stayed in the home for about a year. When my mother got better, she came and got us back. At that time, there were only 7 of them. Dorothy stated that after her mother's recovery, she remarried and reared 5 more children. Thus, Dorothy became sibling to 11 others. She describes these times as being extremely difficult. Her mother never worked and her step-father worked as a coal-miner. They were so poor that they ate beans and potatoes everyday. They very seldom had meat. On a rare occasion, they ate chicken. When asked if they had Sunday dinners or big dinners on holidays, Dorothy's response was, no. As a matter of fact, we were so poor that we didn't even celebrate Christmas. There was no money for food or toys. We were fortunate enough to get all of our clothes from the second hand store. This was only because one of my cousins owned it. Whenever there was a new shipment in, my cousin would call my mother and allow her to pick out what she wanted before they placed them out to the public. Even though we wore second hand clothing, we still had to share and wear hand-me-downs. Dorothy described life with her mother as being very strict. She remembers that they were not allowed to go anyplace or do anything. They were constantly being whipped by both parents with either a switch or a belt. At the age of 15, Dorothy decided to leave home. She moved to Chicago to live with an older sister. It was here that she met Darrin's father, Donald.

3

Donald Crumb Shatner stated that he came from a family of six. He had three brothers. He believed that his mother had a mental problem because she would always start an argument with their father and then leave the house. Mr. Shatner described one particular argument where his parents were arguing and his mother left and never returned. He was about 13 years old when this happened. He remembers his mother as being quick tempered and never holding one job for any significant period of time. He states that because of her temper and inability to settle in any one place for a long period of time, he lost contact with her several years ago. When asked if there was any history of mental illness in his family, Mr. Shatner replied, outside of my mother's mental troubles, one of my younger brothers killed himself about five years ago over the break-up of his marriage. He also stated that while his father never remarried, he occasionally entertained women at their home and that they were basically raised by their father. Mr. Shatner appears to have the utmost respect for his father and feels that he did a good job in raising them.

Dorothy alleges that the marriage was one of constant abuse, both physical and mental. Donald states that the marriage was one of constant infidelity on Dorothy's part. Thus, after twelve years of marriage, the couple decided to divorce. In a report dated July 17, 1980 written by social worker Dorothy Miller of Sunny Ridge Family Center in Wheaton, Illinois, she cites that there appears to be problems with both parents. Ms. Miller states that her

4

impression of Darrin's parents is that they appear to be "rather narcissistic"; that they present as having some difficulties in being able to admire the growth and development of their children without being threatened by it. She goes on to say that Mr. Shatner apparently came from a broken home. He suffers from feelings of rejection, being unloved by his mother and never fully accepted by his father. Ms. Miller was somehow able to disclose the fact that like Darrin, Donald Shatner had behavior problems as well when he was an adolescent. While her report indicates that he was able to overcome his deficiency by the time he reached adulthood, IDOC records indicate differently. (see attached report)

The report acknowledges severe marital problems in the home and goes on to say that some of the patterns which appeared in Donald Shatner's family origin are being repeated now. His family broke up when he was about 12 or 13 years of age ( as is his family when Darrin went into placement), and that his mother had left the family much as Mrs. Shatner sometimes says she would like to do. After interviewing the Shatner family, Ms. Miller was left with the impression that, while both of Darrin's parents had some insight into Darrin's problems and needs, they had a great deal of difficulty meeting those needs without feeling cheated in their attempts to meet their own needs.

**INTERVIEWS WITH DARRIN'S GRANDPARENTS**

5

Donald Adair, Darrin's paternal grandfather stated that he was totally against Darrin's parents getting married. If you get married against my wishes, I'll have the marriage annulled. Mr. Adair remembers one of several encounters he had with Dorothy prior to her marrying his son. He stated that she had resided in the same apartment building as he and his family when they met. One day while walking to the store, she came upon him insisting that he introduce her to his son. Introduce me to your son. I want to marry him. Mr. Adair stated that he had nothing against Dorothy. He simply thought they were too young to get married. Nevertheless, because he had forbidden them to get married, Dorothy and Donald eloped and went to Virginia to get married after dating for only six months. Mr. Adair believes that because of their age, neither his son, nor his new daughter-in-law were prepared to become responsible parents. Thus, when Darrin was born, he was shifted from one relative to the next because his parents didn't make any time for him. "If Darrin wasn't with me, he was with Pat Ryan, Darrin's godfather and personal friend to his father), or his maternal grandmother in Kentucky. If he wasn't with either of us, he was with another family member or in the detention home." When asked whether or not he was aware of any child abuse towards Darrin, Mr. Adair stated that Darrin was constantly abused by both parents. He recalled one incident in particular when he had gone to the shopping mall with Dorothy and Darrin. It appears that Dorothy had gotten angry with Darrin for some reason and took his head and banged it against the street light pole. Mr. Adair stated that

6

everyone around wanted to call the police on Dorothy so they just got in the car and drove home. He stated that he too was angry but decided not to press charges against her. Mr. Adair stated that he would keep Darrin quite often to keep his mother from beating him.

As it relates to his family, Mr. Adair stated that he believed his wife had some form of mental impairment. He described her demeanor as being very unpredictable and explosive. "She would get angry over the least little thing and seem to just explode into a violent rage." She was very distant from the kids. She would punish them by hitting them in the face with her hand or fist. Although she was their biological mother, she would refer to them as being my kids. She would always get angry and leave home. The last time she left was on Christmas Eve. The kids were heart-broken. They have never liked Christmas since. According to Mr. Adair, his wife had a brother who suffered from some sort of epileptic seizures and another brother who displayed violent behavior when drinking.

Mr. Adair describes his wife's lack of parental bonding further when he recalled an incident in which his son Tom ended up committing suicide. He stated that Tom was having difficulty in his marriage and wanted to spend time with his mother for advice and comfort in his time of grief. According to Mr. Adair, Tom was allowed to stay with his mother for only a short period of time after which she told him that he had to leave. Tom then came and stayed with his father (Mr. Adair) for a while before returning

7

home. Upon returning home, he discovered that his wife had left with his son going to Germany, where she eventually remarried. After a period of time, his son matured and returned to the United States to visit with him. Mr. Adair reports that at the time of his son's return, Tom was living with his boss. It appears that his boss both verbally and physically assaulted Tom's son. According to Mr. Adair, Tom then went and got a gun, held his boss hostage, eventually shot and killed him before turning the gun on himself. This incident has turned into bitterness towards Tom's mother (Darrin's paternal grandmother). Currently, no one knows nor cares about her whereabouts.

