CASE NO. ___12 cv 47___

ATTACHMENT NO. ___5___

EXHIBIT _____

TAB (DESCRIPTION) _____

PLEASE SUBMIT FIVE WORKING DAYS IN ADVANCE OF HEARING

## JUVENILE COURT LIAISON PROGRESS REPORT

4/5/83

Time Period Covered _____

endar 22

d's Name _Darrin Shatner_ Birthdate 7-12-67

No. X784-80-01

tact Dates: _____

URAL PARENTS:

her _Dorothy Shatner aka Newsome_ Address _Mc Henry, Il. (815)385-6808_

er _Donald Shatner_ Address _3705 W. Palmer, Chgo. Il. 60647_

ER PARENTS:

lifornia Juvenile Detention Address _Los Angeles County_
_San Fernando Valley_

of Placement _3-18-83_ Legal Status _GA_ Date _5-16-80_

### CURRENT INFORMATION ON:
(Please do not be limited by line space; use back if needed)

CHILD: (adjustment and progress) _Darrin is currently in Cali. Juvenile Detention charged with stealing a motorcycle. Apparently Darrin ran from his father's home to maternal uncle, Monroe Newsome, in CAL. The uncle kicked him out when Darrin stole from him & came in drunk. Darrin proceeded to steal_

OBLEMS: _____

ATURAL PARENTS: (involvement-situation) _The father, 1) failed to notify DCFS that Darrin had run from him & 2) failed to respond to 2 letters sent to him. It's unknown what the details or his involvement are @ this point. The mother contacted DCFS & feels Darrin has continued to give all those involved_ ~~TERESTED RELATIVES:~~ _a strong message he needs to be locked up, i.e. DOC. She does not feel she can control Darrin._

IVING ARRANGEMENT:
_see Child section above_

RIVATE GUARDIAN: _____

ANS AND RECOMMENDATIONS: _Il. will work with CAL. on Darrin's eventual return to Il. Upon his return, the J.A.W. will be executed. A probable cause hearing will be held as Darrin has very extensive history of runaway. Darrin will be returned to court to answer charges of violation of probation. The judge will then decide if Darrin will be sent to D.O.C._

ICE _Chgo. - North_ CASEWORKER _Moira Havelock_

B-4

150

1.) Child - cont.

a motorcycle from the apartment complex the uncle managed. Darrin then joined Circus Vargas & drove the motorcycle to Burbank. The Burbank police spotted the motorcycle & arrested Darrin on 3-18-83. Darrin has been in Juvenile Detention since that time. The next court hearing for sentencing in CAL. is 4/7/83. The Probation Officer in CAL will make arrangements for Darrin to return to Il. after that hearing.

The Cook County Probation Dept. does have a J.A.W. out on Darrin, next court date, 5/18/83. Marge Perleman is the involved Prob. Officer. Ms. Perleman, as well as the former DCFS worker, Marilyn Harmon, indicate that Darrin is in violation of his probation. Both stated that Judge Barish had clearly indicated to Darrin that any more trouble would get Darrin sent to D.O.C. Ms. Perleman indicated that when Darrin is returned to Il., the police will be notified to execute the J.A.W. A probable cause hearing will be held to have Darrin held in Custy.

151

# COUNTY OF LOS ANGELES

### PROBATION DEPARTMENT

199 North Euclid Avenue
Pasadena, California 91101
Telephone: (213) 356-5389



NETH E. KIRKPATRICK
Chief Probation Officer

APRIL 7, 1983

DEPARTMENT OF CHILD AND FAMILY SERVICES
4320 WEST MONTROSE
CHICAGO, ILLINOIS, 60641

ATTENTION:  MOIRA LOVELOCK
SOCIAL WORKER

AS PER OUR TELEPHONE CONVERSATION, I AM SUBMITTING THE FOLLOW-
ING INFORMATION:

DARRIN WAYNE SHATNER WAS ARRESTED BY BURBANK POLICE OFFICERS,
ON MARCH 18, 1983, FOR DRIVING WITHOUT THE OWNERS CONSENT (10851
CALIFORNIA VEHICLE CODE).  HE WAS DETAINED IN JUVENILE HALL
BECAUSE HE WAS WITHOUT PARENTAL SUPERVISION.  THE DISTRICT ATTORNEY
FILED A PETITION ALLEGING DRIVING WITHOUT THE OWNERS CONSENT AND
ONE COUNT OF GRAND THEFT.  ON MARCH 23, 1983, THE DRIVING WITHOUT
THE OWNERS CONSENT ALLEGATION WAS REDUCED TO A MISDEMEANOR; THE
MINOR ADMITTED THAT AMMENDED ALLEGATION, AND THE GRAND THEFT
ALLEGATION WAS DISMISSED PER CASE SETTLEMENT (PLEA BARGAIN).  THE
CASE WAS CONTINUED TO THIS DATE (4-7-83) FOR DISPOSITION.

BECAUSE THE MINOR IS A WARD OF THE COURT IN BOTH YOUR STATE AND
COUNTY, THE COURT, AS A DISPOSITION (SENTENCING) ORDERED THE
MINOR TRANSPORTED BACK TO ILLINOIS.  ALTHOUGH THE MINOR WAS
DECLARED A WARD OF THE COURT HERE, THAT WARDSHIP IS TO FACILLITATE
DETENTION AND TRANSPORTATION.  WARDSHIP WILL TERMINATE SUBSEQUENT
TO THE MINORS ARRIVAL THERE.
REGARDING YOUR QUESTION OF WHAT WOULD HAPPEN TO THE MINOR IF HE
WAS A RESIDENT OF THIS COUNTY----HE WOULD HAVE BEEN SENT TO OUR
CAMP/COMMUNITY PLACEMENT PROGRAM (DETENTION FOR SIX TO NINE MONTHS).
IF YOU HAVE ANY ADDITIONAL QUESTIONS, PLEASE CALL ME.

SINCERELY,

Robert L. Petersen

ROBERT L. PETERSEN
DEPUTY PROBATION OFFICER

152

| M. STONE | | TYPE CA |
|---|---|---|
| UNK. | | |
| UNK. | | |

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES
## JUVENILE COURT

| 270 | DATE 4-7-83 | APP./NON-APP. APP. |
|---|---|---|

### N THE MATTER OF:

| SHATNER, DARRIN WAYNE | | | |
|---|---|---|---|
| X | | | |
| 0731843 | USUALLY LIVES WITH: PLACEMENT | AREA FO | DPO 753 |
| 352 | CURRENTLY WHEREABOUTS JUVENILE HALL | | |
| TRANSPORTATION ORDER | | | CODE 03 |

**COURT NO:** J110304

### PROBATION OFFICER'S REPORT

### SCHOOL DATA
SCHOOL CHICAGO, ILL.
PROSSER HIGH

### PERSONAL & FAMILY DATA:

| | AGE | | ETHNIC ORIGIN | RELIGION | LEGAL CUSTODY | NATURAL PARENTS MARITAL STATUS | GRADE | ATTENDANCE | STATUS | AGE |
|---|---|---|---|---|---|---|---|---|---|---|
| M | 15 | 7-12-67 | CAUC. | BAPTIST | MOTHER | DIVORCE | 11 | UNSAT. | DROP | |
| SHATNER, DONALD GENE | | | | ADDRESS 3705 W. PALMER, CHICAGO, ILL. | | PHONE (312) 227-7241 | SOCIAL SECURITY # 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 | | | 35 |
| NEWSOME, DOROTHY LOU | | | | 1506 WEST HOLLYWOOD | | (815) 385-6808 | DECLINES TO STATE. | | | 34 |
| X | | | | | | | | | | |
| X | | | | | | | | | | |
| X | | GUARDIAN OR RELATIVE (FA. FIANCEE) WYMAN, JO ANNE | | 3705 W. PALMER, CHICAGO, ILL. | | (312) 227-7241 | X | | | X |
| X | | | | | | | | | | |

### REFERRAL INFORMATION & RECENT COURT ACTION:

| | | | | AGENCY CODE NO. 0312 | REQUESTING AGENCY CASE/CITATION/LOCATION 83-77-2654 |
|---|---|---|---|---|---|

| REFERRED BY BURBANK | DATE REFERRED 3-18-83 | DATE PET. FILED 3-22-83 | ALLEGATIONS: (1) DWOC. 10851 VC |
|---|---|---|---|
| HEARING DATE 5-23-83 | APPROACHED? YES | CAL. X | (2) EFT (487.1 PC) |
| | HEARD BY | SUSTAINED BY: | AMENDED? |

153

REDUCED TO MISD; PARA. 2 DISM.CASE SET

REASON FOR HEARING:

        ON MARCH 18, 1983, THE MINOR WAS ARRESTED BY BURBANK POLICE FOR ONE COUNT OF 10851 VEHICLE CODE (DRIVING WITHOUT THE OWNER'S CONSENT). THE MINOR WAS DETAINED AT JUVENILE HALL AND THE DISTRICT ATTORNEY FILED A PETITION ON MARCH 22, 1983, ALLEGING ONE COUNT OF 10851 VEHICLE CODE (DRIVING WITHOUT THE OWNER'S CONSENT) AND ONE COUNT OF 487.1 PENAL CODE (GRAND THEFT). AT THE ADJUDICATION HEARING ON MARCH 23, 1983, PARAGRAPH ONE ALLEGING DRIVING WITHOUT THE OWNER'S CONSENT WAS REDUCED TO A MISDEMEANOR AND THE GRAND THEFT ALLEGATION WAS DISMISSED PER CASE SETTLEMENT. THE CASE WAS THEN CONTINUED TO THIS DATE FOR REPORT.