Darrin's maternal grandmother, Agnes Bently currently resides in Seco, Kentucky. She is presently 73 years old. She describes Darrin as being very nice and polite. She stated that there was nothing dysfunctional about her family and that her daughter left home at the age of 15 simply to make a better life for herself. Ms. Bently stated that she has never had any problems out of Darrin whatsoever, although both Darrin and Dorothy state just the opposite. It appears that Darrin went to live with his maternal grandmother at the age of either 10 or 11 for a brief period of time. While in Kentucky, Ms. Bently enrolled Darrin into the Fleming Neon Elementary School. He attended this school for only a couple of months before being shipped back to Illinois after he was caught sniffing paint to get high.

8

This was the origins of Darrin Shatner's nuclear family. The experiences of his parents and grandparents, molded Darrin. This comprises his genetic make-up. From this, he has become that person who stands before the court today.

## INFANCY (AGES 0 TO 4)

Darrin was born on July 12, 1967 at Ravenswood Hospital located on the north side of Chicago. His mother describes her delivery as being very difficult. She states she was in labor for over 35 hours and had to eventually be heavily sedated in order for the doctors to deliver Darrin. Records indicate that Ms. Shatner did in fact undergo a difficult delivery. (see records from Sunny Ridge Family Center) According to Dorothy, Darrin was scarred on his face as a result of the forceps used to pull him out. These scars remained with Darrin for a long period of time as is evident on his childhood pictures. Dorothy reports Darrin as being a very sickly child; that he was always crying and unable to retain his formula. Although it was long ago, she still remembers the sleepless nights trying to comfort her baby who seemed to be in such agony that it was almost unbearable to hear him cry. Dorothy would constantly take him to the hospital hoping and praying that sooner or later they would be able to prescribe something that would work, only to return home to the same routine of having what seemed like a hysterical baby on her hands. This cycle continued for several months. Darrin eventually grew out of it.

Once Darrin overcame his this difficult stage, he began to develop similar to other infants his age. Records revealed that he achieved all of the developmental milestones age appropriately. (see records from Sunny Ridge Family Center) Darrin was described by his mother as being very hyper. By the time Darrin reached one year old, his father was serving time in prison for robbery. Darrin's mother struggled to make ends meet while awaiting the return of her husband. She stated that she had to work two jobs and that she and Darrin barely survived. At the age of two, Darrin made his first attempt to run away from home. According to his mother, both she and Mr. Shatner were asleep at the time of the incident. Mrs. Shatner reports that Darrin got out of bed, went downstairs, opened the door and walked across the street where he was almost hit by a car. She stated that two adults picked him up and took him to the police station. Darrin remembers the story differently. According to Darrin, his mom and dad were fighting and one of his uncles was sleeping on the living-room couch when he simply came down stairs, unlocked the door and walked out with nothing on but a diaper. He stated that he walked down the street and got into a police car thinking it was a taxi-cab; that he was then taken to the police station where his mother was notified to come pick him up and bring him some clothes.

From the time of birth, Darrin was left with his dad's friend Pat Ryan on a regular basis. Both Mr. and Mrs. Shatner state that they didn't have time for Darrin and that he was always pawned off

10

on Mr. Ryan or whomever would keep him. At the age of three, Darrin reported to his mother that Uncle Pat (Pat Ryan) was pulling down his pants and fondling him. Although he stated that Uncle Pat did not hurt him, his mother neglected to take any actions from the allegations which had been made. As a matter of fact, she went right on sending Darrin over to Uncle Pat's every chance she could. When asked why she did nothing with regards to investigating the allegation made by Darrin, her response was that she had suspected that Pat was like that but that she could not prove it. She had no explanation as to why she continued to send her only son, her baby, to this man whom he had accused of fondling him other than to say that she really didn't have time for Darrin. By the time Darrin reached 4 years old, he attempted to run away from home again by climbing out of the window of his room and down a tree. This time he packed his clothes. Thus, at an early age not only was Darrin denied access bonding with either of his parents, but when he looked for an explanation or even help as to how to resolve the situation with uncle Pat, he was totally ignored.

As soon as he was old enough, Darrin was placed into nursery school. According to records received from Sunny Ridge Family Center, Darrin attended his first years of school at Blue Bird Nursery School. Although his mother reports him as being extremely hyper, the school stated that Darrin did not present any problems. As a matter of fact, records indicated that he had a rather good experience there.

11

**(AGES 5 THRU 10)**

By the time Darrin reached five years old, he had begun to sniff glue. He was constantly being abused by his both of his parents. His mother stated that she didn't really want Darrin because he was too sick and too hyper. Darrin was being disciplined by either a hit across the face, a hit on the head, or sent to his room. He received verbal abuse from both mom and dad, either cursing him or telling him how bad he was. When his parents would go on vacation, Darrin was told that he could not come because he was too mean, and no one wanted to be bothered with him. At the age of five, Darrin began suffering from severe headaches. His mother would treat them by giving him Tylenol. She stated that at one point Darrin's headaches were so bad that he would sit in his room and cry while holding his head and rocking back and forth. By the time Darrin reached eight years old, his mother took him for a brain scan to determine what was going on in his head. While she can't recall what the diagnosis was, she did remember that he was placed on Dilantin. By the time Darrin reached 10 years old, his nightmares became worse. According to his father, Darrin would have these dreams nearly every night. He would dream that the devil was going to come and get him. His father states that Darrin was always seeing things (hallucinating). It was at this time Darrin began sniffing paint fumes and drinking to get rid of the dreams. However, this only intensified his hallucinations. Darrin admits that at this point he wanted to kill himself. He was then sent to

12

live with his maternal grandmother in Kentucky. He remained in Kentucky for approximately six months before returning home.

## ACADEMIC PROGRESS

After Darrin's initial introduction into nursery school, he began having nightmares. With the onset of kindergarten came the great many moves to different schools. According to a social history done for the individualized education program on June 25, 1979, (see attached report) Darrin had eight moves to different school. He attended Bell School in Chicago for Kindergarten and St. Gregory for first grade. These four years seemed to have gone without any problems. However, in second grade, at St. Gregory, there began to be problems of his biting and arguing, whereupon his parents took him out and enrolled him in Pierce Elementary, a neighborhood school for third grade. Darrin was apparently quite upset with this move and cried hysterically until his parents returned him to his original school. After third grade his parents moved and enrolled him into Midwest Military School in Wheaton for fourth grade. He apparently liked the school but did not function well there. His behavior seemed to worsen and he engaged in a great deal of fighting and bullying. His grades were low and he had a difficult time focusing, but liked the fun activities. Because there was no improvement, though he liked the school, his parents removed him after one year of attendance and returned him to the Chicago Public Schools where he spent time at Haugen, Montifiore, and Pierce schools before he was moved into a special class in

Swift School for the end of his fifth and sixth grade. Apparently at Swift school, he had been put in a special class merely in order to get him out of the regular class so that the other students could learn due to the disruptions Darrin caused in class. Darrin was then transferred to Arden Shores where he attended seventh grade. In seventh grade, at the age of twelve, Darrin was testing on a third grade level. Before eventually dropping out of school, Darrin attended at least four other schools, Locust Junior High, Howard Junior High, Rosenthal, and Prosser High School.