PRESENT OFFENSE:

        ACCORDING TO THE BURBANK POLICE REPORT DATED MARCH 18, 1983, COUPLED WITH THE STATEMENTS OF THE MINOR, VICTIM AND WITNESSES, THE CIRCUMSTANCES SURROUNDING THE PRESENT OFFENSE APPEAR TO BE AS FOLLOWS:

        ON OR ABOUT MARCH 10, 1983, THE MINOR WAS STAYING WITH A MATERNAL UNCLE (MONROE NEWSOME) AT 25625 APARTMENT 41, SOUTH NARBONNE AVENUE, LOMITA, CALIFORNIA. THE MINOR'S UNCLE IS THE MANAGER OF AN APARTMENT COMPLEX THERE. THE MINOR STATED THAT HE WAS ASSISTING HIS UNCLE IN MAINTAINING THE APARTMENTS WHEN HE ALLEGEDLY FOUND A KEY TO VICTIM JAY ROBERT ARCHER'S 1978 HONDO MOTORCYCLE.

-2-

THE MINOR CLAIMS THAT HIS UNCLE TOLD HIM THAT HE COULD NO LONGER RESIDE WITH HIM. THE UNCLE REPORTED THAT THE MINOR WAS CREATING SUCH A DISRUPTION WITHIN HIS FAMILY, I.E. STEALING MONEY FROM HIM, REFUSING TO FOLLOW ORDERS, DRINKING, INSULTING HIS WIFE, ET CETERA, THAT HE ASKED HIM TO LEAVE.

THE MINOR WENT TO THE VICTIM'S PARKING SPACE, TOOK THE VICTIM'S MOTORCYCLE, AND BECAME EMPLOYED WITH THE "CIRCUS VARGAS." THE CIRCUS TRAVELS THROUGHOUT THE SOUTHERN CALIFORNIA AREA AND HAPPENED TO BE IN BURBANK ON THE DATE OF THE MINOR'S ARREST. ON MARCH 18, 1983, A CALIFORNIA HIGHWAY PATROL OFFICER STATIONED IN GLENDALE, CALIFORNIA, RECEIVED INFORMATION FROM AN ANONYMOUS EMPLOYEE OF THE CIRCUS VARGAS THAT THE MINOR WAS DRIVING A BROWN HONDO 750 MOTORCYCLE WHICH WAS POSSIBLY STOLEN. AN OFF-DUTY BURBANK POLICE OFFICER WAS AWARE OF THE FOREGOING INFORMATION AND OBSERVED THE MINOR DRIVING THE AFOREMENTIONED MOTORCYCLE. THE MINOR WAS CONFRONTED BY BURBANK POLICE OFFICERS, YET CLAIMED THAT HE PAID $300 FOR THE MOTORCYCLE. A RADIO CHECK OF THE LICENSE PLATE WAS INITIATED, THE MOTORCYCLE WAS A LOS ANGELES COUNTY SHERIFF'S - LOMITA STATION - CASE (STOLEN MOTORCYCLE), CONSEQUENTLY THE MOTORCYCLE WAS IMPOUNDED AND THE MINOR ARRESTED. AS IT WAS APPARENT THAT THE MINOR HAD NO SUPERVISION THE MINOR WAS DETAINED AT JUVENILE HALL AND A PETITION REQUESTED.

-3-

6C692G – PROB. SA – PS 8-82

155

MINOR'S STATEMENT:

THE MINOR WAS INTERVIEWED AT THE SAN FERNANDO VALLEY JUVENILE HALL ON MARCH 29, 1983. THE MINOR WAS ADMONISHED REGARDING HIS RIGHTS AND ADMITTED THE AMENDED ALLEGATIONS OF THE PETITION IN FULL. THE MINOR STATED THAT HE "GOT SICK OF CHICAGO", HITCHHIKED TO CALIFORNIA AND LIVED WITH A MATERNAL UNCLE IN LOMITA. THE MINOR CLAIMED THAT HE WAS WORKING FOR THE UNCLE AROUND THE APARTMENT. THE MINOR STATED THAT HE LIVED WITH THE UNCLE FOR APPROXIMATELY THREE MONTHS, HOWEVER WAS "KICKED OUT" AFTER COIN OPERATED LAUNDRY MACHINES WERE BROKEN INTO. THE MINOR CLAIMED THAT HE RETURNED TO THE UNCLE'S HOME AND LIVED WITH HIM FOR APPROXIMATELY ONE MONTH AND A HALF BEFORE THE UNCLE'S WIFE "GOT UPSET" AND ASKED THE MINOR TO LEAVE. THE MINOR STATED HE LIVED WITH A 27-YEAR-OLD LADY NAMED CATHY IN THE SAME APARTMENT COMPLEX FOR ONE NIGHT, "FOUND" A KEY TO THE VICTIM'S MOTORCYCLE ON THE GROUND, TRIED THE KEY IN THE VICTIM'S MOTORCYCLE THEN TOOK IT. THE MINOR CLAIMS THAT HE THEN OBTAINED EMPLOYMENT WITH CIRCUS VARGAS AS A "BUTCHER" (SELLS PEANUTS, POPCORN, AND OTHER ITEMS) AND RECEIVED APPROXIMATELY $50 A NIGHT. THE MINOR CLAIMED THAT HE WAS RIDING THE MOTORCYCLE AROUND THE HILLS IN BURBANK, WAS STOPPED BY POLICE, AND SUBSEQUENTLY ARRESTED.

THE MINOR STATED HE WOULD LIKE TO RETURN TO THE CHICAGO AREA AND LIVE WITH HIS FATHER, OR HIS PATERNAL GRANDFATHER IN

—4—

156

MARYLAND. THE MINOR CLAIMED THAT IF HE COULD NOT RESIDE IN MARYLAND THAT HE WOULD LIVE WITH MATERNAL RELATIVES IN KENTUCKY.

THE MINOR TOLD OUTLANDISH STORIES THROUGHOUT THE INTERVIEW, I.E. THAT HE WAS A MALE WITCH, THAT HE WAS A MEMBER OF THE SATAN'S SLAVES MOTORCYCLE GANG IN THE SAN FERNANDO VALLEY, ET CETERA. THE MINOR TOLD THE PROBATION OFFICER THAT HE WAS SORRY FOR WHAT HE HAD DONE TO THE FATHER'S FIANCEE IN CHICAGO (MINOR APPARENTLY STOLE JEWELRY FROM THE FIANCEE). THE MINOR ASKED THE PROBATION OFFICER NOT TO TALK WITH HIS FATHER ABOUT THAT INCIDENT.

PARENTS' STATEMENT:

THE MINOR'S MOTHER, DOROTHY LOU NEWSOME, TELEPHONE NUMBER (815) 385-6808, WAS CONTACTED BY TELEPHONE ON MARCH 25, 1983. MISS NEWSOME REPORTED THAT SHE HAD LEGAL CUSTODY OF THE MINOR AND THAT SHE WOULD LIKE THE MINOR SENT BACK TO ILLINOIS. SHE SAID, "THAT WOULD BE THE BEST THING FOR HIM." THE MOTHER INDICATED THAT SHE DID NOT WANT THE MINOR WITH HER AS SHE COULD NOT CONTROL HIS BEHAVIOR. THE MOTHER STATED THAT THE MINOR IS CURRENTLY A WARD OF THE COURT AND GAVE THE PROBATION OFFICER THE MINOR'S SOCIAL WORKER'S TELEPHONE NUMBER IN CHICAGO. THE MOTHER CLAIMS THAT SHE WAS LIVING WITH HER BOYFRIEND, MARK DUMKE, AND MR. DUMKE'S MOTHER AT 1506 WEST HOLLYWOOD, CHICAGO. (IT SHOULD BE NOTED THAT THE MINOR'S FATHER CLAIMED THAT THE FOREGOING ADDRESS IS PROPERTY OWNED BY THE MOTHER, HOWEVER STATED THAT SHE DOES NOT RESIDE THERE.) THE MOTHER WAS VAGUE REGARDING

-5-

157

PERSONAL HISTORY QUESTIONS ASKED BY THE PROBATION OFFICER. THE MOTHER INDICATED THAT THE SOCIAL WORKER WOULD GIVE THE PROBATION OFFICER PERSONAL HISTORY INFORMATION. THE MOTHER CLAIMED THAT THE FATHER'S WHEREABOUTS ARE UNKNOWN AND CHARACTERIZED HIM AS A "GAMBLER."