According to reports, while Darrin was at Arden Shore (see Appendix), he was able to achieve some improvement in his school performance. Reports also indicate that during his first 6 months at Arden Shore, he put forth an effort to change, but towards the end decided he would not do any more work because he did not like the school. It was concluded that Darrin was a child in need of the services of a special class to upgrade his academic skills, to give emotional support, and to help him with his behavior problems. Throughout all of his years in school, both in private and public schools, Darrin was in counseling for feelings of abandonment, neglect, and feeling unwanted and the abuse he suffered by his parents.

**(AGES 10 THRU 15)**

At the age of ten, Darrin was sent to a military school in Wheaton, Illinois. His parents thought that firm discipline was

14

what he needed. He developed a relationship with the staff as well as with the other kids to the extent that he didn't want to leave. He enjoyed playing sports as part of a team, a family. Although he was under very strict rules, he was happy. He was settled, content. However, because of his failure to excel academically, after the first year, his parents took him out of the school, noting that it was costing them $3000.00 a year for Darrin to attend this school. Upon pulling him out of this school, Darrin was re-enrolled into the Chicago Public School system. With the return to the old neighborhood, brought a return of the old psychological problems; the acting out; the negative behaviors. It was only a year later that Darrin became a ward of the state of Illinois.

Ms. Shatner stated that she and her husband had become embroiled in a dispute, and he put both her and Darrin out on the street. She stated that she and Darrin went to live with a close friend; that Darrin had become uncontrollable and she asked the state to take custody. It was at that point Darrin stole the friend's car and ended up in a juvenile detention.

As a ward of the state, Darrin underwent psychological evaluations to determine what his problem was and what if anything could be done to assist him. Attached, are documents from various placement centers to which Darrin was sent. Also find documentation about the various placement centers that refused to take Darrin. By the time Darrin reached 15 years old, he had been accepted and

15

rejected from at least five to six different placement centers. He had run away several times and had been involved in numerous illegal activities. His mother had relinquished custody of Darrin to the state at the age of 13 [thirteen] and he was isolated in a world of neglect, abuse, abandonment, and rejection, as well as physical health problems, seizures, and headaches.

**LEARNING DISABILITY**

Somewhere between 5% and 10% of all school-aged children are diagnosed with a learning disability. Government figures show that about 11 [eleven] children and youth out of every 100 [one-hundred] attending public schools have been identified as handicapped for special education purposes.(Kauffman, James M. & Hallahan, Daniel P. (1988). Exceptional children: Introduction to special education. (4th Ed). Chicago: Prentice Hall. 257. The brain is a very complex part of the human make-up, and is acutely vulnerable to trauma. While experience may alter the behavior of an adult, it "literally provides the organizing framework" for the brain of a child. (Dr. Bruce Perry, Baylor College of Medicine) If the brain's organization reflects its experience, and the experience of the traumatized child is fear and stress, than the neurochemical responses to fear and stress become the most powerful architects of the brain and its functioning.

High cortisol levels during the vulnerable years of zero to 3, increase activity in the brain structure involved in vigilance and

16

arousal. As a result, regions of the brain that were activated by the original trauma are immediately reactivated whenever the child dreams of, thinks about or is reminded of the trauma. According to Perry, the slightest stress, the most inchoate fear, unleashes a new surge of stress hormones. This in return causes hyperactivity, anxiety and impulsive behavior. Trauma also scrambles neurotransmitter signals. Since neurotransmitters play key roles in telling growing neurons where to go and what to connect to, children exposed to chronic and unpredictable stress will suffer deficit in their ability to learn. Some percentage of capacity is permanently lost. (Bruce Perry, "Your Child" Newsweek Spring/Summer 1997 pg. 31-32)

In a 1993 study of the relationship between learning disabilities and delinquency, Karen Waldie and Otfried Spreen found that "learning disabilities may be linked to certain underdeveloped personality skills such as general impulsiveness and poor judgment. A deficiency in these skills may lead to increased susceptibility to delinquent behavior through unwise social choices."

By the time Darrin reached second grade, he was diagnosed as having a learning disorder. From that point on, he was placed in special education classes.

**(AGES 16 THRU ADULT)**

17

At sixteen, Darrin had the misfortune of walking in on his Uncle Pat and witnessing him engaging in oral sex. This was the same Uncle Pat that had been playing with Darrin's genital area since he was three. While Darrin denies that Uncle Pat has ever done anything but play with him, it didn't seem to affect him too much that he had now discovered that Uncle Pat was gay. As a matter of fact, Darrin went on to say that, that explains why this same man was so jealous of me and Uncle Pat's relationship.

Unfortunately, unlike the song, "It Just Gets Better With Time", for Darrin, age brought nothing but grief, hurt, pain, depression, anger, anxiety, and loneliness. The older he got, the more trouble he encountered. Before it was over, Darrin found himself doing cocaine, LSD, alcohol, and inhaling glue, paint, and anything else he had access to in order to get high. He was in and out of juvenile detention both here and in California. (See Appendix). When he would run away from home now, he was leaving the state. He knew that neither of his parents wanted him around nor did his mother's new husband. Darrin ended up hanging with the wrong crowd. He had gone all of his life never experiencing what others experience love from a significant caretaker including his parents.

## LACK OF PARENTAL BONDING/ABANDONMENT

At the age of two, both Darrin and his mother, admits that Darrin tried to run away from home. Darrin stated that it was because his parents were fighting. His mother stated that she and her husband were asleep at the time. Darrin's father states that as a small child Darrin would always have nightmares that the **devil** was going to get him. At the age of three, Darrin reported to his mother that Uncle Pat was pulling his pants down and playing with him. Yet, his mother continued to send him to Uncle Pat's house everyday while she worked and all summer long. Darrin's parents were constantly fighting. Darrin was privy to this whenever he was home. he also received constant abuse from both parents as well whenever he was home.

In a "Special Article" on "Anxiety Disorders of Childhood and Adolescence: A Critical Review", it is noted that the DSM-III-R correlates anxiety disorders of childhood or adolescence, with separation anxiety disorder. Separation anxiety disorder occurs when developmentally inappropriate and excessive anxiety emerges concerning separation from the major attachment figure. Research has shown that this disorder is most common in seven and eight year olds. It's becoming to be more prevalent in prepubertal than postpubertal.

Current data shows that young children, immature and dependent on a mothering figure, are particularly prone to anxiety related to separation. Because children undergo a series of developmental

fears—fear of losing the mother, fear of losing the mother's love, fear of bodily damage, fear of their impulses, fear of the punishing anxiety of the super-ego and of guilt, most have transient experiences of separation anxiety based on one or another of those fears.