THE MINOR'S FATHER'S, DONALD GENE SHATNER'S, PRESENT WHEREABOUTS ARE UNKNOWN. MR. SHATNER DID CONTACT THE PROBATION OFFICER ON MARCH 30, 1983, BY TELEPHONE. MR. SHATNER STATED THAT HIS MAILING ADDRESS IS 3705 WEST PALMER, CHICAGO. HE INDICATED THAT ADDRESS WAS THE HOME OF HIS FIANCEE, JO ANNE WYMAN. THE FATHER STATED HIS PHONE NUMBER TO BE (312) 227-7241. THE FATHER STATED THAT HE WOULD LIKE THE MINOR RETURNED TO HIM SO THAT HE COULD PLACE THE MINOR WITH HIS FATHER IN MARYLAND. HE CLAIMED HIS FATHER WORKS AT A MARINA AND WOULD BE ABLE TO FIND EMPLOYMENT FOR THE MINOR. THE FATHER FEARED HAVING THE MINOR RETURN TO ILLINOIS STATE AUTHORITIES AS HE WOULD MOST LIKELY BE PLACED IN THE "AUDI HOME." THE FATHER SAID, "I DON'T WANT HIM LOCKED UP." THE FATHER STATED THAT HE CANNOT CONTROL THE MINOR. HE REPORTED THAT HE RAN AWAY FROM HIS HOUSE, THAT HE STOLE JEWELRY FROM HIS FIANCEE, TOLD LIES AND FAILED TO ATTEND SCHOOL. THE FATHER STATED HE PUT HIM IN A "GOOD SCHOOL". THE FATHER STATED THE MINOR WAS PHYSICALLY ABUSED BY THE MOTHER. HE CLAIMED THE MOTHER IS NOT ALWAYS TRUTHFUL WITH THE AUTHORITIES. THE FATHER STATED THAT HE WAS LIVING WITH HIS BROTHER AS HE IS PRESENTLY

–6–

FILING FOR BANKRUPTCY.  THE FATHER APPEARED TO BE COOPERATIVE
THROUGHOUT THE ENTIRE INTERVIEW.

INTERESTED PARTIES:

       VICTIM JAY ARCHER, 25625 SOUTH NARBONNE AVENUE,
APARTMENT 25, LOMITA, CALIFORNIA, (213) 534-1755, IS THE HOME NUMBER.
THE WORK NUMBER IS (213) 320-5102.  THE PROBATION OFFICER CONTACTED
THE VICTIM ON APRIL 1, 1983.  THE VICTIM STATED THAT THE MOTORCYCLE
WAS BADLY DAMAGED AND WOULD REQUIRE REPAIRS INTO THE HUNDREDS OF
DOLLARS.  HE INDICATED HE HAD NO INSURANCE COVERAGE ON THE MOTORCYCLE.

       JUVENILE HALL STAFF WERE INTERVIEWED ON MARCH 29,
1983.  THE STAFF REPORTED THAT THE MINOR IS GENERALLY COOPERATIVE
AND PRESENTS NO BEHAVIORAL PROBLEMS TO THEM.  ONE STAFF MEMBER DID
INDICATE THAT THE MINOR FREQUENTLY ACTS SILLY.

       MINOR'S SOCIAL SORKER, MOIRA LOVELOCK, DEPARTMENT OF
CHILD AND FAMILY SERVICES (STATE OF ILLINOIS), 4320 WEST MONTROSE,
CHICAGO, ILLINOIS 60641, TELEPHONE NUMBER (312) 282-9470, EXTENSION
296, WAS CONTACTED ON MARCH 28 AND MARCH 30 BY TELEPHONE.  MISS
LOVELOCK INDICATED THAT THE MINOR IS A "WARD OF THE STATE OF ILLINOIS,
AND HAS BEEN SO FOR THE PAST THREE YEARS."  SHE STATED THAT THE MINOR
WAS IN A PLACEMENT AT "COVENANT HOME", WAS REMOVED FROM PLACEMENT
AND PERMITTED TO RESIDE WITH THE MINOR'S FATHER.  SHE STATED THE
MINOR RAN AWAY FROM THE FATHER, AND HEARD RUMORS THAT HE WAS LIVING
IN CALIFORNIA.  MISS LOVELOCK STATED THAT SHE WOULD LIKE THE MINOR

-7-

SC682G — PROB. 5A — PS 8-82

159

RETURNED TO THE STATE OF ILLINOIS, AND FELT THAT HE SHOULD BE
TURNED OVER TO THE DEPARTMENT OF CORRECTIONS IN THAT STATE.
MISS LOVELOCK ALSO STATED THAT THE MINOR WAS ON PROBATION IN COOK
COUNTY AND GAVE THIS PROBATION OFFICER THE MINOR'S PROBATION OFFICER'S
NUMBER.

COOK COUNTY PROBATION OFFICER KAREN BROOKS, (312)
470-7340, EXTENSION 7339.  THE PROBATION OFFICER CONTACTED KARN
BROOKS' SUPERVISOR, MARGE PEARLMAN, ON MARCH 30, 1983.  MISS PEARLMAN
STATED THAT THE MINOR HAS BEEN ON PROBATION FOR THE PAST TWO YEARS
AND THAT A WARRANT WAS ISSUED FOR HIS ARREST ON OCTOBER 29, 1982.
ADDITIONALLY, MISS PEARLMAN STATED THE REVIEW DATE WAS MARCH 30,
1983.  MISS PEARLMAN STATED THAT THEY WOULD LIKE THE MINOR RETURNED
TO ILLINOIS AND TO BE HANDLED BY THEIR AGENCY.

PERSONAL HISTORY:

THE MINOR WAS BORN JULY 12, 1967, IN CHICAGO, ILLINOIS.
HIS BIRTH WAS A NORMAL FULL-TERM BIRTH, HOWEVER THE MINOR WAS
SUBSEQUENTLY DIAGNOSED AS BEING HYPERKINETIC.  THE MOTHER CLAIMED
THE MINOR WAS IN A MILITARY SCHOOL FOR SEVEN YEARS, AND AT THE
MIDWEST ACADEMY FOR TWO YEARS IN WHEATON.  ADDITIONALLY, THE MINOR
HAS BEEN PLACED IN A VARIETY OF STATE SCHOOLS AND APPARENTLY HAS
FAILED TO ADJUST WITHIN THOSE PLACEMENT FACILITIES.

THE MINOR'S PARENTS WERE MARRIED IN OCTOBER OF 1966
IN CLINTWOOD, VIRGINIA.  THE COUPLE SEPARATED IN 1979 AND DIVORCED IN

-8-

6C682G — PROB. 3A — PS 8-82

160

FEBRUARY OF 1982. ACCORDING TO THE MOTHER, THE FATHER "GAMBLED" WITH THEIR MONEY (VIA THE STOCK EXCHANGE). THE FATHER CLAIMS THAT THE MOTHER WAS UNFAITHFUL TO HIM. THE MINOR IS THE ONLY CHILD BORN OUT OF THAT UNION. THE MINOR'S FATHER REPORTS THAT HE IS PRESENTLY UNEMPLOYED. HE NORMALLY MAKES HIS LIVING BUYING AND SELLING STOCKS, COMMODITIES, ET CETERA. THE FATHER IS FILING FOR BANKRUPTCY. THE MINOR'S MOTHER REPORTS THAT SHE IS UNEMPLOYED, HOWEVER BOTH THE MINOR AND FATHER CLAIM THAT SHE IS EMPLOYED AS A BEAUTICIAN. MOREOVER, THE FATHER CLAIMS THAT THE MOTHER OWNS PROPERTY AND RECEIVES MONIES FROM THAT PROPERTY.