Darrin's mother never bonded with Darrin. From the time of his birth up and to the present day, she has always complained of his being a bother and her being too young to have children. She went as far to say that when he was a baby she would distance herself from him because she couldn't take his constant crying. From the time of his birth up to the present day, Darrin has always been the responsibility of others, anyone but mom and dad. Darrin was always kept by Pat Ryan, by Grandpa Donald, by Grandma Agnes, by anybody else who would keep him. Darrin grew up with adequate possessions and food. But he has never received appropriate love and guidance during his developmental years. He grew up in a home in which he was abused; a home where he was allowed to come when everyone else needed a rest from babysitting. He grew up in a home where instead of going on family vacations, he was shipped off to the babysitter when his parents wanted to take a vacation. He grew up watching other kids in the neighborhood go on vacations with their parents. Darrin grew up in a home that whenever he was there he was being disciplined, even, e.g. for bringing his mom a glass of water with no ice. He grew up in a home where his father would beat him in the

head until he was nearly unconscious and blood was gushing from his nose and mouth.

In addition, Darrin was constantly being shipped to boarding schools. Although there were set visitation schedules made for his parents to visit with him, they may have visited him once or twice within a three to four month period. Darrin watched as other kids received visits from their family members. Even while in therapy sessions to counsel Darrin on his behavior and try to improve his relationship with others, his parents had excuses for not attending them.

In addition, Dr. Sylvia Brody, a well known research psychologist from Lenox Hill Hospital in New York, specializing in pediatric psychiatry states in her article, "Signs Of Disturbance In The First Year Of Life", that the psychological disturbance in infants derive mainly from two sources. One of which relates to Darrin is a history of uneven maturation, apathy, persistent irritability, and hypertonicity. She states that the matrix of the mother-infant relationship for which she devised a three-fold scale, plays a vital part in the psychological make-up of the infant. Medical research has concluded that deprived of a stimulating environment, a child's brain suffers.

The absence of a father can have many ramifications upon a child. Charles Nelson and Paul M. Valliant found in a recent study

21

that "Adolescent boys without fathers and from lower socioeconomic families were significantly more similar in personality to young offenders than were those male youths who had fathers. "The combination of poor parental childrearing practices, parental uninvolvement, parental criminality, parental aggressiveness, and deviant peers were strong predicators of the development of juvenile delinquency."

A child relies upon his or her parent to provide support, set reasonable boundaries, to be consistent, and to teach the difference between right and wrong. Parents model appropriate decision and choice making, moral systems, and boundaries. If there is no consistent set of standards for the child, the child is not able to learn a consistent set of morals. There are four different basic types of parenting styles: authoritarian, permissive, indifferent, and reciprocal. Darrin was exposed to only one, indifferent, characterized by neglect and lack of involvement and rejection, leading to aggressive behavior. The risks associated with such risks inconsistent parenting are compounded in adolescence, when the teenager is prone to truancy, status offenses such as curfew violation, and experimentation with drugs and alcohol. At this point in a teenager's life, a parent or other individual might try to intervene. However, in some cases such attempts at intervention are likely to be met with stubbornness, sullenness, or other unwillingness to cooperate and respond.

22

Darrin was placed into a number of boarding schools and juvenile detention in an attempt to correct the psychological damage done to him by his parents. Darrin was in a percentile where even if the intentions were good, it was too late. He was unable able emotionally unequipped to conform.

## PHYSICAL ABUSE

When they weren't beating and cursing each other, they were terrorizing Darrin. Both parents admit to verbal and physical abuse to Darrin. Darrin would receive beatings at the hand of his mother beatings with broom sticks, or whatever was at her disposal. His mother reports that at the age of four, Darrin's father beat him in his head and face with his fist. His father would punch him in his head and face until Darrin would be bleeding. Darrin received constant verbal abuse from both parents. His mother would always call him a "stupid bastard", while his father would call him a" dumb son-of -bitch." By the time Darrin reached eleven years old, he was telling his mother that he wished he was dead. At the age of twelve, Darrin stole his father's car trying to run away and ended up crashing it into another car. This resulted in a severe head injury to Darrin. According to his mother, after he received treatment for his injuries, his father then beat him almost unconscious.

Children who witness violence in their homes learn that violence is "normal", and are taught to accept violence as a way of

life. Children who are beaten by their parents as Darrin was, often suffer long-term, serious effects. They often experience a confusing juxtaposition of intense fear and intense love for the abusive parent, as is demonstrated even today as Darrin states that he would die for his mom. The self-esteem of such children is often low. Abused children are likely to feel isolated, unworthy, and may avoid close peer relationships so as to avoid detection of abuse. Such children are typically socially withdrawn and have poor peer relations. Because children internalize physical abuse, they tend to have bleak expectations about the future. In a recent study, Cathy Spatz Widom (1989) concluded that "[o]verall, abused and neglected subjects had higher rates than did controls for adult criminality and arrest for violent offenses."

Darrin's maternal aunt, Helen Newsome described Darrin's life as something out of a Betty Davis movie, "Hush, Hush, Sweet Charlotte". According to Helen, whenever she and her children would come over to visit, Darrin would either be in his room on punishment or standing in a corner. She distinctly remembered the one time that Darrin's birthday came and his mother neglected to even acknowledge it. Helen stated that Darrin was devastated, crushed. Nevertheless, his mom acted as though it was just another day.

Helen believed that neither Dorothy nor Donald really wanted Darrin. They both constantly abused him. Helen stated that she

24



would sometimes keep Darrin just so he could come over and play with her kids to have peace of mind if only for a little while. I felt sorry for Darrin, but outside of keeping him every now and then, there wasn't anything else I could do.

## ILLNESSES AND INJURIES

Darrin has a history of chronic headaches. According to his mother, these headaches began when he was a toddler. He would cry uncontrollably, and she would give him aspirin. He would eventually seem to cry himself to sleep. Darrin continues to complain about these headaches even today.

Darrin also has a long history of injuries stemming back to age five or six when he was falling out of trees. It seemed that every couple of days Darrin was injuring himself in some form or fashion. Once he was hit in the head by his father, with a marble ash-tray. Another time he was hit in the head with a baseball bat and knocked unconscious for 20 minutes. Darrin has also received a blow to the head with a wine bottle. He received most of his injuries at the hands of his parents. Records revealed that at the age of 8 [eight], Darrin was being evaluated for severe headaches for which he was prescribed dilantin. He recalled one time in particular when his father hit him in the face and broke his nose. At the age of 11 [eleven], Darrin had to undergo surgery to have a

25

lesion removed. He was diagnosed as having molluscum contagiosum. The lesion was located under the left rib cage. Attached as exhibits, is information regarding this disease. There are no further records indicating whether or not any follow-up treatment was ever done. Darrin was also involved in another incident where he was hit with a baseball bat and his teeth were knocked out.