THE MINOR STATES THAT HE LAST ATTENDED PROSSER HIGH SCHOOL IN CHICAGO, ILLINOIS, AS AN 11TH GRADER. HIS ATTENDANCE THERE WAS UNSATISFACTORY AND HE WAS SUBSEQUENTLY DROPPED AFTER HIS RUNAWAY.

FINANCIAL INFORMATION:

ACCORDING TO BOTH OF THE MINOR'S PARENTS, THEY ARE BOTH UNEMPLOYED AND ARE LIVING OFF OF SAVINGS, FRIENDS, ET CETERA.

GANG INFORMATION:

THE PROBATION OFFICER HAS NO INFORMATION TO CONCLUDE THAT THE MINOR IS A MEMBER OF ANY ORGANIZED GANG, OR THAT HE PARTICIPATES IN ANY GANG RELATED ACTIVITIES. THE MINOR DID STATE THAT HE WAS A MEMBER OF "SATAN'S SLAVES MOTORCYCLE CLUB" IN THE SAN FERNANDO VALLEY, HOWEVER THE PROBATION OFFICER DOUBTS THE CREDITABILITY OF THE MINOR'S CLAIM.

-9-

161

PREVIOUS HISTORY:

AGE 15            3-18-83 – BURBANK PD – 10851 VC (DRIVING WITHOUT
                  THE OWNER'S CONSENT) – PETITION REQUESTED.  CASE
                  NUMBER J110304, JUDGE MONTES, DEPT. 270, DISTRICT
                  ATTORNEY FILED A PETITION ON 3-22-83 ALLEGING ONE
                  COUNT OF 10851 VC (DRIVING WITHOUT THE OWNER'S
                  CONSENT) AND ONE COUNT OF 487.1 PENAL CODE (GRAND
                  THEFT).  AT THE ADJUDICATION HEARING ON 3-23-83,
                  THE DRIVING WITHOUT THE OWNER'S CONSENT ALLEGATION
                  WAS REDUCED TO A MISDEMEANOR AND WAS SUSTAINED BY
                  ADMISSION AND THE GRAND THEFT ALLEGATION WAS
                  DISMISSED PER CASE SETTLEMENT.

     (THIS REFERS TO THE PRESENT OFFENSE.)

               IN ADDITION TO THE ABOVE, ILLINOIS STATE AUTHORITIES

INDICATE THE MINOR HAS A LENGTHY ARREST RECORD, AND THAT HE WAS

PLACED ON PROBATION MAY 16, 1980, IN COOK COUNTY, ILLINOIS.

ANALYSIS AND PLAN:

               THE MINOR APPEARS TO BE A SOPHISTICATED 15-YEAR-OLD

DELINQUENT WHO HAS HAD MULTIPLE OPPORTUNITIES TO CHANGE HIS BEHAVIOR.

HE WAS PLACED IN A VARIETY OF STATE AND COUNTY PLACEMENT FACILITIES,

WAS PERMITTED TO LIVE WITH HIS FATHER IN CHICAGO, YET CONTINUED TO

MISBEHAVE BY LYING, STEALING, RUNNING AWAY, ET CETERA.  IT IS

APPARENT THAT THE MINOR IS EMOTIONALLY TROUBLED, SELF-DESTRUCTIVE

AND IN NEED OF PSYCHOLOGICAL COUNSELING, GUIDANCE AND SUPERVISION.

               THE MINOR IS A WARD OF THE STATE OF ILLINOIS, AND IS

ON PROBATION IN COOK COUNTY, ILLINOIS.  HE HAS A WARRANT FOR HIS

ARREST THERE AND AUTHORITIES WOULD LIKE HIM RETURNED.  IN VIEW OF

THE FOREGOING, THE FOLLOWING RECOMMENDATION HAS BEEN SUBMITTED.

-10-

RECOMMENDATION:

        IT IS RECOMMENDED THAT THE MINOR BE DECLARED A WARD OF THE COURT UNDER SECTION 602 OF THE WELFARE AND INSTITUTIONS CODE; THAT THE MINOR BE PLACED IN THE CARE, CUSTODY AND CONTROL OF THE PROBATION OFFICER FOR THE PURPOSE OF TRANSPORTING THE MINOR TO THE DEPARTMENT OF CHILD AND FAMILY SERVICES (STATE OF ILLINOIS) OR THE COOK COUNTY PROBATION DEPARTMENT (IN ILLINOIS); THAT THE COURT ORDER THE PROBATION OFFICER TO TRANSPORT THE MINOR TO THE DESTINATION AND TO PAY THE COST OF SUCH TRANSPORTATION TOGETHER WITH NECESSARY MEALS, LODGING AND CLOTHING, AND THE EXPENSE THEREOF TO BE CHARGED

-11-

163

AGAINST THE COUNTY OF LOS ANGELES; THAT THE CASE BE CONTINUED TO
THE NONAPPEARANCE CALENDAR OF APRIL 22, 1983, IN DEPARTMENT 270,
FOR JUDICIAL REVIEW.

RESPECTFULLY SUBMITTED,

KENNETH E. KIRKPATRICK,
PROBATION OFFICER


BY _Robert L. Petersen,_
ROBERT L. PETERSEN, DEPUTY
FOOTHILL AREA OFFICE
356-5389


READ AND APPROVED:




ROSEMARY KENNEDY, SDPO

(SUBMITTED:  4-1-83)
(RECEIVED:   4-1-83)
(TYPED:      4-4-83)
RLP:JG  (6)


-12-

164

Darren
Wayne

## RAVENSWOOD HOSPITAL ADMISSION RECORD

Patient: R.N. CLINIC Baby
Street: Crumb, Mrs. Dorothy O.B.
4512 N. Malden
Chgo. Ill.
Telephone:
Sex & Age: F 18
Adm. Date: 7-11-67 7:58 P.M.
B.C. Cert. No.:
S S No.: 019 42 5639
Other Ins. Co.:

Bill To: R.N. CLINIC & HOSP. **175.00
Address: Flat Rate

Doctor: Japzon

Disch. Date: 7-15-67

Employer of Patient: Hus.—Artist
Address: Mercury Screw Div.
Lincolnwood—Brewst.
677 1300
Husband C3

Nearest Relative: Dr. Donald Crumb
Husband

no
3-3-48
Presby.                    Kentucky

Move @ 5 5/day

| DIAGNOSIS: |
|---|
| ADMITTING |
| FINAL |

### COMPLICATIONS OR INFECTIONS:

### OPERATIONS:

### CONSULTATION WITH:

| CONDITION ON DISCHARGE | REC. | IMP. | UNIMP. | N T | DEC | OUT |
|---|---|---|---|---|---|---|

## RAVENSWOOD HOSPITAL ASSOCIATION

FORM NO.

### CASE SUMMARY

165

## APGAR RATING SHEET

NAME: _____ DATE: _____ DOCTOR: _____

| SIGN | 0 | 1 | 2 | TOTAL |
|---|---|---|---|---|
| HEART RATE | ABSENT | SLOW BELOW 100 | OVER 100 | 2 |
| RESPIRATORY EFFORT | ABSENT | SLOW IRREGULAR | GOOD CRYING | 2 |
| MUSCLE TONE | LIMP | SOME FLEXION OF EXTREMITIES | ACTIVE EMOTION | 2 |
| RESPONSE TO CATHETER IN NOSTRIL | NO RESPONSE | GRIMACE | COUGH OR SNEEZE | 2 |
| COLOR | BLUE PALE | BODY PINK, EXTREMITIES BLUE | COMPLETELY PINK | 2 |
| TOTAL APGAR RATING | | | | 10 |

166

# RAVENSWOOD HOSPITAL

| DATE | PHYSICIAN'S ORDERS | DATE | PROGRESS NOTES |
|------|--------------------|------|----------------|

NURSES REMARKS

## INFANT'S EXAMINATION    Indicate Normal by a [ ✓ ]

INITIAL

Measurements:
   Circumference of head:
   Circumference of chest:
   Length in inches:
Color:
Skin:
Head:
   Eyes:
   Ears:
   Nose:
   Mouth:

Chest:
   Heart:
   Lungs:
Abdomen:
Genitalia:
Extremities:
Back:
Reflexes:

Cord:

Anus:
Moro:

Physician:
Date:

Discharge
   Summary:

167

Case 1:12-cv-08570 Document #: 1-3 Filed: 10/25/12 Page 20 of 40 PageID #:861

## RAVENSWOOD HOSPITAL ASSOCIATION

8

7

6

5

4

3

2

1

ILLINOIS DEPARTMENT OF PUBLIC HEALTH
DIVISION OF PREVENTIVE MEDICINE
ROOM 502 STATE OFFICE BUILDING, SPRINGFIELD

339 B

DOROTHY CRUMB
040470 F 19 7-11-
JAPZON

BLOOD SPECIMEN FOR PHENYLKETONURIA

1. PLACE OF BIRTH STATE ILLINOIS
COUNTY    CITY-TOWN-VIL.-TWP.

HOSPITAL

339 B

LABORATORY NAME & REGISTRATION

Cook Chicago RAVENSWOOD

NAME OF INFANT    7. PHYSICIAN    7-13-67    LAST    CRUMB    RESULTS

DARREN WAYNE

3. DATE OF BIRTH    NAME    Dr. Japzon
MO.    DAY    YR.

7  12  67

7  15  67    ADDRESS  1931 N. Wilson

X    CITY  Chicago    ILL.