At the age of nine, Darrin fell out of a tree while visiting his grandmother in Kentucky. He was knocked unconscious for several minutes. He never received medical treatment for this head injury.

At the age of 10 [ten], Darrin was hit by a car and received injuries to his head. It was reported as a hit and run. There was yet another illness when Darrin was quite young where he ran a high fever of about 105. According to his mother, she was unable to get him to the hospital, so she called the pharmacy and had medicine delivered to their home. Since Darrin has been incarcerated there was one incident of him running a fever of at least 106, which is considered by the medical community to be extremely dangerous to a person's physical health and brain functioning.

Darrin has  a history of seizures as well. These too began when he was young and continue through the present date. Darrin was placed on phenobarbital for his seizures. He reports that during the onset of the seizures, he has "visions", hallucinates. During a visit with Darrin on May 1st of this year, he stated that he was

26

having a migraine headache as we spoke but that he chose not to request any medication for it. He would simply let it run its course. When asked when was the last time he had a seizure, he stated that he had just had one a couple of weeks ago. Again, he continues to go untreated for his illness.

## SUBSTANCE ABUSE

The child's home and parental figures are central to his development. Substance abuse and violence in the home engender feelings of instability, fear, anxiety, and anger in the child. Children who witness violence in the home, suffer from low self-esteem, a constant need for nurturing, and negative feelings about their family and their environment. Parental violence and substance use, teaches that child that those behaviors are societal and morally acceptable. Children learn, and form a system of norms and values from what they see in their environment.

Inhalants are breathable chemical vapors that produce psychoactive (mind altering) effects. Research from the National Institute On Drug Abuse, has shown that young people are likely to abuse inhalants, in part because inhalants are readily available and inexpensive. Inhalants fall into three different categories:

**\* Solvents**
- industrial or household solvents or solvent-containing products, including paint thinners or solvents, degreasers (drycleaning fluids), gasoline, and glues.



- art or office supply solvents, including correction fluids, felt-tip-marker fluid, and electronic contact cleaners.

**\* Gases**

- gases used in household or commercial products, including butane lighters and propane tanks, whipping cream aerosols or dispensers (whippets), and refrigerant gases.

- household aerosol propellants and associated solvents in items such as spray paints, hair or deodorant sprays, and fabric protector sprays.

- medical anesthetic gases, such as ether, chloroform, halothane, and nitrous oxide (laughing gas)

**\* Nitrites**

- aliphatic nitrites, including cycohexyl nitrite, which is available to the general public; amyl nitrite, which is available only by prescription; and butyl nitrite, which is now an illegal substance.

Initial use of inhalants often start early. Some young people may use inhalants as a cheap, accessible substitute for alcohol. Research suggests that chronic or long-term inhalant abusers are among the most difficult to treat and they may experience multiple psychological and social problems.

Inhalant abuse is deadly serious. Sniffing volatile solvents, which includes most inhalants can cause severe damage to the brain and nervous system. (See Appendix).

Darrin constantly watched both his parents drink themselves into a stupor and fight until they each would pass out. At parties he would drink along with them. Darrin has a long history of substance abuse. According to Darrin, he began sniffing glue at the

28

age of five. When he was 8, his mother states that they caught him sniffing glue. It appears that he was having a bad reaction to it when it began throwing himself back and forth against the wall. By the time he reached 10, he was very heavy into glue and paint. By the time he reached 15 years old, Darrin reports doing glue, paint, and LSD. Reaching his young adulthood brought along cocaine, both nasal insufflating (snorting) and intravenously.

In reviewing Darrin's extensive history of substance abuse, Post-Conviction Counsel consulted with toxicologist, Dr. James O'Donnell. On April 11, 1998 his report was as follows.

"Darrin Shatner described abusing glue, Toluene, and a substance like toluene (TOLY) which unlike the glue, he began abusing in his early teens and continuing for several year. He described acute toxicity as the "echo zone", wherein he experienced auditory hallucinations, distorted and confused thought, and extreme disorientation. He started abusing marijuana and hashish at the age of 13, and described this as his drug of choice for his teen-aged years, smoking everyday as much as he could get his hands on. The marijuana made him mellow, "giggly," laid back, and generally "feel good". (See Exhibit B).

His abuse of alcohol was primarily on weekends during his adolescence, becoming intoxicated almost weekly. He liked the high from alcohol. Alcohol made him braver. He responded or rather hyper-responded to any social interaction and found himself

29

frequently in flight while intoxicated from alcohol. He occasionally experienced blackouts.

Darrin began using cocaine around his 18th birthday. His method of cocaine consumption was nasal insufflation (snorting) and later occasional smoking. He described a frequent and consuming use of cocaine beginning at age 18 and continuing and escalating up to September 1, 1986, the day of the murder of Greg Schneider. He experienced the high as a "pick-up" and extremely pleasurable. He described the cocaine effect as "pumped up". The use resulted in more and more craving for more cocaine, even during the period of intoxication and "high". "In my opinion, he was psychologically addicted to cocaine."

On the day of the murder, Jean Rogoz introduced him to "intravenous cocaine" (IV cocaine). It was his first experience. He described this "IV cocaine" as a "heavenly rush, like nothing ever done, better than free basing." He started out with three "IV" shots, eventually using ten shots throughout the evening of the incident. He described excitement. He also described intense "Jonesing", which to the addict is the extreme craving to get more of the drug to maintain the high, a drug seeking behavior that is somewhat unique to cocaine, i.e., the intoxicant is seeking more drug while intoxicated."

30

Dr. O'Donnell's report goes go further to describe the effects of the toxicity of cocaine. The free alkali base of cocaine is an intermediate compound in the interaction of the hydrochloride salt from coca leaves. The remaining product is more volatile and may be smoked in a cigarette or water pipe. Nasal insufflation (snort) of cocaine powder results in some immediate effects and in significant blood levels and brain levels within 20 minutes, with a maximum at 30 minutes. Any cocaine use has a high potential for dependency and overdose, since the period of euphoria is quickly followed by a powerful dysphoric mood swing that leads to further drug use. Escalating doses lead to a 24 to 96 hour binges or runs, similar to amphetamine use. As the compulsive drug use continues, interest diminishes in social contact, family, friends, food, sexual activity, and other usual activities.

The half-life of cocaine is about 0.9 -1.5 hours. However, cocaine plasma levels remain detectable for 4-6 hours. Clinical (toxic effects) continue for hours even though the euphoric effects wear off in 20-40 minutes. In chronic cocaine users, the plasma cocaine half-life averages 48 minutes after a 32 mg. intravenous injection. the metabolite of cocaine can be detected in the urine for approximately three (3) days.