HOSPITAL COPY    15

CLINICAL LABORATORY REPORTS

FORM NO. 652-B-F10

168

## RAVENSWOOD HOSPITAL ASSOCIATION

| | | RAVENSWOOD HOSPITAL | LAB | BLOOD BANK LAB | IN PATIENT |
|---|---|---|---|---|---|
| | | H. H. METZ, PATHOLOGIST | 9 | BLOOD GROUPING | |

DATE RECEIVED

| CODE | | | | |
|---|---|---|---|---|
| 007 | COOMBS | DIRECT | Negative | |
| | | INDIRECT | | |
| 006 | BLOOD GROUP | ABO GROUP | MN GROUP | OTHER GROUP |
| 008 | Rh FACTORS | | | |
| 009 | Rh ANTIBODY TITER | SALINE | DILUTION | |
| | | ALBUMIN | DILUTION | |
| | | COOMBS | DILUTION | |
| 015 | A & B ANTIBODY TITERS | ANTI-A | DILUTION | |
| | | ANTI-B | DILUTION | |

CHART COPY

BLOOD GROUPING

169

Crumb

FORM NO. 632-9-F18

CLINICAL LABORATORY REPORTS

## RAVENSWOOD HOSPITAL
### NEWBORN RECORD

DOROTHY CRUMB
C40070 F 18 7-11-6
JA...

Name _Elizabeth_          Room _337B_   Sex _Male_  Date _7-12-6?_  Time _5:51 A.M._ (P.M.)
Father's Name _Gerald_          Mother's Name _Dorothy_
Address _7582 N. Maiden_          Telephone _328 631?_
Obstetrician _Josephson Lee_ — Pediatrician _____    Interne _____
Graduate Nurse: Day _____          Evenings _____          Night _____

| MOTHER | | INFANT | | |
|---|---|---|---|---|

Gravida _7_    Para _5_          Eyes eroded by _____
Weeks of gestation _37_          Resuscitation Measures by:
Complications of Pregnancy and Labor:          (None)          Catheter          Oxygen

Stimulants — Kind and amount: _____

Duration of Labor 1st _____  2nd _____          Respiration:
Type of Delivery _____                 Time of a. 1st breath _____
Complications of Delivery _____              b. 1st cry _____
                                             c. Normal respiration _____

Medication — amount and time          Rh factor: Positive _____   Negative _____
_____                                  Rh titers: Date and results: _____

Anesthesia _____                       Date of Circumcision: _7-14_ _____
Rh factor: Mother _____  Father _____
Rh titers: Date and results: _____     ADMISSION TO NURSERY
                                       Time _____   Medication _____

                                       Special Treatment: _____

| DAY OF LIFE | 2 | 3 | Y | S | 6 | |
|---|---|---|---|---|---|---|
| DATE | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| WEIGHT | 7-14 | | | 7·11½ | 7·12 | | |
| TEMP. A.M. | | | | 97·2? | 98·8 | | |
| TEMP. P.M. | 98 | 98 | | 98·6 | 98 | | |
| STOOL Type | | mec | | ssgn | | | |
| STOOL No. | | | | | | | |

| | Fr | Br | Fl | Fr | Br | Fl | Fr | Br | Fl | Fr | Br | Fl | Fr | Br | Fl | Fr | Br | Fl | Fr | Br | Fl |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 A.M. | | | | #0 | 1½ | | #0 | | | | | | | | | | | | | | |
| 2 P.M. | | | | #0 | 1½ | | | | | | | | | | | | | | | | |
| 6 P.M. | | | | | | | | | | | | | | | | | | | | | |
| 10 P.M. | | | | | | 1 | | | | | | | | | | | | | | | |
| 2 A.M. | | | | | | 2 | | 3 | | | | | | | | | | | | | |
| 6 A.M. | | | | | | 2 | | 3 | | | | | | | | | | | | | |

(N U R S I N G S)

## 170

REMARKS _____
_____
_____ OVER

Case: 1:12-cv-00047 Document #: 1-5 Filed: 01/04/12 Page 23 of 40 PageID #:1361





# ARCHIVES OF DERMATOLOGY

*Editor*
**Kenneth A. Arndt, MD**

*Archives of Dermatology*

- Table of Contents
- *Archives* Past issues
- Past issues of Off-Center Folds
- Related links
- Instructions for Authors

- About *Archives*
- Classified ads
- Reader Services
- Search

**Abstracts - August 1997**

## Resolution of Recalcitrant Molluscum Contagiosum Virus Lesions in Human Immunodeficiency Virus-Infected Patients Treated With Cidofovir

*Kappa P. Meadows, MD; Stephen K. Tyring, MD, PhD; Andrew T. Pavia, MD; Tena M. Rallis, MD*

**Background:** Molluscum contagiosum virus (MCV) causes cutaneous skin growths that mainly affect children, sexually active adults, and immunocompromised individuals. Lesions of MCV in patients infected with human immunodeficiency virus can be large and numerous, and response to available treatments is often unsatisfactory.

**Observations:** We describe 3 men infected with human immunodeficiency virus who presented with extensive MCV lesions that were not responsive to various treatments. Patient 1 demonstrated dramatic clearing of his MCV lesions when intravenous cidofovir therapy was started for his treatment-resistant bilateral CMV retinitis and because of cidofovir's possible activity against MCV. In case 2, cidofovir was compounded as a 3% cream in a combination vehicle (Dermovan) for extensive facial involvement, and complete resolution of MCV was seen after 1 month of therapy. In case 3, intravenous cidofovir therapy was started both for CMV retinitis and in an attempt to clear 90% facial MCV involvement; after 1 month of treatment, all clinical evidence of MCV had resolved. All 3 patients remain clear of recurrence.

**Conclusions:** Cidofovir, a nucleotide analog of deoxycytidine monophosphate, appears to have contributed to clearing of advanced MCV lesions in these 3 patients, thus providing suggestive evidence of clinical activity against MCV. Controlled trials of cidofovir therapy for MCV in persons infected with human immunodeficiency virus are warranted.

Arch Dermatol. 1997;133:987-990

Continue abstracts
Table of Contents

171



HIV/AIDS Information Center
The Journal of the American Medical Association



## Library



 

**Figure 1.** Case 1. Front (left) and side (right) views of extensive, nodular, crusting plaques of molluscum contagiosum virus confluent on the cheeks and chin, with individual smaller lesions on the nose.

Return to article

**JAMA HIV/AIDS**   Newsline ♦ Library ♦ Treatment Center ♦ Prevention
Policy ♦ Education & Support Center ♦ Best of the Net
Search ♦ Feedback ♦ AMA Home Page

This site produced by the *Journal of the American Medical Association* with grant support from Glaxo Wellcome Inc.
© 1997 American Medical Association. All rights reserved.

172



**NIDA** Research Report Series

# Inhalant Abuse

## *Its Dangers Are Nothing To Sniff At*

## Inhalant Abuse

About 17 percent of adolescents in this country say that they have sniffed inhalants-usually volatile solvents such as spray paint, glue, or cigarette lighter fluid-at least once in their lives, according to NIDA's 1993 Monitoring the Future study, a national survey of 8th-, 10th-, and 12th-grade students. In fact, results from a number of surveys suggest that among children under 18, the level of use of inhalants is comparable to that of stimulants and is exceeded only by the level of use of marijuana, alcohol, and cigarettes.

Inhalant abuse, however, is a stepchild in the war on drugs. The abuse of inhalants, which includes a broad array of cheap and easily obtainable household products (see table), is not viewed in the same high-risk category as drugs such as alcohol, cocaine, and heroin. Some people tend to view inhalant "sniffing," "snorting," "bagging" (fumes inhaled from a plastic bag), or "huffing" (inhalant-soaked rag in the mouth) as a kind of childish fad to be equated with youthful experiments with cigarettes.