Cocaine in increasing doses causes a rostral-caudal stimulation of the brain beginning with the cortex. Initially, euphoria, hyperactivity, restlessness, confidence, and garrulity

31

occur. Cocaine may cause CNS symptoms either by potentiating catecholamines or by depressing central inhibitory pathways. Sympathomimetic (Adrenalin-like) effects which follow acute cocaine use include increased heart rate and blood pressure, dilated pupils, constriction of peripheral blood vessels, and a rise in body temperature and metabolic rate.

Depending on dose, chronicity, personality, genetic predisposition, and expectation, Dr. O'Donnell states that cocaine produces a continuum of psychiatric syndromes ranging from euphoria and dysphoria to a schizophreniform psychosis similar to amphetamine-induced psychosis. Acute overdose or habitual use leads to profound mood changes characterized by paranoid thinking, agitation, irritability, restlessness, and impulsivity. While under the influence of cocaine, distorted thought processes can result in impaired judgment and attentional deficits increase the chance of accidental trauma.

Dr. O' Donnell concludes his report by stating that in his opinion, Darrin Shatner was extremely intoxicated and impaired from cocaine at the time of the incident. He further stated that this intoxication and impairment would have resulted in extreme emotional disturbance and a diminished capacity.

Darrin recognized that his life was out of control with cocaine. He related to Dr. O'Donnell during an interview that in

August of 1986, shortly before the Schneider murder, he had sought but was refused treatment in a psychiatric hospital drug treatment center. He was refused treatment, due to financial constraints.

## INTIMATE RELATIONSHIPS

In 1989, while in Hawaii, Darrin met Cinda McConnell. Cinda recalls that when she met Darrin, he had a job working with parrots. According to Cinda, she and Darrin had dated for two years prior to them becoming engaged. She described him as being a very loving person. She admitted that he did have a drug problem. He was getting high about once a week on cocaine and LSD. He was really working hard at trying to quit his habit. When asked if she knew anything about his past, her response was, " I know neither of his parents wanted him and that he had previously had problems with his bones." Ms. McConnell stated that Darrin had informed her of one other woman, Jean Rogoz, whom he had a crush. She stated that Darrin had informed her that Jean had turned him and several of his friends on to intravenous usage of cocaine. She had also provided him with cocaine so that he ended up being "strung out" on cocaine. It was his desire to get clean.

Cinda and Darrin are the parents of one baby boy, Dustin Lloyd Shatner born March 31, 1991. According to Cinda, she and Darrin were engaged to be married. At the time of his arrest, she stated that she was three months pregnant. It is believed that Dustin, like his father Darrin, has a learning disability. Cinda states

33

that he is presently undergoing several tests to either rule out or confirm.

The only point in his life where he appeared to try and get control was when he met Cinda in Hawaii. Cinda seems to have had a positive effect on Darrin. She was the first person in his life who loved him for who and what he was. She wasn't trying to change him. instead the new found relationship Darrin now had, seemed to give him the incentive to do something positive in life. Darrin states Cinda was as exciting to Darrin as the rush of cocaine. He liked what he felt and wanted it all the more. As a result, he asked her to marry him and be his forever. However, their relationship soon came to an abrupt end when Darrin was arrested for the current charge.

## PRESENT INCARCERATION

For a few years after the incident, while Darrin was a fugitive, he lived in Florida and Massachusetts. He travelled with the "Grateful Dead Band". His drug of choice was "acid", (also known as LSD, Lysergic Acid Diethylamine), a hallucinogen. He abused the LSD as well as other hallucinogens during this period and subsequently moved to Hawaii. There he sold and used LSD. A move to Oregon continued his use of alcohol, marijuana, and LSD, leading up to the time of his arrest.

34

At the time of the murder/arson, Mr. Shatner was intoxicated by cocaine, which impairs the ability of the brain to think clearly, causes other impairments in ability to function, and alters behavior and increases risk taking. He states that he is very sorry for the events that took place that night and wished that he could turn back the hands of time and make everything alright.

**SUMMARY**

Darrin Shatner was born, an only child, to Dorothy and Donald Shatner on July 12, 1967. From the onset of his birth, to his present incarceration, he has lived a life of abuse and isolation. He has lived a life of desperation and desertion. He began running away from home at a very early age. The first time he was two years old. The second time he was four. The first time, he left in his diaper, the second time, he packed his clothes. Darrin and his family are the only ones that know what it was he was trying to get away from. At the age of three, Darrin told his mother that Uncle Pat had been pulling his pants down and playing with him. At the age of four his father was beating him in his face and head with his fist while his mother verbally abused him and beat him as well with her fist and broom sticks as well as the leg or arm of a chair. At the age of five Darrin began his journey from one school to the next being mentally evaluated at each institution. At the age of five Darrin also started sniffing glue as a means of escape. Since he had been unsuccessful in running away, he figured he would

try to escape within himself. By the time he reached eight years old, he was sniffing glue and paint. He was taken to the hospital for a brain scan to determine the cause of chronic headaches he had been having since he was a toddler. He was placed on dilantin. By the time he was nine, he was getting into trouble with the law. He also began having seizures. By the time he reached ten or eleven, he was being shipped off to boarding schools. At the age of eleven, Darrin was undergoing surgery for molluscum contagiosum. By the time Darrin reached twelve, he had become a ward of the state of Illinois. By the time Darrin reached 15, 16 years old, he was doing LSD. He had received numerous injuries to the head and facial area. He received the injuries at the hands of his parents as well as being in a car accident, falling out of trees, being hit in the head with a baseball bat, a broom, an arm chair, a marble ash-tray, etc. He had been in and out of juvenile detention, both in Illinois and California as well. By the time Darrin reached nineteen, he had been in and out of several detention homes, had been diagnosed as having impulsivity, fits of rage, depression, paranoid personality, etc. By the time Darrin reached 19, he was on death row.

This summarizes Darrin's life for the most part. However, now that we know what courses his life took, we need to know what obstacles prevented him from being a productive law-abiding citizen.

Every one who knew Darrin labeled him as being impulsive, juvenile, angry, depressed, violent, etc. Disorders of impulse control are frequently associated with adult psychiatric diagnoses (e.g., borderline personality disorder, explosive disorder, as well as disorders with a typical onset in childhood (e.g., attention- deficit hyperactivity disorders). Behavior and personality changes are also commonly found in adult neurological diseases. In fact, an inability to restrain one's impulses and control behavior, would be viewed as a neurological marker by an expert in this field.