But inhalant abuse is deadly serious. Sniffing volatile solvents, which includes most inhalants, can cause severe damage to the brain and nervous system. By starving the body of oxygen or forcing the heart to beat more rapidly and erratically, inhalants can kill sniffers, most of whom are adolescents.

Survey data on the prevalence of inhalant abuse is difficult to obtain for a number of reasons, and information that does exist may under-emphasize the severity of the situation. No one knows how many adolescents and young people die each year from inhalant abuse, in part because medical examiners often attribute deaths from inhalant abuse to suffocation, suicide, or accidents. What's more, no national system exists for gathering data on the extent of inhalant-related injuries. Although medical journals have described the situation as serious, some researchers warn that doctors and emergency medical personnel are not adequately trained to recognize and report symptoms of inhalant abuse.

## Scope of the Problem

173

Inhalant abuse came to public attention in the 1950's when the news media reported that young people who were seeking a cheap "high" were sniffing glue. The term "glue sniffing" is still widely used, often to include inhalation of a broad range of common products besides glue, notes Dr. Charles W. Sharp of NIDA's Division of Basic Research.

With so many substances lumped together as inhalants, research data describing frequency and trends of inhalant abuse are uneven and sometimes contradictory. However, evidence indicates that inhalant abuse is more common among all socioeconomic levels of American youth than is typically recognized by parents and the public. For instance, NIDA's Monitoring the Future survey shows that in 1993, one in every five 8th graders, or 19.4 percent, used an inhalant in his or her lifetime.

Inhalants were used by equally high percentages of 10th and 12th graders, according to the NIDA survey. Lifetime inhalant use among 12th graders, which had increased steadily for most of the 1980s, leveled off somewhat at 17.4 percent in 1993. Also, 17.5 percent of 10th graders reported lifetime inhalant use in 1993.

Inhalants are most commonly used by adolescents in their early teens, with usage dropping off as students grow older. For example, while 5.4 percent of 8th graders reported using inhalants within the past 30 days, known as "current" use, only 2.5 percent of seniors reported current use of inhalants.

A major roadblock to recognizing the size of the inhalant problem is the ready availability of products that are inhaled. Inhalants are cheap and can be purchased legally in retail stores in a variety of seemingly harmless products. As a result, adolescents who sniff inhalants to get high don't face the drug procurement obstacles that confront abusers of other drugs.

Inhalant abuse also appears to be a problem worldwide according to research data presented at a recent NIDA technical review, "Epidemiology of Inhalant Abuse: An International Perspective." According to Nicholas Kozel, of NIDA's Division of Epidemiology and Prevention Research, low price and easy availability and access make inhalants as problematic in Africa, Asia and Latin America as it is in the United States.

---

# A Glossary of Terms

- *Bolt, Bullet, Climax, Locker Room, Rush.* Street names for butyl nitrite, which is packaged in small bottles.
- *Poppers and Snappers.* Street names for ampules of amyl nitrite.
- *Whippets.* Balloons or plastic bags filled with nitrous oxide.
- *Sniffing, Snorting.* Terms for inhaling substances.
- *Sudden Sniffing Deaths.* Death, usually due to heart failure, within minutes of using an inhalant.
- *Texas Shoe Shine.* Spray paint containing toluene.
- *Torch or Fire Breathing.* Igniting exhaled volatile gas, such as propane or butane.

---

For additional information about NIDA send e-mail to Information@lists.nida.nih.gov

---

Case: 1:12-cv-00047 Document #: 1-5 Filed: 01/04/12 Page 27 of 40 PageID #:361
http://www.nida.nih.gov/ResearchReports/Inhalants/Inhalants2.html

Volatile solvents produce a quick form of intoxication-excitation followed by drowsiness, disinhibition, staggering, lightheartedness, and agitation. Because many inhalant products contain more than one volatile solvent, it is difficult to clearly identify in humans the specific chemical responsible for subsequent brain or nerve damage or death.

Some volatile solvents are inhaled by abusers because of the effects produced not by the product's primary ingredient but by propellant gases, like those used in aerosols such as hair spray or spray paint. Other volatile solvents found in aerosol products such as gold and silver spray paint are sniffed not because of the effects from propellant gases but because of the psychoactive effects caused by the specific solvents necessary to suspend these metallic paints in the spray.

Nitrites historically have been used by certain groups, largely gay men, to enhance sexual experience and pleasure. Often called "poppers' or "rush," some nitrite products are sold as room odorizers. But use of nitrites has fallen off dramatically in recent years. This may be partly because products containing butyl, propyl, and certain other nitrites were banned in 1991, although products using chemical variants of the banned substances are still sold.

For the past 13 years, NIDA's Monitoring the Future survey has adjusted for the underreporting of nitrite use, recognizing that many survey respondents did not include information about nitrite use when answering survey questions about inhalant abuse. That's because most respondents fail to consider the use of nitrites as a form of inhalant abuse, unless prompted with specific questions mentioning "poppers, rush," or other nitrite-specific references, researchers say.

Some observers now believe that adjusting inhalant abuse survey results to combine nitrite use with volatile solvent use can lead to mistaken conclusions when viewing consolidated data over several years. That's because nitrite use is declining while volatile solvent use has been on the rise for a number of years. "In combining solvents with nitrites and then adjusting the data, it appears that inhalant use has not changed over the past 16 years when, in fact, solvent use has steadily increased for a decade and a half and just now may be leveling off," says Dr. Fred Beauvais, a psychologist and NIDA-funded researcher at the Tri-Ethnic Center for Prevention Research at Colorado State University at Fort Collins (see figure).

Because the current inhalant profile lumping nitrites with volatile solvents leads to misleading data and inferences, many researchers believe that a scientific description of inhalant abuse should distinguish abuse of volatile substances from abuse of nitrites and perhaps anesthetics.

Within the other major category of inhalants, the anesthetics, the principal substance of abuse is nitrous oxide. A colorless, sweet-tasting gas used by doctors and dentists for general anesthesia, nitrous oxide is called "laughing gas" because it often induces a state of giggling and laughter. Recent anecdotal reports indicate that nitrous oxide is being sold illicitly to teenagers and young adults at outdoor events such as rock concerts and on the street. Nitrous oxide often is sold in large balloons from which the gas is released and inhaled for its mind-altering effects.

But nitrous oxide is no laughing matter. Inhaling the gas may deplete the body of oxygen and can result in death; prolonged use can result in peripheral nerve damage.

## Inhalants and Their Chemical Contents

# *Volatile Solvents*

### Adhesives

- Airplane Glue
- Rubber Cement
- Polyvinylchloride (PVC) Cement

### Aerosols

- Spray Paint
- Hair Spray
- Deodorant, Air Freshener

### Solvents and Gases

- Nail Polish Remover
- Paint Remover
- Paint Thinner
- Typing Correction Fluid and Thinner
- Fuel Gas
- Cigarette Lighter Fluid
- Gasoline

### Cleaning Agents

- Dry Cleaning Fluid
- Spot Remover
- Degreaser

### Dessert Topping Sprays

- Whipped Cream, Whippets

# *Nitrites and Anesthetics*

### Nitrite Room Odorizers

- "Poppers" and "Rush"

### Anesthetics

- Gas
- Liquid
- Local

[Adapted from *Inhalant Abuse: A Volatile Research Agenda*, NIDA Research Monograph 129, 1992.]



# Inhalant Abuse

Inhalants are breathable chemical vapors that produce psychoactive (mind-altering) effects. Although people are exposed to volatile solvents and other inhalants in the home and in the workplace, many do not think of inhalable substances as drugs because most of them were never meant to be used in that way.

Young people are likely to abuse inhalants, in part because inhalants are readily available and inexpensive. Sometimes children unintentionally misuse inhalant products that are found around the house in household products. Parents should see that these substances are monitored closely so that they are not inhaled by young children.

Inhalants fall into the following categories:

- **Solvents**
  - *industrial or household solvents or solvent-containing products*, including paint thinners or solvents, degreasers (drycleaning fluids), gasoline, and glues
  - *art or office supply solvents*, including correction fluids, felt-tip-marker fluid, and electronic contact cleaners

- **Gases**
  - *gases used in household or commercial products*, including butane lighters and propane tanks, whipping cream aerosols or dispensers (whippets), and refrigerant gases
  - *household aerosol propellants and associated solvents* in items such as spray paints, hair or deodorant sprays, and fabric protector sprays
  - *medical anesthetic gases*, such as ether, chloroform, halothane, and nitrous oxide (laughing gas)

  - **Nitrites**
  - *aliphatic nitrites*, including cycohexyl nitrite, which is available to the general public; amyl nitrite, which is available only by prescription; and butyl nitrite, which is now an illegal substance.