**CONCLUSION**

Darrin Shatner was born to a couple that not only didn't want him, but constantly abused and neglected him. Dr. Alfred M. Karnicki, in his psychiatric evaluation of Darrin, states in his report of February 27, 1980, " Darrin is oriented, alert and intelligent. His thinking is rational. He is depressed and discouraged about his parents and operates (toward himself) partly out of morbid parental introject. His grandiose, exhibitionistic self is archaic: i.e., it is confined to his juvenile, delinquent acting-out. He has not learned to be grandiose and exhibitionistic in more maturated and productive ways. It may well be that his parents cannot appropriately respond to him as "special" to them when he is intelligent, effective, creative and charming. They may see him on those occasions as threatening to their own (respective) narcissistic equilibriums." (See Appendix).

37

In a report dated May 8, 1980, from the Northern Suburban Special Education District Developmental Learning Services Program, According to this report, Darrin was placed in the juvenile home at the age of five for glue sniffing, and because he took items from his mother's room. Because his parents had not visited nor inquired as to his release, Darrin was ultimately placed with DCFS for residential treatment placement.

In a letter from Corinne Warsawsky, Director of Education at Arden Shore, dated October 23, 1979, it indicates that the Shatner's once again failed their son when they neglected to show up for a scheduled conference. (See Appendix).

Attached to this mitigation report, are numerous documents showing a pattern of neglect; showing an angry and depressed child who cried out for love in the only way he knew how, by incorporating into his behavior the violence and rage he witnessed by his parents each time they fought . There is also documentation revealing the fact that Darrin not only lashed out at others, but that on numerous occasions, he tried to harm himself.

Attached to this mitigation report, are several letters of correspondence from various agencies to the Shatners, imploring them to become more interested in their son; several letters indicating that perhaps they were the core of his problems. Yet, it

wasn't until Darrin ended up on death row that his parents were willing to accept the responsibility for the lack of parental bonding, the physical and mental abuse, and the neglect that was perpetrated by them against their son. In conclusion, Darrin has become a socially and physically impaired human being, easily influenced by anyone who is willing to show him some attention.

Attached to this mitigation report, are all the reasons Darrin resorted to drugs, to acting out, to running away. All of these were a means of escape. These were the only avenues Darrin knew to use to survive. How accountable are Darrin's parents for his actions. Both of them survived poverty and abandonment. This multi-generational pattern of inappropriate parenting and mental cruelty on Darrin. The purpose of this report is to bring the court's attention mitigating factors for consideration.

Attempt to assess the difficulties one would experience if they encountered the negative life experiences that Darrin did; the incident in which his father beat him in the face and head until blood was gushing from both his mouth and nose, the time his father continuously struck him in the face until he had broken his nose; or even the time his mother called him a bastard because he failed to put ice in her water; or the overt abandonment when his parent's went on vacation and left him behind stating that he was too bad.

Darrin was constantly punished for things he did and even when he hadn't done anything at all. He existed in a no win situation. This was an example of the inappropriate parenting he experienced during his developmental years. It was an ongoing process since the day he was born. His mother describes his birth as extremely painful. If asked how many pounds Darrin weighed in at, she couldn't tell you. If asked how old was he when he stopped spitting up his food, she couldn't tell you. If asked what were the most memorable moments of Darrin's childhood, her responses would be all negative.

Darrin was recently evaluated by Dr. Harry Gunn, a prominent forensic psychologist in the Chicagoland area. In his report Dr. Gunn concludes that Darrin has a great deal of conflict regarding his self concept and his pattern for relating to others. Above all, he has extremely strong dependency needs and in particular, he wants to be controlled by a female. After all these years, he is still seeking a mother. He associates his mother's acceptance with being hurt and he is prepared to harm himself if that will bring support from a woman. Clearly, Mr. Shatner has always been controlled by women. He knows his dependency and resultant helplessness and is also prone to take flight at times. He can relate to rather intense warmth, but his suspiciousness can also disrupt his relationships.

40

Dr. Gunn goes on to state that Mr. Shatner's conscious controls are of fair strength, but his unconscious controls are weak. He periodically suffers strong depressive mood and then feels a push to act out. He has used drugs because with consciousness dimmed, he can feel a little less empty. He can be self destructive but hostility towards others are unlikely unless under drug influence or directed by a significant woman.

Pathological impulsivity can be conceptualized as a failure to regulate, monitor, or control behavior and emotional expression. Because of an inability to exercise normal controls, behavior becomes disruptive and may consist of either excesses or deficits.

The effects of impulsivity in neurobehavioral disorders may be seen across areas of functioning that include cognition, behavior, and emotional expression. The impact on cognition leads to a change in functioning that may be characterized by a failure to consider, review, or appreciate the nature of one's actions. Poor judgment is common, as are limited insights, diminished self-monitoring capability, and lack of concern about the impact of one's actions on others. [Impulsivity in Adult Neurobehavioral Disorders, Judith A. Holmes, Judith L. Johnson, and Ann L. Roedel]

Symptoms which in the adult indicate depression, are not necessarily found in children with depressive reaction. Thus, symptoms which in the adult are usually considered diagnostic for depression – such as suicidal attempts or suicide, do not

necessarily point toward the same diagnosis in children, but may be impulsive acts, indicating acute anger or rebellion rather than chronic depression. (Kurt Glaser, M.D., "Masked Depression in Children and Adolescents)

In older children, behavioral problems and delinquent behavior, such as temper tantrums, disobedience, truancy, running away from home, may indicate depressive feelings but may not be recognized as such.

According to Dr. Gunn, the diagnostic pattern then is one of Major Depression with slight psychotic features, 296.34 (Axis 1). The Axis II is Dependent Personality, 301.6. There are also features of Borderline Personality, 301.83. The latter includes the constant feeling of abandonment, impulsiveness, transient stress-related paranoid ideation, idealization of certain others, and in particular – identity disturbance.

Dr. Gunn recommends neurological testing to rule out the possibility of such brain damage from the injuries as well as the drug usage. He is of the opinion that Darrin did not have any intent to commit murder when the crime took place; that given his personality, if he allowed the woman he was with to initiate him into IV drugs, he would not have been aware of what was taking place.

42

In nearly all of the evaluations contained within this report, Darrin is reported as always operating in a juvenile state of mind which indicates he was unable to negotiate the developmental stages appropriately.  However, when his acts of defiance demonstrated his confusion and pain, Darrin was regarded as being too old for such outbursts, and he was punished.

In order to make a fair assessment of the appropriate sentence in Shatner's case, these mitigating facts should have been brought to the attention of the court at the time his death sentence was imposed.  Thus, these factors are presently being brought to the court for use in his Post-Conviction Petition.

Respectfully  submitted,

Alice M. Washington, MCJ

43

## References

1) Nelson, Charles & Valliant, Paul M. (1993) Personality dynamics of adolescent boys where the father was absent. Perceptual and motor skills. 76: 435.