## Extent of Use

Initial use of inhalants often starts early. Some young people may use inhalants as a cheap, accessible substitute for alcohol. Research suggests that chronic or long-term inhalant abusers are among the most difficult to treat and they may experience multiple psychological and social problems.

**Monitoring the Future Study**

 

Sniffing highly concentrated amounts of the chemicals in solvents or aerosol sprays can directly induce heart failure and death. This is especially common from the abuse of fluorocarbons and butane-type gases. High concentrations of inhalants also cause death from suffocation by displacing oxygen in the lungs and then in the central nervous system so that breathing ceases. Other irreversible effects caused by inhaling specific solvents are as follows:

- **Hearing loss** - toluene (paint sprays, glues, dewaxers) and trichloroethylene (cleaning fluids, correction fluids)

- **Peripheral neuropathies or limb spasms** - hexane (glues, gasoline) and nitrous oxide (whipping cream, gas cylinders)

- **Central nervous system or brain damage** - toluene (paint sprays, glues, dewaxers)

- **Bone marrow damage** - benzene (gasoline).

Serious but potentially reversible effects include:

- **Liver and kidney damage** - toluene-containing substances and chlorinated hydrocarbons (correction fluids, dry-cleaning fluids)

- **Blood oxygen depletion** - organic nitrites ("poppers," "bold," and "rush") and methylene chloride (varnish removers, paint thinners).

Death from inhalants usually is caused by a very high concentration of fumes. Deliberately inhaling from an attached paper or plastic bag or in a closed area greatly increases the chances of suffocation. Even when using aerosol or volatile products for their legitimate purposes (i.e., painting, cleaning, etc.), it is wise to do so in a well-ventilated room or outdoors.

---

## Health Consequences

NIDA has funded several research grants looking at the health consequences and neurological effects of inhalant abuse, as well as epidemiological studies. Several studies have focused on factors related to inhalant use, especially among high-risk groups, including Native American and Hispanic youth. Further research will be important to determine the long-term consequences of inhalant abuse and to design prevention and treatment efforts.

Amyl and butyl nitrites have been associated with Kaposi's sarcoma (KS), the most common cancer reported among AIDS patients. Early studies of KS showed that many people with KS had used volatile nitrites. Researchers are continuing to explore the hypothesis of nitrites as a factor contributing to the development of KS in HIV-infected people.

*Part of the NIDA Capsule Series - (C-93-02)*

[NIDA Home Page][NIDA Capsule Index]



# Inhalant Abuse

## Its Dangers Are Nothing To Sniff At

## Dangers of Inhalant Abuse

Although no central system exists in the United States for reporting deaths and injuries from abusing inhalants, several studies have documented the dangers associated with inhalant abuse. A study by Dr. James C. Garriott, the chief toxicologist in San Antonio and Bexar County, Texas, examined all deaths in the county between 1982 and 1988 that were attributed to inhalant abuse. Most of the 39 inhalant-related deaths involved teenagers, with 21 deaths occurring among people less than 20 years old. Deaths of males outnumbered those of females 34 to 5. Many of the abusers met with a violent death possibly related to but not directly caused by the use of volatile solvents. Eleven deaths were caused by suicide (10 by hanging), 9 by homicide, and 10 by accident, including falls, auto accidents, and overdoses.

Most of those people who died in Bexar County had used toluene-containing products, such as spray paints and lacquers, Dr. Garriott reported. The next most frequent cause of death in the Texas study was the use of a combination of chemicals found in typewriter correction fluids and other solvents. Other abused substances that resulted in death included gasoline, nitrous oxide, and refrigerants, such as fluorocarbons (Freon). Freon now has been replaced with butane or propane products in most aerosols.

## *Inhalant abuse is deadly serious. By starving the body of oxygen or forcing the heart to beat more rapidly and erratically, inhalants can kill sniffers, most of whom are adolescents.*

As reported in the Texas study, the solvent toluene, a common component of many paints, lacquers, glues, inks, and cleaning fluids, is identified frequently in inhalant abuse deaths and injuries. A 1986 study of 20 chronic abusers of toluene-containing spray paints found that after one month of abstinence from sniffing the paint, 65 percent of the abusers had damage to the nervous system. Such damage can lead to impaired perception, reasoning, and memory, as well as defective muscular coordination and, eventually,

180



Case: 1:12-cv-00047 Document #: 1-5 Filed: 01/04/12 Page 32 of 40 PageID #:361

dementia.

In England, where national statistics on inhalant deaths are recorded, the largest number of deaths in 1991 resulted from exposure to butane and propane, which are used as fuels or propellants. Many researchers believe that abuse of butane, which is used in cigarette lighters, is on the increase in the United States. NIDA's Dr. Sharp says, "It's hard to tell whether this is a passing fancy or whether some youthful abusers actually like to get dizzy on the butane and propane gases."

A recent report of this particular inhalant problem in the Cincinnati region indicates that butane gas is the cause of enough deaths to foster national concern about the abuse of fuel gases, whether or not it is a passing form of inhalant abuse, Dr. Sharp says. He notes that "sniffers seem to go out of their way to get their favorite product." For instance, in certain parts of the country, "Texas 'shoe-shine' [a shoe-shining spray containing toluene] and silver or gold spray paints are local or current favorites," he says. Since the banishing of fluorocarbons, the most common sniffing death hazards among students in the United States probably are due to butane and propane, Dr. Beauvais says. "Doctors and emergency room staffs need to be aware that the profile of the teenager who inhales volatile solvents is not limited to the ethnic lower socioeconomic classes," he cautions. "Many sources lead us to believe that abuse of these readily available inhalants has reached epidemic proportions, indicating an urgent need for preventive efforts directed at teenagers and their parents with emphasis on the risk of sudden sniffing death."

For additional information about NIDA send e-mail to Information@lists.nida.nih.gov

[NIDA Home Page][Publications Index][Report Index][Previous Report Section][Next Report Section]

181

Case: 1:12-cv-00047 Document #: 1-5 Filed: 01/04/12 Page 33 of 40 PageID #:361



**NIDA** Research Report Series

# Inhalant Abuse

## *Its Dangers Are Nothing To Sniff At*

## Who's Abusing Inhalants?

One possible reason for the increased use of volatile solvents is that more girls are joining boys in sniffing solvents. "The rates of solvent use for males and females have been converging over the past 20 years," Dr. Beauvais says. Recent studies in New York State and Texas report that males are using solvents at only slightly higher rates than females are. Among Native Americans, whose solvent abuse rates are the highest of any ethnic group, lifetime prevalence rates for males and females were nearly identical, according to 1991 NIDA data.

## How Inhalants Rank Among Most-Abused Substances

Lifetime Use of Selected Substances by 8th, 10th and 12th Graders



*Experimentation with inhalants is widespread among adolescents. NIDA's Monitoring the Future survey shows that among 8th, 10th, and 12th graders who have used drugs at least once in their lives, the prevalence of inhalant use is exceeded only by the prevalence of marijuana, cigarette and alcohol use.*

There is a public perception that inhalant abuse is more common among Hispanic youth than among other ethnic groups. However, recent surveys have not found high rates of abuse by Hispanics in all geographic

Case: 1:12-cv-00047 Document #: 1-5 Filed: 01/04/12 Page 34 of 40 PageID #:361
http://www.nida.nih.gov/ResearchReports/Inhalants/Inhalants4.html

ethnic groups. However, recent surveys have not found high rates of abuse by Hispanics in all geographic areas, Dr. Beauvais points out. "It appears that rates for Hispanics may be related to socioeconomic conditions," he says. "As those conditions vary so will the levels of solvent use. Hispanic youths in poor barrio environments may use solvents heavily, but Hispanic youths in less stressful environments do not."

In fact, inhalant abuse shows an episodic pattern, with short-term abuse outbreaks developing in a particular school or region as a specific inhalant practice or product becomes popular in a fashion typical of teenage fads. This episodic pattern can be reflected in survey results and can overstate the magnitude of what is a continually fluctuating level of abuse, says Dr. Beauvais.