2) Phares, Vicky. (1979) Psychological adjustment, maladjustment, and father-child relationships. In Michael E. Lamb (Ed), The role of the father. New York: John Wiley.

3) Kaplan, Harold I., M.D., & Sadock, Benjamin, J., M.D. (1991) Synopsis of psychiatry: Behavioral sciences [and] clinical psychiatry. (6th Ed.) Baltimore: Williams & Wilkins. 39

4) Widom, cathy Spatz (1989). Child abuse, neglect, and adult behavior: Research design and findins on criminality, violence, and child abuse. American Journal of Orthopsychiatry. mm59: 455

5) Gilbert, D. & Kahl, J.A. (1987). The american class structure: A new synthesis. (3rd Ed) Chicago: Dorsey. 336

6) Waldie, Karen & Spreen, Otfried. (1993). The relationship between learning disabilities and persisting delinquency. Journal of learning disabilities. 26:422.

7) Davis, Larry E., & Proctor, Enola, K. (1989). race, Gender & Class: Guidelines for practice with individuals, families, and groups. New Jersey: Prentice-hall. 257

## LIST OF APPENDICES

page no.

Birth Certificate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Northern Suburban Special Education District . . . . . . . . . . . . . . . . . . . . . 2

Multi-Disciplinary - I.E.P. Staff Notes . . . . . . . . . . . . . . . . . . . . . . . . 11

Closing School Summary for Arden Shore Home for Boys . . . . . . . . . . . . . . . . 13

I.E.P. – Arden Shore dated 06/20/79 . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Correspondence from Arden Shore to Shatner's Parents
dated 06/25/79 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Summary Report from Northern Suburban Special Ed . . . . . . . . . . . . . . . . . . 17

Records from Juvenile court dated 08/22/79 . . . . . . . . . . . . . . . . . . . . . . 18

I.E.P. from Arden Shore dated 10/09/79 . . . . . . . . . . . . . . . . . . . . . . . . 26

Correspondence from Arden Shore to Shatner's Parents dated
10/23/79 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Correspondence from Arden Shore to Dr. Mikaelian . . . . . . . . . . . . . . . . . . 28

Summary of Parent Conference, N.S.S.E.D dated 12/18/79. . . . . . . . . . . . . . . . 30

Records from Juvenile court dated 01/25/80 . . . . . . . . . . . . . . . . . . . . . . 31

Summary of Parent Conference, N.S.S.E.D dated 02/06/80. . . . . . . . . . . . . . . . 41

Report from Dr. Alfred M. Karnicki, M.D. . . . . . . . . . . . . . . . . . . . . . . . 42

I.E.P. from Arden Shore dated 03/03/80 . . . . . . . . . . . . . . . . . . . . . . . . 43

I.E.P. from Arden Shore dated 04/18/80 . . . . . . . . . . . . . . . . . . . . . . . . 45

Correspondence from Arden Shore to Shatner's Parents dated
04/21/80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Correspondence from Juvenile Court . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Correspondence from Arden Shore to Shatner's Parents dated
04/22/80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Memo regarding progress at Arden Shore . . . . . . . . . . . . . . . . . . . . . . . . 49

Intake Summary from District #39 . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

D.C.F.S. Records dated 05/05/80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Arden Shore Staffing Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

D.C.F.S. Records dated 05/05/80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Report from Sunny Ridge Home dated 06/17/80 . . . . . . . . . . . . . . . . . . . . . 60

Report from Sunny Ridge Home dated 06/27/80 . . . . . . . . . . . . . . . . . . . . . . . . . 63

Medical Report from Dr. Hameeduddin, M.D. . . . . . . . . . . . . . . . . . . . . . . . 64

Sunny Ridge Home - Initial Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Report from Sunny Ridge Home dated 07/18/80 . . . . . . . . . . . . . . . . . . . . . . . 68

Correspondence from Arden Shore to Shatner's Parents dated
07/30/80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Sunny Ridge Home - Closing Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Correspondence from Arden Shore to D.C.F.S dated 09/03/80 . . . . . . . . . . . . . . 73

Correspondence from Arden Shore to D.C.F.S dated 09/30/80 . . . . . . . . . . . . . . 75

Academic Progress Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Incident Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Transfer Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Correspondence from Arden Shore to D.C.F.S dated 10/30/80 . . . . . . . . . . . . . . 82

Correspondence from Arden Shore to D.C.F.S dated 11/05/80 . . . . . . . . . . . . . . 84

Cook County Juvenile Court Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Correspondence from Arden Shore to D.C.F.S dated 12/04/80 . . . . . . . . . . . . . . 87

Academic Progress Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

D.C.F.S. Case Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Correspondence from Arden Shore to D.C.F.S dated 01/02/81 . . . . . . . . . . . . . . 91

Correspondence from Arden Shore to D.C.F.S dated 02/11/81 . . . . . . . . . . . . . . 92

Cook County Juvenule Court Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Cook County Juvenule Court Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Covenant Childrens' Home and Family Services Intake Sheet . . . . . . . . . . . . . . . 96

Correspondence from Larkin Home to D.C.F.S. . . . . . . . . . . . . . . . . . . . . . 101

Correspondence from Belleville Diocese to D.C.F.S. . . . . . . . . . . . . . . . . . . . 102

Correspondence from Hoyleton to D.C.F.S. . . . . . . . . . . . . . . . . . . . . . . . 103

Closing Summary/Shelter Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

Treatment Review/Covenant Children's Home . . . . . . . . . . . . . . . . . . . . . . 106

Incident Report/Covenant Children's Home . . . . . . . . . . . . . . . . . . . . . . . 110

Correspondence from Covenant to D.C.F.S dated 01/14/82. . . . . . . . . . . . . . . 112

Correspondence from Covenant to D.C.F.S dated 02/02/82. . . . . . . . . . . . . . . 113

Treatment Review II/Covenant dated 04/06/82 . . . . . . . . . . . . . . . . . . . . . . . . . 115

D.C.F.S. Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Treatment Review III/Covenant dated 06/22/82 . . . . . . . . . . . . . . . . . . . . . . . 130

Treatment Review and Closing Summary/Covenant . . . . . . . . . . . . . . . . . . . . . . 136

Police Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

Los Angeles County Juvenile Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Cook County Juvenile Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

Correspondence from L.A. to Illinois D.C.F.S. . . . . . . . . . . . . . . . . . . . . . . . . 152

Birth Records from Ravenswood . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

Article on Molluscum Contagiosum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

Articles on Inhalant Abuse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

Article /Impulsivity on Adult Neurobehavioral Disorders . . . . . . . . . . . . . . . . . . 189

Article/Negative Family Environment as a Predictor of Boy's Future Status . . . . . . . . 194

Article/Masked Depression in Children & Adolescents . . . . . . . . . . . . . . . . . . . 202