## What is the True Picture of Inhalant Abuse

Trends in Lifetime Use of Inhalants, Inhalants Adjusted, and Nitrites by High School Seniors, 1979-1993



*In surveys of drug use, the category "Inhalants Adjusted" includes the use of nitrites and volatile solvents. Some researchers believe this category leads to misleading conclusions about trends in the prevalence of inhalant use. For instance, the "adjusted" figures from NIDA's 1993 Monitoring the Future survey indicate that inhalant use by high school seniors has been fairly stable since 1979. But nitrite use has gone down dramatically during that period. The true picture of inhalant use, say some observers, is the category "inhalants", which does not include nitrites and which has steadily increased for several years before leveling off.*

Inhalant abusers typically use other drugs as well. "Children as young as 4th graders who begin to use volatile solvents also will start experimenting with other drugs, usually alcohol and marijuana," says Dr. Beauvais. "Adolescent solvent abusers are typically polydrug users and are prone to use whatever is available, although they do show a preference for solvents." However, solvent abuse often is held in low regard by older adolescents, who may consider it unsophisticated, a "kid" habit, he adds.

Not only juveniles are abusing inhalants. Current reports indicate that college age and older adults are the



*A Volatile Research Agenda,* 1993.

- Goodwin, F.K., "Statement on the High School Senior Survey," U.S. Alcohol, Drug Abuse, and Mental Health Administration, January 27, 1992.

- Hormes, J.T.; Filley, C.M.; and Rosenberg, N.L. Neurologic sequelae of chronic solvent vapor abuse. *Neurology* 36(5):698-702, 1986.

- "Inhalants: Sniffing for a High," *Impact,* winter 1988-89.

- Jumper-Thurman, P., and Beauvais, F., "Treatment of Volatile Solvent Abusers," *NIDA Research Monograph 129: Inhalant Abuse: A Volatile Research Agenda,* 1993.

- Miller, N.S., and Gold, M.S. "Organic Solvent and Aerosol Abuse," *AFP,* July 1991.

- National Institute on Drug Abuse, *NIDA Capsules,* "Inhalants Abuse," Sept. 1993.

- Oetting, E.R., Edwards, R.W., and Beauvais, F., "Social and Psychological Factors Underlying Inhalant Abuse," *NIDA Research Monograph Series 85,* 1988.

- Oetting, E.R., and Webb, J., "Psychological Characteristics and Their Links with Inhalants: A Research Agenda," *NIDA Research Monograph 129: Inhalant Abuse: A Volatile Research Agenda,* 1993.

- Rosenberg, N., "Neurotoxicity from Solvent-Inhalant Abuse," *NIDA Research Monograph 129: Inhalant Abuse: A Volatile Research Agenda,* 1993.

- Sharp, C.W.; Beauvais, F.; and Spence, R., eds. *Inhalant Abuse: A Volatile Research Agenda.* NIDA Research Monograph 129. NIH Pub. No. 93-3475. Washington, DC: Supt. of Docs., U.S. Govt. Print. Off., 1992.

- Sharp, C.W., and Rosenberg, N.L. Volatile substances. In: Lowinson, J.H.; Ruiz, P.; Millman, R.B.; and Langrod, J.G., eds. *Substance Abuse: A Comprehensive Textbook.* 2d ed. Baltimore, MD: Williams & Wilkins, 1992. pp. 303-327.

- Siegel, E., and Wason, S. Sudden death caused by Station of butane and propane. *New England Journal of Medicine* 323(23):1638, 1990.

- Siegel, E., and Wason, S., "Sudden Sniffing Deaths Following Inhalation of Butane and Propane: Changing Trends," *NIDA Research Monograph 129: Inhalant Abuse: A Volatile Research Agenda,* 1993.

- Solvent Abuse Foundation for Education (SAFE), "Some Commonly Asked Questions about Solvent Abuse," 1992.

- Solvent Abuse Foundation for Education (SAFE), "A White Paper on the Abuse of Solvents and Other Inhalants," 1992.

- U.S. Alcohol, Drug Abuse, and Mental Health Administration, "Inhalant Abuse Among Native Americans' Alarming,'" *ADAMHA News,* March-April 1990.

184

# DAMAGE INHALANTS CAN DO TO THE BODY & BRAIN

**A. BRAIN** The chemicals abused by inhalant users affect different parts of the brain, producing a variety of sensory and psychological disorders. Many inhalants are thought to dissolve the protective myelin sheath that surrounds neurons - brain cells - resulting in cell death (see brain diagram).

**B. CEREBRAL CORTEX** Cellular death here causes permanent personality changes, memory impairment, hallucinations and learning disabilities.

**C. CEREBELLUM** This is the center that controls balance and coordination. Inhalant-related damage results in loss of coordination and slurred speech. Chronic abusers experience tremors and uncontrollable shaking.

**D. OPHTHALMIC NERVE** Toluene may affect this nerve causing sight disorders.



**A. BLOOD** Some substances like nitrites and methylene chloride (paint thinner) chemically block the oxygen carrying capacity of the blood.

**B. LUNGS** Repeated use of spray paint as an inhalant can cause lung damage.

**C. HEART** Abuse of inhalants can result in **"sudden sniffing death syndrome."** This is due to a sudden and unexpected disturbance of the heart's rhythm. All inhalants can produce sudden sniffing death syndrome.

**D. LIVER** Halogenated compounds like trichloroethylene (a component of aerosol paints and correction fluid) have been linked to damage of this organ.

**E. KIDNEY** Inhalants containing toluene impair the kidney's ability to control the amount of acid in the blood. This is reversible when toluene leaves the body but, in the long-term, kidney stones may develop.

185



| | |
|---|---|
| **A. MUSCLE** Chronic inhalant abuse can lead to muscle wasting, reduced muscle tone and strength. |
| **B. BONE MARROW** Benzene, a component of gasoline, has been shown to cause leukemia. |

186



# ADDITIONAL DAMAGE CAUSED BY INHALANTS

**PERIPHERAL NERVOUS SYSTEM** Chronic inhalation of nitrous oxide (whipped cream propellant) and hexane (found in some glues and camp stove fuels) results in damage to the peripheral nerves. Symptoms can include numbness, a tingling sensation or total paralysis.

**ACOUSTIC NERVE AND MUSCLE** Toluene inhalation destroys cells that relay sound to the brain. Chronic abusers can become deaf.

 HOME PAGE

# DAMAGE INHALANTS CAN DO TO THE BODY & BRAIN

**A. BRAIN** The chemicals abused by inhalant users affect different parts of the brain, producing a variety of sensory and psychological disorders. Many inhalants are thought to dissolve the protective myelin sheath that surrounds neurons - brain cells - resulting in cell death (see brain diagram).

**B. CEREBRAL CORTEX** Cellular death here causes permanent personality changes, memory impairment, hallucinations and learning disabilities.

**C. CEREBELLUM** This is the center that controls balance and coordination. Inhalant-related damage results in loss of coordination and slurred speech. Chronic abusers experience tremors and uncontrollable shaking.

**D. OPHTHALMIC NERVE** Toluene may affect this nerve causing sight disorders.



**A. BLOOD** Some substances like nitrites and methylene chloride (paint thinner) chemically block the oxygen carrying capacity of the blood.

**B. LUNGS** Repeated use of spray paint as an inhalant can cause lung damage.

**C. HEART** Abuse of inhalants can result in **"sudden sniffing death syndrome."** This is due to a sudden and unexpected disturbance of the heart's rhythm. All inhalants can produce sudden sniffing death syndrome.

**D. LIVER** Halogenated compounds like trichloroethylene (a component of aerosol paints and correction fluid) have been linked to damage of this organ.

**E. KIDNEY** Inhalants containing toluene impair the kidney's ability to control the amount of acid in the blood. This is reversible when toluene leaves the body but, in the long-term, kidney stones may develop.

Case 1:12-cv-00091 Document 1-3 Filed 05/24/12 Page 40 of 40 PageID #:361

# 15

## IMPULSIVITY IN ADULT
## NEUROBEHAVIORAL DISORDERS

JUDITH A. HOLMES, JUDITH L. JOHNSON, and ANN L. ROEDEL

## IMPULSIVITY AND FAILURE OF REGULATION

Disorders of impulse control are frequently associated with adult psychiatric diagnoses (e.g., borderline personality disorder, kleptomania, explosive disorder, pyromania) as well as disorders with a typical onset in childhood (e.g., Tourette's syndrome, tic disorders, attention-deficit hyperactivity disorder). Behavioral and personality changes are also commonly found in adult neurological diseases. In fact, an inability to restrain one's impulses and control behavior may be the initial symptom or primary complaint noted by concerned family members or by neurologists when examining a patient for potential central nervous system (CNS) dysfunction. In this chapter we focus on the etiology and clinical presentation of impulsiveness associated with adult neurobehavioral disorders.

Pathological impulsivity can be conceptualized as a failure to regulate, monitor, or control behavior and emotional expression. Because

309